# UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF VIRGINIA

### Lynchburg Division

JANE DOE

      Plaintiff

v.

LIBERTY UNIVERSITY, INC.

and,

MELVIN PRIDE,
both individually and in his official capacity as Liberty
University Counselor Education and Supervision (CES)
faculty and Director of Clinical Training for the CES
program, and,

LISA SOSIN,
both individually and in her official capacity as Liberty
University CES faculty and Dean of the CES department,
and,

MARY DEACON,
both individually and in her official capacity as Liberty
University CES faculty, member of CES leadership, and
CACREP liaison, and

ELIAS MOITINHO,
Both individually and in his official capacity as Liberty
University faculty and as Department Chair, and

SHIELD MINISTRIES, and,

DAVID TRULUCK,
both personally and in his official capacity as Executive
Director of Shield Ministries and as Minister at Shield
Ministries, and,

MELODIE TRULUCK,
both personally and in her official capacity as a Shield
Ministries board member, treasurer, and as Program
Coordinator

         Defendants

Civil Action No: 6:19CV00029

**JURY TRIAL DEMANDED**

CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

**MAY 1 5 2019**

JULIA C. DUDLEY, CLERK
BY: F Coleman
DEPUTY CLERK

---

COMPLAINT
Doe v. Liberty University et al.

## COMPLAINT

Plaintiff Jane Doe (hereinafter "Jane"),[1] *pro se*, files this Complaint against Liberty University Inc., et al.

In her complaint, Jane seeks redress for actions that were taken by Liberty. Jane was denied assistance when she was emailed, Liberty multiple times documenting the coercive and abusive hostile educational environment she endured, even stating explicitly on one occasion that she was "unsafe". When Jane's environment became so negative due to the actions of her two site supervisors she chose to involuntarily resign to avoid further harm to her psychologically, physically, mentally, as well as to her family and finances.

Despite Jane's reports, Dr. Pride, Director of Clinical Training, chose to give Jane a low grade based on information from the site. In the ensuing remediation plan as well as in the course grade, Jane was never given specific allegations so that she could address Dr. Pride's concerns. Jane does not even know when the remediation committee met. Many times Liberty faculty repeated what the site had said, further demoralizing Jane.

Jane re-took the course in fall 2016 and spring 2016 while the appeals process continued and the Inspector General was investigating the situation. Jane had to start from the beginning with her new External supervisor, as Jane to regain clinical competency. A number of things devolved throughout the semester as Jane was faced with juggling internship and family responsibilities while she attempted not to hospitalize her child for the third time. Jane requested to withdraw, which was denied, even though Dr. Deacon knew the severe family circumstances Jane labored under. Finally, Jane was expelled and given a failing grade due to pretextual factors, including her attempt to file with Liberty's Title IX office due to retaliation she endured for attempting to file with Title IX. All attempts to appeal the situation were denied. Jane described the safety

---

[1] Contemporaneously with this Complaint, Plaintiff has filed a Motion for Permission to Proceed under Pseudonym, in order to protect the confidentiality of Plaintiff's then minor child, given the extremely sensitive and private nature of the matters alleged herein and to comply with the University's requirement that disciplinary proceedings be kept confidential.

COMPLAINT
Doe v. Liberty University et al.

issues with multiple offices at Liberty with no resolution. Summer 2018 Provost Hicks stated

that safety issues were to be dealt with by the Title IX office, which took around ten days to even

email back, discrediting the idea that the Title IX office could deal with emergency crisis

situations such as the one Jane had tried to report.

Jane in support thereof respectfully alleges the below:

**PARTIES**

1. Plaintiff Jane Doe is a natural person who resides in South Carolina. Throughout the

course of events described herein, Jane was a student at Liberty University and/or appealing the

University's arbitrary and capricious decision to expel her. She was dismissed in Spring 2017

from the doctoral program despite a stellar academic record. Jane kept meticulous business

records of all communications and hereby certifies the authenticity of such records included as

Exhibits attached hereto, pursuant to Virginia Codes §§ 8.01-390.3 and 8.01-4.3.

2. Defendant Liberty University (hereinafter "Liberty"), is a private, Christian, liberty arts,

research university with a principal address of 1971 University Boulevard, Lynchburg, Virginia

24515. LIBERTY is the largest nonprofit university in the United States, and the largest

university of any kind in the Commonwealth of Virginia. At all times material hereto,

LIBERTY acted by and through its agents, employees, and representatives, at least some of who

were acting in the course and scope of their employment and/or in the promotion of LIBERTY's

business, mission and/or affairs.

3. Defendants Melvin Pride, Lisa Sosin, Mary Deacon and Elias Moitinho are natural

persons who are residents and domiciliaries of the Commonwealth of Virginia. Though

defendants PRIDE, MOITINHO, SOSIN and DEACON were all acting in their official

capacities as salaried, full-time, non-adjunct faculty members of Defendant Liberty, at times

material herein one or more of them also acted in manners that fell outside the scope of their

employment duties while continuing to act in concert with other Liberty faculty in order to effect

Jane's dismissal from the Liberty CES program.

COMPLAINT

Doe v. Liberty University et al.

4.  Defendant Shield Ministries is a non-profit corporation in South Carolina.

**5.**  Defendants David and Melodie Truluck are natural persons who are residents and domiciliaries of the State of South Carolina.  Each was employed in official capacities as employees or contractors at Shield Ministries.  Though defendants TRULUCK and TRULUCK were all acting in their official capacities as salaried employees and/or contractors of Shield Ministries, at times material herein one or more of them also acted in manners that fell outside the scope of their activities as employees or contractors of Shield Ministries, while acting in concert with Liberty faculty to effect Jane's dismissal from the Liberty CES program.

**JURISDICTION AND VENUE**

6.  For diversity purposes, Jane is a citizen of the state of South Carolina and Liberty Defendants are citizens of or a business with its principle office in the Commonwealth of Virginia.

7.  This court has original diversity over this claim pursuant to 28 U.S.C § 1332 because the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states.

8.  This court also has original jurisdiction under Title IX of the Education Act Amendments of 1972, 20 U.S.C § 1681, *et seq*. and 28 USC § 1331, and jurisdiction over related state common law and statutory claims under the principles of ancillary and/or pendent jurisdiction pursuant to 28 U.S.S. § 1367.

9.  Venue is proper in the Western District of Virginia pursuant to 12 U.S.C. § 1391(b)(2) and Code of Virginia § 8.01-262(1) because a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in the Commonwealth of Virginia and because defendant Liberty's principal office and/or residence and principal place of employment are in Virginia.

**NATURE OF THE ACTION**

10. This case arises out of outrageous actions taken by DEFENDANTS LIBERTY, PRIDE, SOSIN, DEACON and MOITINHO concerning false and unsupported allegations of misconduct

COMPLAINT
Doe v. Liberty University et al.
Case 6:19-cv-00029-NKM   Document 1   Filed 05/15/19   Page 4 of 65   Pageid#: 4

made against Jane, a female student at LIBERTY, involving several faculty members in collusion.

11. Jane was a doctoral student in LIBERTY's Counselor Education and Supervision program (CES) through Spring 2017.

12. In that time, Jane completed all coursework for the degree, including practicum, save for the internship and the dissertation. She had around a 3.8 grade point average and had an A in previous practicum courses. She presented at a counseling related conference in Fall 2015 as well, where licensed practitioners received Continuing Education Units (CEU's) for attending her presentations. She obtained a provisional license, as a Licensed Professional Counselor Associate (LPCA) in South Carolina in January 2017. These accomplishments document Jane's high level of academic proficiency, competence and expertise.

13. No LIBERTY staff or faculty voiced any concerns to Jane regarding Jane's conduct in her capacity as a doctoral internship student until December 2015, even though Jane had completed three months of internship prior to December 2015 and six months of practicum experience.

## BACKGROUND: THE VULNERABILITY OF THE SUPERVISOR-SUPERVISEE RELATIONSHIP

14. Jane would like to attempt to explain how and why the Supervisor – Supervisee (e.g., the one being supervised) relationship is intensely different than the normal student-professor relationship.

15. While the student-professor relationship is typically, under the law, not a fiduciary relationship, supervisor-supervisee relationships are quite different from the normal student-professor relationship. For example, in the clinical literature, Ellis, et al. state: **"The supervisee is in an inextricably vulnerable relationship—an evaluative, hierarchical**

**relationship** where the supervisor holds the supervisee's professional career in his or her hands"[2] [emphases Jane's]

16. **Fiduciary Duty of Physician:** See, e.g., Lockett v. Goodill, 430 P.2d 589, 591 (Wash. 1967) ("The relationship of patient and physician is a fiduciary one of the highest degree. It involves every element of trust, confidence and good faith."); Hoopes v. Hammargren, 725 P.2d 238, 242 (Nev. 1986) ("... we believe the fiduciary relationship and the position of trust occupied by all physicians demands that the standard apply to all physicians."); Moore v. Regents of University of California, 793 P.2d 479, 483 (Cal. 1990) ("... ins oliciting the patient's consent, a physician has a fiduciary duty to disclose all information material tothe patient's decision."); Tracy v. Merrell Dow Pharmaceuticals, Inc., 569 N.E.2d 875, 879 (Ohio1991) ("The physician-patient relationship is a fiduciary one based on trust and confidence and obligating the physician to exercise good faith."); Brandt v. Medical Defense Associates, 856 S.W.2d667, 670 (Mo. 1993); Nehme v. Smithkline Beecham Clinical Laboratories, Inc., 863 So.2d 201,206-207(Fla. 2003) ("...we do recognize the fiduciary, confidential relationship of physician-patient imposing on the physician a duty to disclose" known facts and known causes.); Murfreesboro Medical Clinic, P.A. v. Udom, 166 S.W.3d 674, 683 (Tenn. 2005) ("... we see no practical difference between the practice of law and the practice of medicine. .... These relationships are "consensual, highly fiduciary and peculiarly dependent on the patient's or client's trust and confidence in the physician consulted or attorney retained." Karlin,77 N.J. 408, 390 A.2d 1161, 1171 [(N.J. 1978)] (Smith, J., dissenting)."); Harrison v. Valentini, 184 S.W.3d 521, 525 (Ky. 2005) ("The fiduciary relationship between the parties grants a patient the right to rely on the physician's knowledge and skill")[3]

17. Defendant Sosin and Liberty colleague Thomas (p. 459) state: "From a legal standpoint, because trust is placed in the counselor to serve a counselee's best interests, the legal system

---

[2] Ellis, M. V., Berger, L., Hanus, A. E., Ayala, E. E., Swords, B. A., & Siembor, M. (2014). Inadequate and harmful clinical supervision: Testing a revised framework and assessing occurrence. *The Counseling Psychologist*, *42*(4), 434-472.)

regards counseling as a contract … the counseling relationship is viewed as a "fiduciary" relationship, because the power is entrusted for the benefit of the counselee." – serious statements indeed.  (Sosin & Thomas, Therapeutic expedition: equipping the Christian counselor for the Journey).

18. If legally there is a "fiduciary" relationship between counselor and counselee, as Defendant Sosin states, **there must be a similar relationship between the supervisor and supervisee due to the emotionally vulnerable power differential between supervisor and supervisee.**  In this relationship all aspects of the supervisee are critiqued, including counseling skills and interpersonal relationships.  Ethics codes have standards that must be met as well.

19. An important part of this "fiduciary" relationship is recognizing trauma when it occurs, and recognizing **how difficult it can be for those in the throes of trauma to even verbalize what has happened,** let alone writing it out.  Defendant Sosin, in her doctoral thesis (p. 32), alludes to the difficulties in facilitating verbal expression when an individual has undergone traumatic experiences.  She states, "The creative-expressive therapies include art, drama, and physical challenge.  These can facilitate emotional and verbal expression…".  Later in the same paragraph, she states that these "give patients a unique and different ways of "having a voice and making a stand"…"

20. Further, Defendant Sosin and Liberty colleague Rockinson-Szapkiw describe the destructive effects of bullying, as follows:  "Research is beginning to emerge which demonstrates that bullying is a potential risk factor for the development of posttraumatic stress disorder (PTSD) symptoms among adolescents".[4]

21. While Sosin does not describe bullying in a supervisor-supervisee relationship in similar terms, logically, she would agree that bullying in a supervisor-supervisee relationship causes great harm.

---

[4] Lisa S. Sosin and Amanda J. Rockinson-Szapkiw. "Creative Exposure Intervention as Part of Clinical Treatment for Adolescents Exposed to Bullying and Experiencing Posttraumatic Stress Disorder Symptoms" *Journal of Creativity in Mental Health* (2016). Available at: http://works.bepress.com/lisa_sosin/24/

COMPLAINT
Doe v. Liberty University et al.

22. Please note that Jane is not alleging that all uncomfortable experiences in supervision are harmful supervision, but instead, that once certain criteria are met, <u>supervision can be harmful</u>. Jane believes that Defendants Sosin, Pride and Deacon would also agree on this.

23. Ellis, Berger, et. al, state: "We defined *harmful supervision* as supervisory practices that result in psychological, emotional, and/or physical harm or trauma to the supervisee." They continue with: "The effects of harmful supervision incidents or experiences include symptoms of psychological trauma … conspicuous loss of self-confidence, functional impairment in the supervisee's professional or personal life, and a significant decline in the supervisee's general mental or physical health. The effects… may persist for months to years" (p. 8).

24. Ellis et al, on page 2, rightfully caution: "There are many reasons that bad or harmful clinical supervision is an important topic for discourse, not the least of which is potential harm to clients and supervisees ....**Thus, the supervisee is at risk of harm should a supervisor act in unethical or harmful ways**." and continue, on page 7, with: "Harmful supervision should be distinguished from those instances where a supervisee struggled with painful issues in supervision, or when a supervisor gave painful to hear, emotionally upsetting feedback about the supervisee's professional incompetence… or to protect client or public welfare ... We are attempting to differentiate between the supervisor's actions that were respectful of the supervisee's boundaries…from those instances where the supervisee's best interests were not primary."

25. Yet despite theoretical recognition that trauma can include an individual's inability to discuss – or write – about what happened, Jane's halting attempts at discussing trauma were taken as a "lack of emotional regulation", as she was also criticized, particularly over how she described, in previous emails, her relationship with Defendant Pride– who Jane regarded as someone who had been notified, several times, of an abusive situation, and yet had done nothing, breaking all trust.

26. As these documents will show, Defendant Liberty gave Jane no place to: 1.) report an abusive situation at a doctoral internship site. 2.) Instead of helping Jane in overcoming the abuse, Defendant Liberty instead many times minimized and disregarded the abuse, at one point

even calling it "uncomfortable", when, based on previous emails sent to Liberty by Jane, the relationship went far beyond "uncomfortable". Defendants Sosin, Deacon and Pride have expert knowledge and thus must be held to a higher standard than even an ordinary counselor, as they are faculty supervisors in a Doctoral program. Thus, this gross negligence, which occurred as late at November 2018, must be addressed.

## CASE SUMMARY

27. On or around September 1, 2015, after successfully completing practicum, Jane began an internship with a planned end date of December 18, 2015.

28. In summary, Jane reported multiple situations with abusive supervisors at her site. Liberty did not respond, even though mandated reporters were notified multiple times. This exposed her to further abuse at her internship site, increasing her trauma as she was left in an internship situation which she notified Liberty was unsafe. **Finally, due to Liberty's inaction, Jane had to involuntarily quit the site to get away from an unsafe situation in order to preserve her physical and mental health as well as her professional competency.**

29. Liberty University refused to investigate, sending her from office to office until she arrived back at the same office that had already not helped. Jane attempted to submit a Title IX report to defendant Liberty in multiple times starting in 2016. Jane was hampered by Liberty University's fraudulent attempt to claim lack of jurisdiction, with Liberty claiming in internal memos discovered via FERPA in 2019 that the internship site was not affiliated with Liberty.

30. Attempts to submit a Title IX investigation in the summer of 2016 resulted in retaliation. For instance, email between Sosin and the Director of Title IX, obtained through a FERPA request in February 2019, document the Director of Title IX notifying Sosin that Jane had attempted to submit a Title IX case. The Director of Title IX admitted in the email that she did not understand what Jane was alleging. **It appears obvious that if a Title IX official does not understand the allegations, he or she should ask questions prior to dismissing a complaint.**

COMPLAINT
Doe v. Liberty University et al.
Case 6:19-cv-00029-NKM   Document 1   Filed 05/15/19   Page 9 of 65   Pageid#: 9

31. Liberty then chose to expel Jane based on the word of an individual who Jane's external supervisor had previously described as "erratic" and who had a serious criminal history. Jane was not even allowed to present her case before the expulsion occurred.

32. Defendant Sosin chose to state to Jane in an email that she should not bother appealing, as a decision had already been made. This was one of many occurrences that show that the reasons Jane was expelled were in fact pretextual.

33. Jane attempted to file a Title IX complaint again in the Summer of 2018 and in February 2019. The 2018 appeal was hindered by Liberty's fraudulent refusal to have an investigator speak to her in person, a flagrant violation of Liberty's policies and procedures.

34. In the Summer of 2018, even though Title IX had claimed a lack of jurisdiction previously when Jane had disclosed safety issues, Jane was told by Provost Hicks that **safety issues should be directed to Title IX. Title IX took take over a week to return an email**, thus showing that the Title IX does not appear to be equipped to deal with a crisis situations such as Jane experienced in December 2015 through February 2016.

35. Title IX prematurely closed the case on or around July 2013, 2018, telling Jane that she could re-submit at any time. After Jane was unable to respond quickly to their requests, it appears that Liberty again closed the case, without documenting the re-opening and second closure of the case in internal documents received under FERPA in February 2019.

36. The 2019 email to the Title IX office was not answered by Defendant Liberty at any point between late February and April 2019.

37. It appears from documented evidence that mandated reporters did not send reports of events that occurred in January and February 2016 until Summer 2018, when Defendant Sosin emailed the Title IX office.

38. Some allegations against Jane, as well as some discriminatory, negligent and fraudulent actions, were not even known by the Jane until she filed a FERPA request in 2019.

COMPLAINT

Doe v. Liberty University et al.

39. The extreme trauma that Jane endured as a part of Liberty's negligent treatment of this matter, as well as Liberty's discrimination against Jane for having a disabled child, were extremely injurious to Jane and her family.

40. In summary, Jane's experience was **constantly minimized** by Liberty faculty, who had been notified multiple times that Jane felt unsafe completing her initial internship and in returning to internship under the direction of those at Liberty who had previously acted towards her in a negligent and discriminatory matter. Multiple examples will be cited throughout this document and continuing through to discovery.

## SUMMARY OF PRETEXTUAL FACTORS

41. Jane identifies the following 24 specific irregularities that she believes demonstrate gender, and/or associational discrimination as well as retaliation for making a Title IX report in Summer 2016. This is but a partial listing of the many factors that show that these activities by Defendant Liberty were pretextual in nature and not based on Jane's performance or competency.

    a. Jane was not given key evidence, or even a complete list of allegations against her, in order to prepare her grade appeal;

    b. Evidence was used by Defendant Liberty on grade appeals that did not even exist until a day or two before the appeal was denied, five months after the expulsion was ordered;

    c. That this same evidence was created by Dr. Deacon in retaliation against Jane, as evidenced by her Counseling checklist, written around five months after the grade was given, and much lower than previously given by Jane's external supervisor on either of two occasions;

    d. Liberty claimed to high level administrators, such as Jerry Falwell, that the case had been adequately investigated, when in actuality, it appears no investigative report was ever been written by any individual that had any background or

training in investigations. If an investigative report was prepared beyond Liberty's flawed summation of the case, as shown below, Jane has never received a copy, even in the documents she received from FERPA;

e. That the documents referenced below, titled "LU Individuals Involved with Matters Related to Ms. XXXX", and released via FERPA, include multiple pieces of "evidence" that is not substantiated by various records, is plainly contradicted by the existing records, and/or is cited as evidence without any statements on why or how the item is in fact evidence;

f. That Liberty, rejected her appeal, having already seen previous information, including from Title IX, that biased them against her and prompted them to act in a discriminatory and retaliatory manner;

g. That Dr. Deacon did not grade papers from Fall 2016 prior to giving Jane a failing grade in February 2017, impeding Jane's ability to meet course standards;

h. That Dr. Deacon did not grade or give any feedback on videotapes, depriving Jane of the opportunity to improve and show that she had met course standards;

i. That Jane was required to submit videotapes in her internship when she knew of no one else who had to submit a single videotape, let alone a total of six to complete the course; Furthermore, she was required to submit these videotapes to individuals who had already actively minimized her previous experiences, and thus showed extreme bias.

j. That "evidence" included in Liberty's "case summary", received through the FERPA request was her daughter's illness, a disability, as shown below.

k. That Liberty chose to state in a grade appeal that even if Jane had been able to continue to attend in the course, she would not have achieved competency, despite Jane's external supervisor having attested otherwise.

l. That defendant Liberty chose to state in a grade appeal that even if Jane had been able to continue in the course, she would not have achieved competency, despite

COMPLAINT
Doe v. Liberty University et al.

knowing that Jane from Jane's multiple reports that she felt unsafe returning to internship, and stated that the abuse suffered at the internship site had decreased her sense of professional competency.

m. That Liberty in an unsigned document, from "Leadership" of the CES program, emailed to her by the administrative assistant of the CES Department, Bonnie Gold, on December 5, 2016 (but with attachment dated internally December 6, 2016) that made various untrue statements, including that Jane had no appeals left;

n. That Jane notified Student Advocacy, Erin Bass, that she had withdrawn her general complaint, recommended to her by Dr. Warren, due to defendant Liberty's threat to expel her from the CES department, in an unsigned document from leadership of the CES program, **if she made any more complaints she would be expelled, clearly retaliation**.

o. That Jane attempted to notify Liberty, through Dr. Sosin, of the errors in the unsigned document from leadership, such as that she had not completed the grade appeal process, but was told only to continue to continue working on internship.

p. That Defendant Sosin told an official government investigator that all standards had been met at the government affiliated site, even though she knew that Jane had submitted many standards that had not been met at the site.

q. That Liberty knew that Jane's family was experiencing catastrophic and traumatic experiences, yet still chose to tell Jane she could not withdraw from the course, **thus setting her up for failure**;

r. That Liberty knew that Jane had just found out her child had been sexually assaulted, yet still chose to tell Jane, within days afterwards, in a document from the Leadership of the CES program, that she was having difficulties in "emotional regulation".

COMPLAINT
Doe v. Liberty University et al.

s. That Liberty, including Defendant Sosin, had seen a list of standards that the government-affiliated site had not met, **yet did not ask Jane for any information to substantiate her allegations.** Thus, defendant Liberty knowingly rejected Jane's appeals without having done due diligence by gathering necessary information.

t. No known documents, including in documents obtained through FERPA, show any sort of explanation of how the purported evidence was processed in as related to allegations at both internship sites.

u. That Jane, after working for Liberty as Adjunct Faculty for six years, teaching three terms a year, suddenly received no more course assignments from Defendant Liberty, in close proximity to the time Jane filed her first official Department appeal in Spring 2016, an example of discrimination.

v. Defendant Liberty stated in a document, "Repeatedly contacted SAO to discuss events including "Abuse" suffered at internship and difficulties with daughter. This statement is evidence of discrimination against Jane by defendant Liberty, since Jane is being discriminated against due to her familial association with her child.

w. Defendant Liberty stated in a document, "Repeatedly contacted SAO to discuss events including "Abuse" suffered at internship and difficulties with daughter. This statement is evidence of discrimination against Jane by defendant Liberty, since Jane's allegations of being a victim of a crime were described as "Abuse" without any investigation. Other documents, including one from Dr. Sosin, even use the term alleged "abuse", again without any investigation.

COMPLAINT
Doe v. Liberty University et al.

## LIBERTY'S DISCRIMINATORY SUMMARY, TITLED "LU INDIVIDUALS INVOLVED WITH MATTERS RELATED TO MS. JANE DOE"

42. A document titled "LU Individuals Involved with Matters Related to Ms. Jane Doe", was uncovered via FERPA in February 2019. It is important to note that *Jane was not provided this list of allegations at any time before 2019*, **even when appealing Defendant Liberty's decisions**. Jane has included Liberty's assertions, along with in-line documentation explaining and/or disputing the "facts" as described by Liberty. **Jane's appeal process was greatly impeded by not having this information from Liberty during the appeals process**.

43. **Brittney Wardlaw** – Director of Title IX, LU

44. **Russell Monroe** – Senior Associate Director of LUO/Graduate Community Life, LU

45. **Dr. Mark Meyers** – Associate Dean of Counselor Education, LU

46. **Dr. Kevin Strubel** – Chair, Graduate School, LU

47. **Dr. Steve Warren** – Interim Dean, School of Behavioral Sciences, LU

48. **Gene Brown** – LUPD Officer

49. **Dr. Mary Deacon** – Director of Counseling Programs, Behavioral Sciences, Faculty Supervisor, LU

50. **Dr. XXXXXXX** – labelled by Liberty as Internship Site Supervisor, however, she was the external supervisor, a major error in a document that presumably was sent to everyone looking at Jane's appeals.

51. **Dr. Melvin Pride** – Director of Clinical Training, Behavioral Sciences, LU

52. **Dr. Lisa Sosin** – Director of PhD in Counselor Education and Supervision Program, LU

53. **Erin Bass** – Student Advocate, LU

54. **Dr. Jeffery Boatner** – Associate Dean, Behavioral Sciences, LU

55. **Dr. Elias Moitinho** – Department Chair, Behavioral Sciences, LU

56. Please note, Jane's site Supervisor, was <u>not</u> listed here by Liberty. The decision was unilaterally made by Liberty to revoke the internship site, without speaking to the Site

Supervisor OR following the Liberty University-Win4Life Affiliation agreement. It appears Dr. Deacon assumed that Jane's external supervisor was Jane's site supervisor. Thus, Dr. Deacon did all her "investigation" by speaking <u>only</u> to Jane's external supervisor and not to Jane's site Supervisor. **Jane was on a business trip at the time and was going to answer Dr. Deacon's emails when possible. Jane knew that Dr. Deacon had not even spoken to her site supervisor, thus making the reasonable assumption that the investigation wouldn't end until after Jane had spoken to her supervisor.** When Jane's external supervisor was unsure or did not have an answer to a question, it appears **Dr. Deacon assumed Jane had been unethical when in actually she was speaking to the <u>wrong</u> individual. Additionally, the positive comments of Jane's site supervisor, or of Jane's external supervisor, are not even mentioned in the FERPA files received from Liberty University as far as Jane can tell. Jane was <u>barred from submitting critical information</u> to Dr. Deacon prior to her decision.**

## LIBERTY'S OUTRAGEOUS "SUMMARY OF ACADEMIC EVENTS LEADING TO MS. JANE DOE's DISMISSAL"

57. Please note this document, obtained through FERPA, was undated, thus leading to difficulties in understand when Defendant Liberty claimed certain actions had occurred.

*58.* **Liberty alleges**: Jane brought forward allegation of abuse occurring at a non-LU affiliated internship site in Fall 2015. **Jane asserts**: <u>this site was affiliated with Liberty</u> according to the affiliation agreement signed between the site and Liberty in February 2015.

*59.* **Liberty alleges**: Issue addresses by Title IX and Office of Community Life, determined out of jurisdiction, recommended recourse through the program and outside resources. Outcome provided to Jane via email.

       *x.* **Jane asserts**: As shown by the following **covered Educational Programs** have <u>jurisdiction within Title IX as Title IX covers **all educational activities**. Thus, this finding was in error and is one of many pieces of evidence to support an allegation of pretext</u> in the context of Title IX related discrimination.

    *y.* See the following from the Department of Justice at

       https://www.justice.gov/crt/title-ix [emphases by Jane]:

        *i.* "In conducting such factual inquiries, it is important to remember that *determinations as to what constitutes a covered education program must be made as broadly as possible.*

        *ii.* "*If the recipient does have education as its primary purpose, such as colleges, universities, school districts, training institutes, and academies, then the federal funds result in institution-wide coverage.*"

        *iii.* "Sexual harassment may be prohibited even when it does not occur on the program provider's premises, *as long as the off-premises activity during which the sexual harassment takes place relates to the covered educational program. Crandell, D.O. v. New York College of Osteopathic Med.,* 87 F. Supp. 2d 304 (S.D.N.Y. 2000) (off-campus misconduct actionable under Title IX where harassment occurred in clinic during the student's paid internship)….it is well established that the covered education program or activity encompasses *all of the educational institution's operations including, but not limited to, "traditional educational operations, faculty and student housing, campus shuttle bus service, campus restaurants, the bookstore, and other commercial activities….*"

*60.* **Liberty alleges**: Jane wanted to add a new internship site and was informed at the beginning of November both the Site Approval form and the affiliation Agreement were required prior to seeing clients.

    *a.* **Jane Asserts**: Liberty emails here were a source of confusion because the site Jane <u>attempted to add, the local drug and alcohol center, was already a Liberty affiliated site.</u>  Dr. Deacon passed Jane's emails to Dr. Pride before she had all the details.  For instance, she did not know the site name or that it had an already-existent agreement with Liberty University.

COMPLAINT
Doe v. Liberty University et al.

    *b.*  In an in person, recorded meeting between Jane and the Liberty faculty on or around March 27, 2017, Dr. Deacon acknowledged that she had <u>assumed</u> Jane had decided that since it was going to take too long to get the previous site approved Jane had decided to do an end-run around the requirements through this partnership.  It appears Dr. Deacon <u>assumed</u> that the process would not be quick because she was not aware of the existence of the signed affiliation agreement between Liberty and the previous site, the County drug and alcohol facility and thus thought Jane was taking a shortcut.

*61.* **Liberty alleges**: Jane communicated that her current site Win4Life asked her to provide counseling services to clients affiliated with a different site, Shield Ministries.

    *a.*  **Jane asserts: At no point in November or December 2016 did Dr. Pride or Jane state that this was a different site**.  Email to Dr. Pride of Late November 2015 made it clear that Jane believed Shield Ministries to be the same site as Win4Life, as she remained under the supervision of Win4Life.

    *b.*  **At no time was Shield Ministries represented by Jane as a different site** as defendant Liberty suggests. At no time did Jane report to **any** personnel at Shield Ministries.

    *c.*  Jane did communicate with David Truluck of Shield Ministries when necessary, but <u>only when there was signed release of information between the client and Shield Ministries</u>.  Thus, David Truluck knew clearly that he was <u>not</u> the site supervisor as on multiple occasions Jane had refused to give David Truluck information because the release had not been completed.  Jane's refusal to give information David Truluck requested, may have given David Truluck, an individual with a serious crime record, motivation to allege incorrect information to defendant Liberty.

    *d.*  Internship was conducted at Shield Ministries under supervision of Win4Life, using Win4Life forms, etc. – in other words, everything except for location was

COMPLAINT
Doc. v. Liberty University et al.
Case 6:19-cv-00029-NKM   Document 1   Filed 05/15/19   Page 18 of 65   Pageid#: 18

conducted identically as at Win4Life as Jane had told Defendant Pride in her November, 2016 email. This was affirmed by Jane's site supervisor via letter to defendant Liberty. **All** counseling was conducted under the Win4Life rubric, as explained to Shield Ministries as well to each client seen. **The Win4Life site supervisor has previously affirmed that she was in a meeting where the partnership between Win4Life and Shield Ministries was discussed and approved by both parties, prior to David Truluck's allegations to the contrary**.

e. Since **Sarah did not complete at any time an application to be an intern, volunteer, or in any other capacity at Shield Ministries**, it appears unreasonable for David Truluck to expect that she was completing her internship under Shield Ministries and not Win4Life.

f. The *current* Liberty internship manual at the URL: states: "Counseling clients prior to receiving the email from the internship department verifying their approval of the site and/or supervisor, including sites affiliated with an approved site" (p. 15). However, **this was not in the manual at the time Jane was in the course**, source: https://www.liberty.edu/behavioral-sciences/counselor-ed/wp-content/uploads/sites/19/2019/01/COUC_999_Internship_Manual.pdf compare with manual with heading PhD Practicum and Internship Manual 2015-2016 edit 3-9-16, which was in effect when Jane took internship).

g. It is logical that Liberty included this due to Jane's case. *If this had been written in the manual or syllabus when Jane took the course, this issue would not have occurred.* The policy would have made it clear that utilizing the same site supervisor and the same external supervisor, in a different physical location, was not allowed without specific approval of the faculty supervisor. **Thus, it would appear that Liberty is acknowledging that an error was made in Jane's case,**

COMPLAINT

**or at the minimum, that the existing documentation, and Dr. Pride's emails, lacked clarity**.

62. **Liberty alleges**: Jane was told that an affiliation agreement would be necessary for the new site, Shield Ministries. **Jane asserts**: A plain reading of Dr. Pride's email of December 2016, as referenced above, particularly in light of Dr. Pride's email of late Spring 2016, leads to an entirely different conclusion than what Liberty states.

*63.* **Liberty alleges**: Jane started seeing clients at Shield Ministries WITHOUT a signed copy of Liberty's Affiliation Agreement. **Jane asserts**: no affiliation agreement was necessary because Jane met all the criteria of Dr. Pride's emails of December 2016 and late Spring 2016.

*64.* **Liberty alleges**: Jane was told three separate times to discontinue seeing clients at all Internship locations until all paperwork had been adequately completed.

    a. **Jane asserts**: Jane was on a business trip during all of these three times, and thus apparently did not respond as quickly and as Dr. Deacon **assumed** appropriate;

*65.* **Liberty alleges**: In correspondence with the Director of Shield Ministries, it was determined Jane has misrepresented the relationship between Win4Life and Shield Ministries, Which potentially created a conflict of interest for the two organizations and jeopardized their ability to provide services.

    *a.* **Jane asserts**: Jane and her site supervisor, both attested to Defendant Liberty that Shield Ministries HAD agreed to the same terms and thus it was not a misrepresentation. Multiple emails in January and February 2017, where Win4Life sought to write down the verbal agreement, served as notice to Shield Ministries that Win4Life considered the verbal contract/ partnership between Shield Ministries and Win4Life to be fully in effect starting in late November 2016. <u>Thus, if Shield Ministries did not think a contract was in force, Shield Ministries had multiple opportunities to speak to Win4Life about this matter. Thus it is Shield Ministries that has grievously misrepresented the relationship between Win4Life and Shield Ministries.</u>

COMPLAINT
Doe v. Liberty University et al.

Dr. Deacon to Jane Doe on February 21, 2017 9:40:33 PM – "I am blessed that your daughter does not need to be in court. As far as sending me clarifying documentation, there is not a pressing need for it. Your earlier email provided sufficient information for me. At this point, I need to get additional information directly from the site. Because there is not a signed affiliation agreement between Shield Ministries and the university, you cannot see clients at that site as a part of your internship. I need to have you confirm that you understand that this is the case, and that you will not see clients at Shield Ministries until there is a signed agreement in place. I notified Dr. XXXXXXXX of this as well. Please respond to this email indicating that you are no longer seeing clients at Shield Ministries."

Jane Doe to Dr. Deacon February 22 at 7:09 AM - "I am no longer seeing clients at Shield Ministries. I do want to explain more of what happened, and why I intentionally saw clients as a part of Win4Life. It was not deception at all".

Dr. Deacon to Jane Doe on February 22 8:10 AM – "Could you also confirm that you are also not seeing any clients who are associated in any way with Shield Ministries..."

**Note Jane's external supervisor and Jane had already told Dr. Deacon Jane was not going back there**. Jane was very confused by this whole interaction because when Jane and Jane's external supervisor notified Dr. Deacon that the agreement between Shield Ministries and Win4Life due to the erratic nature of David Truluck, it seemed obvious Jane was not returning to the site. Jane also does not believe Dr. Deacon can order Jane to stop all counseling, including counseling under Jane's provisional license, only the counseling in the internship **after all procedures in the manuals are followed, and only then**.

*66.* **Liberty alleges**: Jane advertised through Psychology Today to see clients independently, without approval or supervision from program coordinators.

COMPLAINT
Doe v. Liberty University et al.
Page 21 of 65

Case 6:19-cv-00029-NKM   Document 1   Filed 05/15/19   Page 21 of 65   Pageid#: 21

a. **Jane asserts**: Jane was never even told as part of the appeals process that Dr. Deacon was using the Psychology Today page as "evidence" against her.

b. Jane does not know of Defendant Liberty having any policy disallowing a student, particularly one that is licensed, from advertising for internship clients at an internship site, through Psychology Today.

c. Logically, it would appear that many Liberty PhD students also advertise through Psychology Today as they have to make a living while attending school.

d. The one client seen through Psychology today was notified, verbally and in writing, using the same Win4Life agreement form, that she was under supervision as well as an intern at Liberty University and thus under Defendant Liberty's supervision. This was not included in the ad because there was no good place to include this.

e. Therefore, Jane does not understand what or how Liberty thinks this is evidence against her, particularly since defendant Liberty does not appear to have explained how any of this "evidence" was evidence;

67. **Liberty alleges**: Repeatedly contacted SAO to discuss events including "Abuse" suffered at internship and difficulties with daughter.

a. **Jane asserts**: This statement is evidence of discrimination against Jane by defendant Liberty, since Jane is being discriminated against due to her familial association with her child.

b. Logically, Jane does not understand how a grade can be given based on the allegations of an abusive supervisor without an investigation.

c. Jane did discuss the issues of abuse with the Student Advocate various times. Since this undated memo from Defendant Liberty does not even state when these contacts occurred, Jane is unable to respond. Jane likely contact the Student Advocate when the Title IX office refused to consider her case and she wanted to know how she could report the allegations so an investigation could occur.

d. As a faculty member, Jane believed that it was her <u>duty as an employee</u> to ensure the systemic issues that occurred were investigated, as she believed they were a significant risk of liability to Liberty. **Thus, as an employee she had to discuss these events to the attention of Defendant Liberty and that Jane was performing a whistleblowing function.**

e. Jane did discuss issues with her daughter because she <u>was unable to find any accommodation</u> with Liberty University, as <u>she had been discriminated against due to her child's disability.</u>

*68.* **Liberty alleges**: Jane was dismissed from the LUO PhD Counseling Education program in March 2017. **Jane asserts**: see comments about lack of due process throughout this document.

*69.* **Liberty asserts**: Jane appealed the decision, but it was upheld. **Jane asserts**: that necessary information for her defense was withheld throughout the appeal, such as this document, as well as in her attempt to file with Title IX.

*70.* **Liberty alleges**: Over the course of the last two years, Jane had threatened "legal action", but declines when asked to clarify her intentions.

a. **Jane asserts**: Since it is unknown when this document was written, she does not know when the "two years" started or ended. She does not know of any time before early 2018 that she even mentioned legal action, let alone declined "when asked to clarify her intentions".

b. Jane *did* ask for mediation on multiple occasions between the Summer of 2016 and early 2018.

c. ***Jane notes that she did tell multiple individuals at Liberty about the difficulties with her daughter.*** **When Jane was not allowed by Dr. Deacon to withdraw from the internship** due to these difficulties, logically Jane may have discussed this with the student advocate. Dr. Deacon apparently <u>assumed</u> that Jane sought to withdraw for other reasons.

COMPLAINT

d.  Note the many times throughout this document Jane Dr. Deacon was told about the family difficulties she was experiencing. Clearly, *there was no reason to deny Jane's request to withdraw from the course*. This left Jane in a very difficult position as she worked 30 or more hours a week, parented her child's extensive needs, and worked around 15 hours a week on an internship she had tried to withdraw from. If Dr. Deacon did not understand the stress Jane was under, she could have corrected this multiple times, such as when she participated in writing a "Letter of Concern" to Jane on December 5, 2016 .

e.  Jane did everything in her power to avoid filing a lawsuit. This included contacting Godly Response to Abuse in Christian Environments (GRACE), as well as several other mediators. She was forced to utilize an attorney to write her academic appeals due to Liberty disallowing Jane additional time to write the appeals after her child was assaulted. Jane desperately did not want to file a lawsuit because in the past she had loved Liberty, both as student and as adjunct faculty.

## LIBERTY'S FLAWED TIMELINE OF TITLE IX ACTIVITY

71. Below are comments on Defendant Liberty's document "Timeline of Title IX involvement", when Defendant Liberty's comments were clearly discriminatory, retaliatory or intimidating. Note this is undated, so it appears to have been last updated on or after the last, in November 2016.

72. June 9, 2016 2:17 PM – Email to Jane from Title IX (Brittney Wardlaw) "Alleged abuse is emotional/psychological and alleged abusers are not employees of the university or even independently contracted." Options available to Jane at that time were "complaint with the board, file a complaint with the directors of the site, or appeal to the Associate Dean in Counseling Education." Acknowledged Jane was granted grace to stay in the program despite

COMPLAINT
Doe v. Liberty University et al.
Case 6:19-cv-00029-NKM   Document 1   Filed 05/15/19   Page 24 of 65   Pageid#: 24

the dismissal policy. "I will not be able to assist you further with this matter from the perspective of the Title IX Office."

  a. **Jane notes**: Please note comments above about Title IX as well as affiliation agreements. Please note it was in force from late February 2015 to late February 2016. However, the student agreement was to end on or around December 18, 2016.

73. June 14, 2016 1:54 PM Email to Dr. Mark Myers (Assoc. Dean of Counselor Education) from Jane: "I remain upset that I received a C due to an abusive supervisor. I do not believe I should have to keep a C for all time simply because an abusive supervisor decided I was incompetent when I had live supervision in front of her on one occasion."

74. **Jane notes**: This is yet another time when Jane notified Defendant Liberty of the abuse that had occurred.

75. Jun 15, 2016 4:58 PM Email to Jane from Dr. Mark Myers (Assoc. Dean of Counselor Education) "…Recommended Jane use "established protocol" to address issues experienced while in the program. Admonishes, **"If you are alleging that a licensed counselor at your site abused you.** You need to make sure that it is what you mean. Accusing someone of abuse opens them up to serious repercussions as well as opens you up to a law suit if that accusation is unfounded or exaggerated…"

  a. **Jane notes: Jane believes this was a statement meant to intimidate Jane. Clearly, Jane would not have reported an abusive situation if it had not occurred.**

76. June 15, 2016 Email to Title IX (Britney Wardlaw) from Jane to reference to the email received to her from Dr. Mark Myers.

  a. **Jane notes**: "Here is an example of the minimization of the abuse I incurred, this one by a Liberty professor. I have forwarded it to Dr. Warren as well."

77. June 26, 2016 9:23 AM Email to Jane from Title IX (Brittney Wardlaw): "By no means are we neglecting your concerns or ignoring that we are here for you. However, we have done

COMPLAINT
Doe v. Liberty University et al.

due diligence in exhausting all efforts to give you the necessary support as we would any individual who is part of the community we server.  Moreover, we have followed through with the protocol that gives us the ability to respond to the allegations."

      a. **Jane notes**: Once again Jane's experiences are **minimized** as the many events cited above do not qualify as **"due diligence"** under any standard.

78. November 25, 2016 4:48 PM Email to Dr. Steve Warren (Interim Dean School of behavioral Sciences) from Jane: "<u>**I spent months being told daily by my supervisors at the**</u> <u>**[site] that I was no good as a counselor.**</u>"  She states faculty, "**only listened to the words of** **two abusive supervisors**" and she was "**blamed in a situation where she really needed** **support."**  Jane then details some personal events involving her **daughter's health, including** **that her child revealed she was sexually abused while at summer camp**.

      a. **Jane notes**: Again, child's **disability** is noted in a **discriminatory** manner.

## OVERALL TIMELINE OF EVENTS

1. On or around November 21, 2015, Jane's minor child ran away from her out of state placement.  Jane knew she would be required to bring her child home from the placement due to lack of money for an additional placement.  This naturally was very upsetting.

2. On or around 23 November, 2015, Jane had to do a well check on a client as part of a plan to avoid hospitalization of client.  Jane's site supervisor came in part way through the session and sat in such a way it made it difficult to see the client.  Written up this way in another write up: Concurrently, Thanksgiving week 2015 Jane's adolescent child's condition worsened.  Although to that point her child had been in an out of state facility due to mental health issues, it quickly became clear around Saturday November 21, 2015, when her child ran away from the facility and had to be returned by the police, that her child would soon be returning how without any adequate placement available.  Jane was devastated and thus unable to function well while performing a well check in this site supervisor's presence".

COMPLAINT
Doe v. Liberty University et al.
Case 6:19-cv-00029-NKM   Document 1   Filed 05/15/19   Page 26 of 65   Pageid#: 26

3.   Jane asked in an email around December 15, 2015, to withdraw from the internship.  The previous year, Dr. Pride had stated in email on or around 16 December 2015 that Jane would be allowed to withdraw.  Jane decided to take an incomplete instead, because ethically she could not leave notes incomplete, even though other professionals had stated her notes met doctoral standards previous to multiple re-writes.  **Jane earnestly believed that when Dr. Pride realized how coercive the situation was, he would find a way to release her from this ethical obligation**, and that if he did not, Defendant Sosin would, since Sosin knew Jane more than Defendant Pride did.

4.   Thus it came as a shock when Dr. Deacon refused to allow withdraw.  Jane likely would not have signed up for the course that semester if she had known that she would not be able to get a withdraw if or when it became necessary..

5.   Jane that she wrote each note 8 to 10 times.  Clearly, this is inappropriate.  Jane asked for help with her notes from her supervisors, but received little help, other than comments such as "this is another example of you not listening".

6.   In desperation, Jane spoke to Dr. Pride, who stated he could not help her since she was not allowed to take notes away from the practicum site.

7.   Sometime in December 2015 or January 2016, a psychologist, apart from the internship site, reviewed note taking with her and found that she was writing notes at a Doctoral Student level.  The external supervisor, who supervised her later in her second internship, also orally reported no problems with Jane's note writing.  This "external supervisor" remains Jane's supervisor for state licensure..

8.   It is sincerely believed by Jane that this was the point she began begging Dr. Pride to come see the site himself.  Jane sincerely believed that if Dr. Pride visited the site for a half day – only a six hour drive each way – he would see the coercive environment for himself and find a solution.  Instead, he stated this was impossible.

9.   Between December 2015 and February 2016, during this time period she spent in excess of four hours writing and re-writing **each** note, exclusive of time spent before December 2015.

COMPLAINT
Doe v. Liberty University et al.
Case 6:19-cv-00029-NKM   Document 1   Filed 05/15/19   Page 27 of 65   Pageid#: 27

10. This was only the only second time she had "live supervision" that semester, as she had only been supervised once previously, in early September 2015, both times for about 15 minutes each.

11. The new site supervisor at the first site decided remediation was necessary. Jane was blindsided by this individual's insistence on remediation, given a few minutes before clinical closed on or around 27 November, 2015, the day after Thanksgiving – thus giving Jane not time to think through a good response..

12. Jane had only been in clinical around seven times since the last evaluation. **Jane had not been supervised weekly by the previous site supervisor as required by the syllabus and current standards**. She had not received any advance warning that there might be a problem as her last evaluation had been good. A site supervisor even acknowledged "dropping the ball" in an email of around February 27, 2016. Additionally, the site supervisor prepared the mid-term evaluation a month late. Jane's second supervisor at the first site did not meet DEFENDANT LIBERTY's guidelines since she did not have a South Carolina license, but had only an out of state license, legal since the internship occurred on a military base.

13. Jane asked Dr. Pride to assist her since no one at the site would provide meaningful assistance. **Dr. Pride refused, stating "I cannot help you". This was devastating**.

14. Jane then sought assistance from a Psychologist outside of the site in Fall 2015.

15. "[Jane's 2nd site supervisor at first internship site] decided after about two hours of supervision and observing one of my sessions, that Jane needed remediation, even though she had had a good mid-term evaluation around two weeks before. She did not listen when I said that my daughter had just run away, or that I was anxious. Instead, she wrote a remediation plan and gave me about thirty seconds to sign it. I should have refused since she did not even tell me why she thought I needed a remediation plan."

16. Additionally, the copy of the remediation letter sent to Liberty University was unsigned. Most importantly, the plan did not meet current standards due to the **plan's lack of specificity**

COMPLAINT
Doe v. Liberty University et al.
Case 6:19-cv-00029-NKM   Document 1   Filed 05/15/19   Page 28 of 65   Pageid#: 28

**and thus lack of being measurable**. Email to Dr. Pride, on or around 12 December, stating Jane had signed the remediation plan only because she felt forced to.

## STANDARDS NOT MET BY DEFENDANT LIBERTY

17. Various standards from the industry as well as the course syllabus and handbook apply to this situation. In an appeal directly to Dr. Pride and Dr. Sosin dated March 15, 2016, Jane listed some industry best practices that the site did not observe:

> The ACES Best Practices emphasize the importance of the working alliance and a supervisor/supervisee relationship that is "collaborative and egalitarian" (1.c), the importance utilizing a supervision contract (8.a), the importance of balancing "challenging and supportive" and "clear" feedback that is constructive... specific, concrete and descriptive" (3.a & b), that the supervisor must recognize that "some level of conflict is inevitable...", and that the supervisor must handle this conflict in "productive ways" (5.b), that the supervisor "*attends to strains, gaps and/or ruptures in working alliance*" (5.b), that the supervisor "*elicts*" and is open to feedback (5.b), that the supervisor discusses supervisee strengths as well as limitations (7.c, 9.a), that the supervisor is attentive to the power differential (5.c), that remediation must include "clear objectives, requirements, a timeline, and consequences" (9.d), and that the Supervisor has the "courage to be imperfect" and does not require supervisees to be perfect (11.d).

> Similar guidelines from the APA emphasize the supervisory relationship and its link to the assessment, evaluation and feedback of supervisees ( http://apa.org/about/policy/guidelines-supervision.pdf). These guidelines amplify the ACA Best Practices by requiring "*openness and transparency*" (E.1), that multiple counseling sessions should be included in an evaluation (E.2 & 3), that feedback should be "*direct, clear, and timely, behaviorally anchored, responsive to supervisees' reactions, and mindful of the impact on the supervisory relationship*" so that "*evaluation is not a surprise" (E.3)*, highlight the possibility of supervisee "*demoralization*" (E.3), the emphasizing importance of the power differential (C, C.3), and by empathizing the importance of a collaborative relationship (Executive Summary).

COMPLAINT
Doe v. Liberty University et al.
Case 6:19-cv-00029-NKM   Document 1   Filed 05/15/19   Page 29 of 65   Pageid#: 29

**18. Despite Jane reporting deficiencies centering around commonly used standards, Dr. Sosin in November or December 2016 notified the Inspector General that the site had exceeded current standards.**

**19. Despite Jane reporting these breaches, she received no response from Dr. Sosin or Dr. Pride asking for details.**

20. On or around 12 December 2015, Dr. Pride notified Jane that issues had occurred at her practicum site that could prevent her from continuing in the program.

21. Even though the internship had ended around 18 December 2015, she was required by Liberty University to keep attending the site, even after she sent emails describing behavior on the supervisor's part that is commonly thought of as abusive, coercive and retaliatory.

22. This left Jane feeling hopeless, frightened and anxious, as 20 plus hours a week, she was left constantly wondering when her supervisor was going to come into Jane's office with another untrue allegation. Several of these allegations were reported to Defendant Liberty with no response.

23. Around 24 hours after leaving the site for the last time, Jane received a C from the Dr. Pride, even though there were inconsistencies between the sites' evaluations and the logs as signed by the supervisor.

## JANE DOE PROVIDES EVIDENCE OF THE COERCIVE/ ABUSIVE ENVIRONMENT AT HER INTERNSHIP SITE WHILE STILL AT THE INTERNSHIP SITE

24. In an attempt to be professional in a difficult situation, Jane decided to describe each abusive situation to Dr. Pride without using the word abuse. Jane initially tried not to use the word "abuse" as it can be defined in many different ways. Jane believed that by documenting each occurrence Dr. Pride or Dr. Sosin would recognize the coercive and abusive nature of the site eventually help her.

25. These multiple reports Jane made to Liberty University via email and via a student evaluation of the site to Dr. Pride, director of Clinical Training, were ignored or received minimal response.

COMPLAINT

26. As Jane wrote the site evaluation she was concerned about how best to describe the abusive and coercive internship site. This report must be understood in the context of the power differential between Dr. Pride and Jane, Dr. Pride's previous lack of response to previous reports. Also since Jane was still stuck in the mesh of an abusive situation and feared she was unsafe, her priority was safety. This meant that she had not yet had time to think things through and focus.

27. The site evaluation labelled Jane's second internship supervisor at the first site as 1 out of 5. One out of 5 was defined by Liberty University as "A *very* inadequate learning experience" [italics in original].

28. Liberty supervisor Dr. Pride labelled at that point as a 3 – Satisfactory – as Jane assumed at that point that Dr. Pride would do his due diligence, for instance, by reading the site evaluation, and investigate – which did not occur.

29. "At this point, I have documented problems with the site, but there is no strong evidence [of my competency], unless Dr. Pride chose to come in person. Since video and audio-taping is not allowed, and notes cannot be removed from the site, I cannot even provide important evidence."

30. "… after dealing with an initial practicum sight in January 2014 that was unethical, I felt this was the best I could find." (Please note that I stated 2014 and not 2015 – a sign of the extreme stress I was under.).

31. Due to Dr. Pride's lack of response, Jane began to add Dr. Sosin to her emailed reports of what had happened. Jane also spoke to Dr. Pride on the telephone one or more times and asked him to come visit the site, since it was within 6 hours of Dr. Pride's location [check if this is in email documentation as I believe it is]. This was refused orally, and likely ignored in the emails.

32. Jane believes that prior to 15 February 2016, Dr. Pride or Dr. Sosin, as a designated mandated reporter should have reported this situation to Title IX, or at the minimum released Jane from her ethical obligation to return to the site. The emails culminated in Jane writing an email, the last of three or more documents, on or about 15 February 2016, stating that it was

COMPLAINT
Doe v. Liberty University et al.
Case 6:19-cv-00029-NKM   Document 1   Filed 05/15/19   Page 31 of 65   Pageid#: 31

unsafe for her to return to her internship site. However no mandated reporter filed anything to Title IX until Summer 2018.

33. Later, in March 2017, when Jane met with multiple Liberty faculty in a recorded meeting after the expulsion, she was once again told she had not reported the situation to Liberty prior to the expulsion. Jane took a moment to collect herself after this outrageous statement and stated something to the effect of "I think the emails I sent to Liberty before I left the site were pretty clear."

34. **Jane has not listened to this meeting again, due to the traumatic nature of sitting in a meeting such as this, and hearing statements such as this, with those who were mandated reporters but did not report.** Jane will be reading the transcript once it is prepared.

35. February 9, 2016, 11:07 am, Jane emailed Dr. Pride: "I just spoke to [Jane's 2 supervisors at first site]. Jane's site supervisor found out yesterday that Frank had written a letter on my behalf... I felt pushed a few minutes ago to tell them that I was planning to find another site...[supervisors state] that I am splitting staff since I wrote an email to someone else who used to be in clinical about the situation yesterday....Other than yesterday, **I have almost 100% stopped talking to other staff about anything to make sure no one thinks I am splitting**. The only exception is that I have needed Frank's encouragement to stay within this situation.....

**Yesterday I even reported when I asked another staff member where more toilet paper was, just so [Jane's two site supervisors] would know I am not splitting**.... Secondly, I was venting because I was very hurt when I was told yesterday by [Jane's site supervisors] that I had told someone I did not want to take instruction from my supervisor because she is a GS 12 in the federal system [and I am a GS 13]... I was also upset because this "rumor" was taken as truth without asking me about it. .... I worked so very hard to work things out this January, arriving early and staying late... I cannot wait to get back to a place where I can fly my wings again.... Please continue to pray for my daughter, as she is still in a lot of pain....".

36. Find a February 12th email to Dr. Pride and Dr. Sosin that is referenced on February 13, 2016 7:33 PM email.

COMPLAINT
Doe v. Liberty University et al.
Case 6:19-cv-00029-NKM   Document 1   Filed 05/15/19   Page 32 of 65   Pageid#: 32

37. February 13, 2016 at 7:33 PM, Jane to Dr. Pride, and *due to lack of response to the email of February 9th, and to report site had gone from "bad to worse":* "I could not get back to you as much as I wanted to yesterday, as my daughter had another emergency. Did you receive the email I sent on Tuesday about problems with my internship site that day? ...

38. I am thinking I was not clear enough in that email or you or Dr. Sosin would have sent me some sort of an reply already. Fortunately Monday is a federal holiday so I cannot be [at the site]. I desperately need to talk to you Monday as at this point I do not feel safe going into the [internship site]. I have no problem with physical safety there, but I do have a problem with emotional and psychological safety....To address your question, things have gone from bad to worse..."

## UNSUCCESSFUL ATTEMPTS TO REMEDY THIS OUTRAGEOUS CONDUCT WITH APPEAL TO TITLE IX AND THE DISABILITIES OFFICES AT LIBERTY

39. FERPA: Sometime in 2016 or 2017 a document titled "LU Personnel Involved with Matters Related to Jane Doe" was created by Defendant LIBERTY. This grievously inaccurate document is discussed below, with Jane's response to **each** allegation in the document.

40. FERPA: On June 8th, 2016 Jane to Brittney Wardlaw, former Title IX coordinator. Later that same day Brittney Wardlaw sent to Lisa Sosin and Elias Moitinho: "All – I have some concerns about this report. **I spoke with Jane over the phone and I'm not sure I understand what she's alleging but I have a feeling it will not be the last that any of us hear from her. Please give me a call at your earliest convenience..."**

41. This is but one example, taken from the FERPA documentation released in February 2019, of where Jane was **defamed** within Liberty. This defamation made individuals such as Elias Moitinho underline at the appeal in an unbiased manner, such as Elias Moitinho.

42. If Jane had known of this conversation, Jane would have asked for her grade appeal to be heard by an unbiased individual.

43. **Jane has personal knowledge, in the form of emails, that she was defamed in this manner, starting in 2016 through Fall 2018 to one other or more individuals who reviewed**

COMPLAINT
Doe v. Liberty University et al.
Case 6:19-cv-00029-NKM   Document 1   Filed 05/15/19   Page 33 of 65   Pageid#: 33

her grade appeal.  **Most recently, Jane was defamed to the Provost in summer 2018 and the President of the University in the fall of 2018. Jane believes much of the defamation occurred in telephone or in person conversations between Liberty affiliated individuals, such as in the case with Brittany Wardlaw above**.

44. Things got steadily worse and many sections of the Code of Federal Regulations and ethical codes were ignored by my site, a US Navy facility outside Charleston, SC.  Dr. Pride left an incomplete open, somehow expecting things to get better. As things deteriorated, I asked to get out of an abusive site, and was told to go back by Dr. Pride. I cried every day at my desk for months [while at the internship]..... The situation has become acute because I have been trying to re-do internship this semester. I finally filed a complaint to the Independent Government Investigator since my site was federal government... I described loss of my confidentiality to Liberty by my supervisors and associated possible discrimination ...I feel very invalidated by Liberty's handling of the situation with my prior internship. **This makes me feel unsafe and unable to perform, particularly when Dr. Pride is involved.**  I believe if he had listened in October and November 2015, this situation would not have occurred, yet he is supposed to be a part of the solution. I tried to talk to him via email two weeks ago to clear the air, and he did not even know the air needed to be cleared. When I described the issue in more detail, he did not even bother to answer my email. **At this point in many ways Liberty's response has been more wounding than the original abuse**."

45. On November 29, 2016 8:39 PM, Jane Doe to Russell Monroe, subject: Internship abuse query: "I understand from the LU PD officer I spoke to today that you are looking into the issues I have had in the counseling department. ....But the larger issues are with my PhD in counseling internship in Fall 2015. I reported issues to the Director of Clinical Training, Dr. Pride. He did not do anything until my new supervisor at the site reported problems around a month later". Despite the fact that I had a B/B+ evaluation 8 days earlier according to the first supervisor, when the new supervisor said I needed remediation, he did not let me even present my side to the

COMPLAINT
Doe v. Liberty University et al.
Case 6:19-cv-00029-NKM   Document 1   Filed 05/15/19   Page 34 of 65   Pageid#: 34

remediation committee." At that point, the situation was somewhat abusive but steadily grew worse.

46. FERPA: March 10, 2017, 12:36 PM: Mary Deacon sends email to Lisa Sosin and Russell Monroe that states that she has attached a "cease-and-desist notice to Jane from Shield Ministries and I will forward a final report from Shield Ministries outlining their experiences with Jane". However, Jane Doe has never received any sort of cease and desist notice from anyone at Shield Ministries. This shows that evidence was used against her that she was not even made aware of. Additionally, Jane believes **no copy** was received through FERPA, only reference in an email.

47. Jane has not yet read everything Liberty sent through FERPA due to the voluminous nature of Liberty's response and because of the traumatic nature of what is recorded there.

48. July 3, 2018 11:42 AM, Jane XXXX to Title IX, subject internship abuse query: "I hope I can feel comfortable as well. I have reported and reported to the department .... As you may even have seen a little bit of already, so often when I've reported details to the department the replies I have received have made the situation much worse...."

49. July 3, 2018, 11:02 AM, Subject: Internship abuse query, Title IX office to Jane: "As a part of the investigative process, we start with a report from the Complainant, which would be you in this matter. So far, we have only heard generally from you that you experienced abuse. Without sufficient detail, we are limited in how we can respond. Dates, names, facts, circumstances, and any other information you can provide would help guide the process, and move things forward. We have reviewed all available information, including this email chain, and we have no record containing the details of the alleged abuse. We care deeply about all members of our campus community and hope that you feel comfortable reporting to our office."

50. July 13, 2018, 5:20 PM, Jane Doe to Title IX, in response to Title IX's unilaterally closing Jane report, subject internship abuse query: " I meant to email you earlier this week. My husband had surgery yesterday. Hopefully things will be setting back in order from his major health problems since March this year. I'm also going to submit a large number of freedom of

COMPLAINT
Doe v. Liberty University et al.
Case 6:19-cv-00029-NKM   Document 1   Filed 05/15/19   Page 35 of 65   Pageid#: 35

information act requests and hopefully get the Inspector General report appealed if that is still possible."

51. July 13, 2018, 10:21 AM, from Jane to Title IX (referencing previous email from Brittney Wardlaw): "… At this point, NO ONE has investigated this situation. The department may be thinking that means an investigation has occurred and found nothing. No matter, significant violations of law have been alleged with no investigation."

52. July 13, 2019 7:39 PM, Title IX office to Jane Doe: "To be clear, you may make a report by simply replying to this email with the details of the alleged abuse. To the extent that these other documents provide the details of your allegations, we are glad to review them, but they are not necessary at this point. If you believe that they are relevant for some other purpose, we are also glad to review them."

53. July 13, 2018 7:42 PM: Jane responded to Title IX office, subject Internship abuse query: "I will try to do that this weekend. Boiling 3+ months of abuse at an internship site, and years of inaction by Liberty employees, into one email, will take quite a lot of time, and of necessity will need to be amended later."

54. On July 18, 2018 at 11:00 am, Jane, in an email to Title IX again expressed confusion on what exactly needed to be submitted: "Could you please clarify with me exactly what I am to submit. I had thought that what I had already sent was sufficient to start the process."

55. Only July 18, 2018 at 11:07 AM Title IX office responded [to Jane]: "Please begin with dates, names, facts, circumstances, and any other information you can provide. What did you submit before? Because our records indicate you have never reported the details of the alleged abuse. If you have a document or writing with these details, you are welcome to re-submit it."

56. July 18, 2018 12:14 PM, from Title IX to Jane, Subject : "Safety Issues" : "This email was forwarded to our office. It does not contain the details of the alleged abuse. I would start by writing a quick one paragraph summary. We need to know specifically what occurred."

COMPLAINT
Doe v. Liberty University et al.
Case 6:19-cv-00029-NKM   Document 1   Filed 05/15/19   Page 36 of 65   Pageid#: 36

57. This email was in response to the below: July 18, 2016, 11:13 AM, from Jane Doe to Title IX: "…It is unreal that I believe I was a crime victim and nothing was done at the time or since. In fact the department denies I ever sent any emails such as this…"

> After this email of Wednesday, July 18th, 10:41 AM was apparently forwarded by Lisa Sosin to Title IX, including the February 9th, 2016, 1107 am to Dr. Pride email in its entirety and a quote from the email of February 13th, 2016: "Quote below: "… **at this point I do not feel safe going into the [site]**. I have no problem with physical safety there, but I do have a problem with emotional and psychological safety."

58. November 30, 2016, Russell Monroe to Jane: "Thank you for contacting me. I understand you spoke to Officer Brown yesterday and believe some clarity may be needed. All university employees are required to direct any report of possible abuse of a minor to LUPD… I understand that you are seeking resolution to some issues related to your internship site. Unfortunately, LUPD or myself are not in a position to investigate those concerns. As I understand it, the best use of your time would be to continue to pursue this through the Center for Counseling and Family Studies, which it sounds like you already are."

59. Later that same day, November 30, 2016, Jane to Russell Monroe, cc'in Brittney Wardlaw and Steven Warren in response: "**What I am not understanding is how Liberty is able to not look at a claim of discrimination at an internship site. Although the claim is not against a Liberty employee, Liberty has taken action based on information provided as part of retaliation or discrimination against me.** It seems that make Liberty a partner to discrimination once Liberty was notified of the discrimination involved, but yet chose to do nothing…"

60. Later on November 30, 2016, Jane to Brittney Wardlaw and Russell Monroe: "I may not mentioned in the emails this summer that the supervisor at my site breached my confidentiality with Liberty as far as what I understand is protected health information (e.g., being in recovery). Since Liberty already knew the information the privacy breach was much less of a problem than it could have been…"

COMPLAINT
Doe v. Liberty University et al.
Case 6:19-cv-00029-NKM   Document 1   Filed 05/15/19   Page 37 of 65   Pageid#: 37

61. December 1, 2016, Brittney Wardlaw to Jane, cc'ing Russell Monroe: "…we do not have the jurisdiction or authority to do anything about the internship site …the extent of our response would be to never recommend that site for internships again and allow you to appeal within the program which I believe you have done. Federal guidelines are very clear that the Title IX application is *at the institution that is receiving the federal funding.* I would encourage/advise you to report the internship to the Equal Employment Opportunity Commission.…" [emphasis Brittney Wardlaw's]

62. FERPA: March 10th, 2017, 12:36 PM, Mary Deacon to Lisa Sosin and Russell Monroe: Dr Deacon states that she had written an incident report which had not gone through. She then attaches the incident report to the email. *At no time was Jane notified an incident report had been filed so she could dispute it.* This incident report is also not attached in the FERPA records, potentially a FERPA violation (but may be elsewhere in it?).

63. It is highly ironic that Liberty immediately accepted this as truthful evidence considering DEFENDANT Liberty first found out from Jane and her external supervisor that she was working at Shield Ministries under Shield Ministries partnership with Win4Life. The report was made because David Truluck of Shield Ministries was "erratic".

64. This agreement was made **without any notification from Shield Ministries that Jane would be closely working with a sex offender**, which appears to be against Liberty's policies.

65. Jane's site supervisor stated she **would not have approved the partnership** if she had been told this by Shield Ministries. This left Jane in a bad position indeed.

66. Jane could find no policy at DEFENDANT LIBERTY about this but there may be one in Liberty's website but the directory would not open[5]. However, news reports show that in 2007, DEFENDANT LIBERTY asked a contractor to fire three sex offenders who were working at the school[6]. Virginia law also does not allow anyone on the sex offender registry to be in a school,

---

[5] https://www.liberty.edu/index.cfm?PID=763
[6] https://forums.aseaofred.com/forums/viewtopic.php?f=13&t=3107

COMPLAINT
Doe v. Liberty University et al.

as it may potentially have minors. Dr. Deacon, and others at Liberty, chose to overlook these requirements.

67. Defendant Liberty appears to have not taken into account Jane's external Supervisor's report that David Truluck of Shield Ministries was erratic.

68. Since Dr. Deacon had not spoken to Jane's site supervisor, Jane did not reasonably expect that Dr. Deacon would end the investigation so quickly.

69. Since Dr. Deacon did not speak to Jane's site supervisor prior to ending her investigation, Jane's site supervisor did not have a chance to affirm that she had been in meetings in which the Win4Life / Shield Ministries discussed the contract.

70. Jane also did not expect Dr. Deacon to end the investigation before getting Jane's documents that reasonably could be expected to show that there was an oral contract between Win4Life and Shield Ministries.

71. When Defendant Liberty was notified that David Truluck was a sex offender, tier II – Defendant Liberty did nothing to remedy this.

72. FERPA: March 10th, 2017, 12:36 PM, Mary Deacon to Lisa Sosin and Russell Monroe: Mary Deacon goes on to state the following: On an email of March 10th, 2016, 7:51 am, "Jane stated that she was planning to seek consultation before deciding whether to attend a meeting with faculty later that month." **Mary Deacon goes on to explain that she feels this is a threat of legal action and a threat to her [Mary Deacon's licensure].** However, consultation is a key part of Counselor Education, and in fact is mentioned 16 times in the American Counseling Association 2014 code of ethics, which governs Mary Deacon's license and which Liberty Universities Counseling program subscribes to. Jane believes the plain meaning of consultation *with another counselor educator* was clear. This shows yet another time Mary Deacon jumped to a conclusion without hearing all of the evidence and biasing those Jane would be taking her case to later. Additionally, this email was opened at some time by Stephany Steger, Title IX, a possible indication of bias in the Title IX process.

73. FERPA: On August 6, 2018, Robert Mullen, Dean of Students, wrote to Mark Hine, Senior Vice President: "They have offered several times to hear her complaint". Mark Hines reply, 16 minutes later: "Nice. But not according to her. ☺"

74. After speaking to Dr. Pride she returned to the site because she felt forced to. The implicit threat was that Dr. Pride would fail her and she would be expelled. Soon after 16 February 2016 Jane was forced to involuntarily resign from her internship site as a result of Liberty University's inaction on this matter.

75. The involuntary resignation was required because the weight of the trauma on Jane and her family had caused great psychological, emotional and physical difficulties. The continual degrading, harassment, coercion, insults and untrue statements by supervisors had degraded Jane in a myriad of psychological, personal, and professional ways. The abuse degraded her skills so that she had to start over with her professional skill building. Jane was unable to concentrate and frequently weepy due to the trauma that constantly re-played in her mind. The impairment caused by the abuse resulted in additional trauma therapy even in January 2019.

76. Jane was told by Dr. Pride that she would have a chance to express her side of the story at a meeting of the remediation committee; however, this did not occur, and Jane was never given a chance to express her side of the story to Dr. Pride and/or the remediation committee.

77. However, since the remediation committee apparently met in secret, Jane does not know when the meeting occurred, who was on the remediation committee, what specifically she was alleged to have done, or even if the remediation committee actually met. She was told only that she had not been "professional and competent" enough. It is believed by Jane that Dr. Pride's concerns were wholly unsupported particularly since Jane never had a chance to respond to specific allegations.

78. Dr. Pride, Tuesday, April 12, 2016 5:17 PM, and cc'ing Dr. Sosin, and Dr. Hinson: "… The **coercion was only a part of the scenario**, not the complete story…"

COMPLAINT
Doe v. Liberty University et al.
Case 6:19-cv-00029-NKM   Document 1   Filed 05/15/19   Page 40 of 65   Pageid#: 40

79. However, according to the Code of Federal Regulations, 29 CFR 553.101: "Individuals shall be considered volunteers only where their services are offered freely and without pressure or coercion, direct or implied, from an employer."[7]

80. Dr. Pride may have understood that one coercive event occurred instead of that many coercive events occurred. However, the Code of Federal Regulations states that no coercion is allowed.

81. As far as Jane knows, a signed copy of the site remediation plan has never been forwarded to Liberty University.

82. Jane signed this as having been received only, as per Office of Personnel guidance.

83. Jane first let Dr. Pride know that she did not agree to the need for remediation around mid-December 2015 [list this email and other email in May or June 2016 etc)

84. Nevertheless, it appears Dr. Pride did not understand that Jane disagreed until an telephone conversation with Jane occurred in April or May 2016.

85. From March 2016 onwards, Jane felt continually belittled and harassed by LU faculty who kept parroting back untrue statements made by the supervisors at the site.

86. Jane was never appraised of any specific difficulties that led to the C and remediation other than the global statement a "lack of professionalism and competency".

87. Jane is not aware of when the remediation committee met, who was on the remediation committee, or any details of what Dr. Pride or others submitted. Thus Jane was never allowed a chance to address specific charges. The files Jane received via a FERPA request in 2019 also did not contain any details of how this decision was made.

88. Jane was directed to submit a grade appeal directly to Dr. Pride and Dr. Sosin as the Liberty University institutional format did not appear to be a good fit.

89. In this emailed grade appeal, Jane notes, verbatim, the many deficiencies of the site, with reference to the ACES guidelines above.

---

[7] https://www.law.cornell.edu/cfr/text/29/553.101

COMPLAINT
Doe v. Liberty University et al.
Case 6:19-cv-00029-NKM   Document 1   Filed 05/15/19   Page 41 of 65   Pageid#: 41

90. At no time did Dr. Sosin or Dr. Pride address these "deficiencies" in any written communication that Jane is aware of.

91. Jane attempted to tell Dr. Pride her side of the story on many occasions, but was not allowed to do so. This meant that the process of giving Jane a grade, and more importantly, the remediation process, **lacked basic elements of fairness as well as procedural and substantive due process**.

92. Ultimately Jane, as part of remediation, was required to meet with Dr. Pride every two weeks for individual supervision. **This was untenable since Dr. Pride had not responded to her urgent need for safety**. Still, Jane attempted to work things out.

93. As far as Jane knows, Dr. Pride still believes she left the internship site of her own free will.

94. Because Jane would have to be supervised by Dr. Pride, she was forced to file <u>additional grade appeals</u> in order to feel she could have an emotionally safe place to continue internship. A second issue is that the agreement also required 100% of sessions to be taped. This was problematic because this would be impossible at many sites, such as the drug and alcohol center in the town Jane lived in.

95. Concurrently, **after six years of teaching Undergraduate Psychology every 8 weeks, suddenly Jane was not given any more classes to teach**. The timing of losing income as an Adjunct appears to substantiate retaliation.

96. Dr. Moitinho appeal details here. Note that Jane again cited standards that the site had not met, this time from other best practices or guidelines. Once again, she was given no specific answer and the subject was not addressed.

97. In email with Dr. Sosin in or around June 2016, Dr. Sosin suggested that if there was any harsh treatment at the site Jane should or could report it to the licensing board.

**98.** It appears that at no point did Dr. Sosin or Dr. Pride take into account the harsh treatment Jane stated had occurred at Jane's first internship site. **Instead, everything the site supervisors**

COMPLAINT
Doe v. Liberty University et al.
Case 6:19-cv-00029-NKM   Document 1   Filed 05/15/19   Page 42 of 65   Pageid#: 42

stated was accepted as true- a violation by Liberty faculty of section F of the American Counseling Association's ethics code.

99.    As a result and because Dr. Sosin had always appeared to be a person of high moral character, Jane tried to start a conversation with Dr. Sosin about the standards that had been ignored by faculty at Liberty University.  This was again ignored.

**100.    Instead, Dr. Myers asked Jane if she was "sure" these things had occurred, as they were serious accusations.  This left Jane unable to find a good answer as of course she would not have made the accusations if there were any doubts.**

101.    Retaliation appears to have continued in the Summer of 2016 when Jane notified Dr. Sosin that she was speaking to Title IX with intent to file a complaint with the Title IX office of Liberty University.

102.    Brittany Wardlaw of Liberty University Title IX spoke to Jane on the phone on one or two occasions in the summer of 2016. Brittany Wardlaw stated that Title IX did not apply since what occurred off campus.

103.    This is incorrect because Title IX states:

Covered educational program or activity (p. 48) – "it is well established that the covered education program or activity encompasses *all* of the educational institution's operations including, but not limited to, "traditional educational operations, faculty and student housing, campus shuttle bus service, campus restaurants, the bookstore, and other commercial activities."

"If the recipient does have education as its primary purpose, such as colleges, universities, school districts, training institutes, and academies, then the federal funds result in institution-wide coverage."  (p. 53)

"It is a familiar principle of statutory construction that courts should give effect, if possible, to every word that Congress has used in a statute."

COMPLAINT
Doe v. Liberty University et al.
Case 6:19-cv-00029-NKM   Document 1   Filed 05/15/19   Page 43 of 65   Pageid#: 43

104.     Doe vs. Mercy, in 2016 and 2017, makes it clear that Title IX applies to all educational activities, even internships, even when internships are run by a hospital.

105.     Brittany Wardlaw then sent Jane to EEOC, which did not even have jurisdiction. Since Brittany Wardlaw was **supposed to be an expert at Title IX, it is believed she would know when something should or could go to EEOC**.

106.     During this time period Jane's then minor child continued to be in extremis.

107.     Since the department and Title IX were unwilling or unable to address, or even acknowledge what had happened at the internship site, Jane reached out to other offices within Liberty University.

108.     Jane attempted to report the situation to the office of disabilities in the Summer of 2016.  The attempt was unsuccessful as Jane was not allowed to file a grievance because her supervisor at the internship site perceived that Jane had a disability.  Jane even when she sent the relevant sections, verbatim, of the Code of Federal Regulations to the Disabilities office at Liberty University, but the department still refused to allow Jane to file a complaint.

**Reports of Illegal Activities to personnel at Liberty University**

109.     Jane initially attempted to report illegal activity to Liberty University in Summer 2016.  Jane attempted to report that the site was breaking the Code of Federal Regulations as described above and that Liberty would not help Jane leave the site.  Later, Jane included the Acting Dean of the School of Behavioral Sciences, Dr. Warren, in Fall 2016.

110.     Jane was told by a representative of Liberty University's Legal Counsel that students could not report illegal activities.

111.     At no time did Liberty University even ask which portion of the Code of Federal Regulations Jane was referring to.

112.     Jane emailed Liberty University faculty on at least one occasion in the summer of 2016 that she felt unsafe returning to the internship under these conditions, and that she needed additional support due to the trauma of the incidents.  Typically, all students are given support,

as Jane was given in her previous practicum through Dr. Jenkins. This did not happen- another ethics violation.

113.     Jane felt that if anything untoward were to occur at an internship site, she would be unprotected. Moreover, since Jane had not received due process in the previous complaint, Jane feared she would be illegally expelled in an arbitrary and capricious manner.

114.     Jane attempted to contact Dr. Deacon since Dr. Deacon was CACREP coordinator at Liberty University. Liberty University had already received CACREP accreditation for one graduate counseling programming and was working on getting the program Jane was in accredited by CACREP as well.

115.     Jane believed that the situation that had occurred was an egregious lack of following the ACA 2014 code of ethics, the syllabus and the course manual.

116.     As CACREP coordinator for Liberty University, Jane believed Dr. Deacon would appreciate the seriousness of these allegations and right the situation. Jane believed that if these issues were not addressed, it was unlikely CACREP accreditation could occur and/or be sustained over time. Initial requests were met with silence.

117.     When Dr. Deacon finally answered, Jane's requests for support were not even acknowledged. There was only strict concern that every detail of the remediation plan be followed[] and that Dr. Deacon needed to speak to those who made the remediation plan in order to understand it.

118.     Jane was told that a mistake could not have been made [].

119.     Dr. Deacon then became her new internship supervisor at Liberty University.

120.     Jane began her second internship as an intern for Win4Life, under the site supervisor, on or around late August or early September 2016. Jane started the internship at this point only because paperwork from Dr. Sosin and Dr. Pride allowed only Summer or Fall 2016 as the dates to re-start internship.

121.     Jane was under severe and unreasonable stress due to the severe trauma that had occurred, Defendant Liberty's refusal to address the issues at her previous internship site, and

COMPLAINT

Defendant Liberty's constantly bringing up the negative and untruthful comments made by the previous supervisors. This constant string of untrue comments was yet another constant reminder of the traumatic events that had occurred.

122.     Jane spent the month of September, as well as a week before the semester started, working with her external supervisor to rebuild shattered self-confidence – **confidence that had been shattered by the previous internship site and Liberty's poor response.**

123.     In mid-September Jane submitted a quarterly summary from her external supervisor, to Dr. Deacon. Jane cc'ed her external supervisor on the email. Despite Jane's external supervisor having been cc'ed on the email Jane's external supervisor told Jane Dr. Deacon had contacted her to ensure that the evaluation had really written what she had written. It seems that since Jane had received a very good evaluation from her external supervisor, <u>Dr. Deacon immediately jumped to the conclusion</u> that the evaluation was fake.

124.     Around 29 September 2016, Jane and her family became embroiled in a Social Service's case due to her child's mental disorder. This raised the severe and unreasonable stress level even higher. This case was similar to, but less severe than, another local case just been resolved[8]. Jane's youngest child is just now beginning to get over the fears she had because apparently Social Services asked her if she wanted a new family. The severe acting out that occurred due to the fear this engendered in her younger child led to two psych-related Emergency Room visits even as late as Fall 2018.

125.     This required Jane to be a sudden single parent, working 30 hours a week, taking children to 2 or more psychological appointments a week, juggling the very real possibility she would have to separate from her husband, attempting to keep her older child from being forcibly kissed in Public School, and finding out her oldest child had been molested at a summer camp in 2015.

---

[8] https://www.postandcourier.com/news/sc-toddler-returned-to-parents-after-judge-finds-no-merit/article_31736a7a-258e-11e9-9f89-1f578600f460.html

COMPLAINT
Doe v. Liberty University et al.

126.     Dr. Deacon did know about several of the intense stresses Jane most particularly about the stress she was under due to the abuse at the previous internship site.

127.     As part of putting together a final grade appeal to Dean Warren, Jane also attempted to notify the Acting Dean of the School of Behavioral Sciences, Dr. Warren, in Fall 2016.

128.     One or more Liberty faculty member filed a mandated report with the LU police department as Jane had just found out her child had been molested at summer camp around 18 months previously.

129.     Paperwork from the LU police department state that Jane seemed more concerned about getting help with internship than with the situation with her daughter.

130.     This was **natural** because Jane was already juggling the situation with her daughter and had a plan forward, while Jane still did not know how to report the crime, or potential crime, that had occurred previously at her internship site so she asked the police department.

131.     Dr. Warren and/or other Liberty individuals apparently reported this because of Defendant Liberty had made them mandated reporters.  **Thus, the failure of Liberty employees to even file a report as mandated reporters until Summer 2018 – around two and a half years later – is inexcusable.**

**132.     In violation of LU policy, Dr. Deacon did not allow Jane to withdraw from the course.**

133.     Instead, Jane was given shortly thereafter, a letter of concern, emailed by administrative personnel on December 5th, 2016 but dated internally as December 6th, 2016, stating that "leadership" was concerned she did not have enough "emotional regulation".

134.     When Jane attempted to speak to Dr. Sosin via email about several untruths in the email, she was not allowed to list the untruths, but instead told only to return to internship. One of the issues that Jane wanted to clarify with "leadership", but was not allowed to, was that

COMPLAINT
Doe v. Liberty University et al.
Case 6:19-cv-00029-NKM   Document 1   Filed 05/15/19   Page 47 of 65   Pageid#: 47

leadership of the School of Counselor Education stated she was done her grade appeals when she was not.

135.     Accordingly, Jane forfeited her final grade appeal – which seemed to be the last possible place to report abuse – due to the intimidation inherent in the letter of "concern".

136.     Many times over the past 2.5 years, Jane has asked for the lack of safety/abuse to be addressed. However, if the email was returned, it would talk only about the grade appeals.

137.     Jane also forfeited the "general complaint" that she had sent through the Student Advocate's office that day, as she believed she would be expelled if she continued it.

138.     When the student advocate asked her if she met to cancel the general complaint, Jane stated she had cancelled it due to the department's "letter of concern". Jane prayed that the student advocate would take the complaint to her supervisors, but apparently the Student Advocate did not. Note: Jane believes that she stated in the letter that she had withdrawn the complaint due to retaliation from the department but must check her email to be sure.

139.     Concurrently to asking for a withdraw around November 24th, 2016, Jane emailed Dr. Pride to double check that it was permissible to begin to get additional hours in a partnership between Win4Life and Shield Ministries, of Charleston, SC. Dr. Pride did not choose to answer for around ten days; nevertheless, Jane believed she was within bounds of his email of early December as well as previous communicates from Spring 2016.

140.     Jane and her site supervisor met with Shield Ministries and David Truluck of Shield Ministries who verbally agreed to this partnership.

141.     Another example of retaliation that occurred at this time is that Dr. Sosin told the Bureau of Personnel Inspector General that Jane had not reported abuse at the site in Charleston until after she left the site. **Additionally, Dr. Sosin reported that everything at the [site] was done according to the syllabus, manual and current standards. Note that above lists many standards that were not met by the site and indeed, not met by Liberty University personnel, including Dr. Sosin. It appears this kept the Inspector General office from doing a complete investigation.**

COMPLAINT
Doe v. Liberty University et al.

142.     Starting in early January 2017, Jane insisted on getting everything in writing from Shield Ministries even though her site supervisor did not believe it to be necessary. She was unable to get cooperation from David Truluck in this endeavor.

143.     Subsequently, Jane discovered David Truluck was on the registered sex offender list in South Carolina. She also found David Truluck to be extremely erratic. This behavior has also been documented to Liberty by others, such as Jane's site supervisor as well as a licensed professional counselor who is a Faculty Emeritus at Clemson University.[9]

144.     When Jane's external supervisor and Jane notified Dr. Deacon of Liberty University that the partnership between Win4Life and Shield Ministries was being dissolved due to multiple issues, **Dr. Deacon began immediately to investigate Jane, not the site**. She quickly came to the conclusion that Jane had an "unauthorized internship site", took the situation to Dr. Sosin, and gave Jane, an F – and expulsion, without even speaking to Jane's site supervisor.

145.     Jane remained confused because there were NO definitions or examples in the manuals that would make it seem that counseling through Win4Life at Shield Ministries was an "unauthorized internship site" and as far as she could tell she had followed Dr. Pride's guidance. Jane wrote this email to Dr. Pride as a CYA so that Dr. Pride could explicitly confirm was being notified of the situation as well as

**EXAMPLES OF RETALIATION FOR ATTEMPTING TO FILE A TITLE IX REPORT**

146.     **Jane believes this was an example of retaliation for Jane's attempt to file a Title IX complaint**. Other retaliation seems to have occurred in 2018 and 2019 as well.

147.     Subsequently Defendant Liberty changed course manual to clarify that counseling within the same internship, at a different site, also requires approval. **If this had been written at the time Jane took this course, she would never have counseled at Shield Ministries without hearing from Defendant Pride.**

---

[9] http://scor.sled.sc.gov

COMPLAINT
Doe v. Liberty University et al.
Case 6:19-cv-00029-NKM   Document 1   Filed 05/15/19   Page 49 of 65   Pageid#: 49

148.     Currently the **Title IX office has not even acknowledged receipt of Jane's attempt to reopen the Title IX case in February 2019, even though Jane was told by the Title IX office that she could reopen the complaint "at any time".**

149.     It took approximately 3 weeks for **Jane's site supervisor to even get in touch** with Dr. Pride at Liberty University because apparently he would not answer her calls or emails. At that point, Dr. Deacon spoke to Jane's site supervisor.

150.     It appeared in a recorded meeting with faculty **in late March, 2017, that faculty did not believe Jane had been abused at the internship site; the audiotape is still too painful for Jane to listen to.** When a statement was made on the audio stating Jane said she hadn't said she had been abused until after she was given a C, Jane stated that she thought the emails she had sent had been clear.

151.     Another time that spring, **Dr. Sosin told Jane not to bother with an appeal because a decision had already been made.** However, when Jane stated she had not even been able to present evidence – such as emails about the partnership with David Truluck – she was told to include it in the appeal.

152.     The last time she re-sent one an email to Dr. Sosin because it appeared the email had accidentally been sent only to Dr. Pride, Jane received an <u>email from the Provost</u> stating all academic appeals were over.

153.     Once again, it appeared that **an academic appeal** was the only way to report abuse at Liberty.

**SAMPLE IRREGULARITIES IN LIBERTY'S RESPONSES TO SARAH'S APPEALS.**

154.     During this period, academic appeals continued slowly. **Jane's child was sexually assaulted in May 2017, but she was not allowed additional time to prepare the appeal,** even as her child was in the mental hospital twice in six weeks.

155.     Incorrect and misleading statements were made on appeal replies, such as that Jane had been "dismissed" from an internship site by David Truluck, when actually, Jane and Jane's external supervisor had dissolved the partnership. David Truluck stated that there was no

COMPLAINT
Doe v. Liberty University et al.
Case 6:19-cv-00029-NKM   Document 1   Filed 05/15/19   Page 50 of 65   Pageid#: 50

partnership and LU faculty took this as truth, rather than believing, or even contacting, Jane's site supervisor.

156.     In 2018, Liberty University took around ten days to even look at Jane's Title IX complaint.  They then asked a long list of questions to Jane.  When Jane stated she needed more time due to her husband's hospitalization and/or surgery that day than the Title IX office wanted to provide, i.e., somewhere around 2 weeks, Defendant LIBERTY closed the complaint and told Jane she could re-open it later – which did  not occur.

157.     An individual who was or is a Title IX office employee notified the Provost that Jane was considering submitting a complaint, an intimidating violation of confidentiality and an example of **defamation in Summer 2018**.  This person never told me they spoke to the Provost but instead waited for the Provost to inform me of this.

158.     Liberty University would only allow Jane to email with an unnamed Investigator; talking with the investigator, for instance, by phone was not allowed.  Liberty's policies allow a report to be made orally as well.  This was an additional factor that made it very hard to submit a complaint as describing traumatic experiences on paper can be almost impossible as it is overly traumatic.

159.     Jane last appealed to Jerry Falwell of Liberty University on or around October 26, 2018, notifying him that attempts to file a Title IX complaint with Liberty University in 2016 and 2018 had been unsuccessful.  Jane made sure that she included the lack of safety in her emails to Dr. Falwell and to David Corry, general counsel.

**WHISTLEBLOWING CONCERNS**

160.     In the fall of 2018, Liberty University's whistleblowing office refused to address these issues when they were alerted.  Instead, they chose to send Jane back to all the places I had already gone, such as Title IX, disabilities office, etc.  When Jane stated she had already done all of those things, and that was why Jane thought this was whistleblowing case she received no

COMPLAINT
Doe v. Liberty University et al.
Case 6:19-cv-00029-NKM   Document 1   Filed 05/15/19   Page 51 of 65   Pageid#: 51

reply. If the whistleblowing office is only going to refer students back to already existing resources, then the whistleblowing office is not a true whistleblowing office.

161.     According to an email received by Jane, **the whistleblowing office does not intend to address whistleblowing concerns**. Instead, the office directs students to reasonable resources – which Jane had already visited.

162.     According to FERPA documentation received in 2019, **the whistleblowing office promised Jane confidentiality while immediately sending her email to the Liberty Administration**.

163.     In 2018, she was told by the Title IX office that the record stated that she had not completed submitting her complaint in 2016. Jane received little response when she sent them back emails to the contrary. It began to feel very unsafe to report to a department that had not helped previously – and at this point would not even let her know the name of the Liberty employee she was emailing with.

**SUMMARY OF THE CASE FACTORS**

164.     In summary, when Jane reported a situation with an abusive internship supervisor at her site. Liberty did not respond, even though mandated reporters were notified multiple times. This exposed her to further abuse at her internship site, increasing her fear and subjective feeling of safety at her internship site. **This also left Jane wondering if she returned to internship in the future, if she would be protected or if she would face a hostile educational environment from Liberty faculty.** Finally, Jane quit the site to preserve her physical and mental health and to preserve what was left of her professional competency and to spend additional time with family, and a daughter in extremis, which could not occur due to Liberty's inaction.

165.     Liberty University refused to investigate, sending her around in circles until she arrived back at the same office that had already not helped. Attempts to submit a Title IX investigation in the summer of 2016 resulted in retaliation. Jane attempted to report the

COMPLAINT
Doe v. Liberty University et al.
Case 6:19-cv-00029-NKM   Document 1   Filed 05/15/19   Page 52 of 65   Pageid#: 52

retaliation to Liberty in 2018, but was hampered by Liberty's refusal to communicate orally with Jane instead of via email. This was a violation of Liberty's policy. Jane's experience was constantly minimized by Liberty faculty, who were notified multiple times that Jane felt unsafe returning to internship.

166.     Liberty then chose to expel Jane based on the word of an individual who Jane's external supervisor had previously described as "erratic." Jane was not even allowed to present her case before the expulsion occurred. Appeals were constantly marked by new information, information used that had been created up to five months after the expulsion, and information or allegations previously unknown to Jane, as she was not even given a list of allegations. Thus, some allegations, and some discrimination, were not even known until Jane filed a FERPA request in 2019. The extreme trauma of this situation from Fall 2015 to the present led to physical and emotional difficulties, increased the difficulties in the family dealing with a disabled child…

167.     LIBERTY's Title IX refused to process Jane's Title IX complaint, in 2016, 2018, or 2019.

168.     Jane was retaliated against for submitting a Title IX complaint.

169.     Jane attempted to resubmit complaint in Summer 2018 only to discover the documentation Title IX kept differed from the emails she had received from Title IX in 2016.

170.     Emails showing LU decided not to talk to her.

171.      Jane attempted to resubmit her Title IX Complaint in February 2019, but this was ignored.

172.     LIBERTY CES faculty abused power and authority and may even be criminal behavior.

173.     LIBERTY CES utilized a flawed remediation process, littered with blatant procedural and substantive due process that even included blatant untruths.

174.     LIBERTY CES disregarded its own written processes and procedures.

COMPLAINT
Doe v. Liberty University et al.
Case 6:19-cv-00029-NKM   Document 1   Filed 05/15/19   Page 53 of 65   Pageid#: 53

175.     LIBERTY CES ignored a student's attempts to report illegal/violations of the Code of Federal Regulations.

176.     The conduct of LIBERTY CES is so brazen, pervasive, and intentional that it evidences a climate and culture of systemic incompetence within LIBERTY's entire School of Behavioral Sciences (SBS), to the detriment of students and their clients both now and in the future.

177.     **The conduct of LIBERTY CES is brazen, pervasive, and intentional.** CES Faculty did not recognize signs of trauma, even though many had advanced training in trauma and all Faculty had at least some training in trauma. Mandated reporters did not send reports of events that occurred in January and February 2016 until Summer 2018.

178.     LIBERTY CES faculty failed to follow the written policies and procedures that had been written by the CES department.

179.     Beyond the CES faculty, Liberty employees appear to not have followed Liberty's procedures in multiple departments.

180.     **Its attacks on Jane constitute harassment, defamation *per se*, negligence, intentional inflection of emotional distress, and retaliation for the exercise of first amendment rights that LIBERTY had preserved for its students.** This intentional, deliberate and malicious conspiracy retaliated against Jane at every turn to harm Jane personally and professionally as well as harming Jane's family.

181.     Liberty's attacks on Jane were arbitrary and capricious, as Jane was not allowed to present evidence to the remediation committee and did not even receive a list of the allegations against her so that Jane could prepare evidence properly. **Case law shows that disciplinary actions, involving expulsion, require much more due process than "academic" actions.**

182.     Told not to bother appealing as the department had made up its mind – and told to put documents Dr. Deacon had hurried by in the appeal – which they had said would not be listened to.

COMPLAINT
Doe v. Liberty University et al.
Case 6:19-cv-00029-NKM   Document 1   Filed 05/15/19   Page 54 of 65   Pageid#: 54

183.    In addition it took five months for Dr. Deacon to even prepare a survey of Jane's counseling abilities. Thus, **Dr. Deacon was creating artifacts to justify decisions she had previously made**. Dr. Deacon marked Jane's skills markedly lower than Jane's external supervisor had on two occasions. **This is evidence of bias as well as retaliation for attempting to file a complaint with Title IX.**

**184.    LIBERTY CES's actions in this case are a flagrant violation, intentional and systemic violation of the Janes's rights in egregious violation of LIBERTY's own policies and procedures, going back over three years.**

185.    An incident report was put in the system regarding Jane. However, Jane was never notified of this, and did not know about the existence of the incident report until February 2019, when it appeared in the documents Jane had requested via FERPA. Jane still has not received a copy of the incident report. Liberty's CES seems to commonly utilize secret remediation meetings, creates no notes or even specific allegations from remediation meetings, and utilizes reports written after the fact (such as by Dr. Deacon) to substantiate the grade

186.    LIBERTY CES has added additional documentation to its newest internship manual, which if it had existed in previous manuals would have made it clear that the student was unauthorized to work at the same site at a different address.

187.    LIBERTY CES, due to ill will, malice, willful arrogance evinces a complete inability to identify actual problematic student behavior or to address problematic faculty behavior, as well as extremely selective application of the "remediation" process. This systemic inability by LIBERTY CES faculty to adhere to its own written policies is problematic based on ethical concerns (American Counseling Association 2014 code of ethics) as well as standards required for accreditation boards, such as ….

188.    The written record substantiates a systemic pattern of gross negligence on the part of Liberty University faculty.

COMPLAINT
Doe v. Liberty University et al.
Case 6:19-cv-00029-NKM   Document 1   Filed 05/15/19   Page 55 of 65   Pageid#: 55

## DAMAGES

## COUNT I

## DEFENDANT LIBERTY UNIVERSITY

### AMERICANS WITH DISABILITIES ACT (1990) as amended (2008)

#### Associational Discrimination & disability of self)

189.     The foregoing allegations are incorporated herein by reference.

190.     As a result of Liberty's inaction, Jane had a disability from the trauma that had occurred as well as additional trauma due to Liberty's continuing lack of basic consideration to the student's point of view.

191.     Previously, in 2016, the Disability office at Liberty University had refused to allow Jane to file a complaint.

192.     LIBERTY CES itself created this hostile educational environment as detailed above.

193.     LIBERTY discriminated against Jane for having a disabled child.

## <u>COUNT II</u>

### Violation of Title IX of the Education Amendments of 1972 as amended by the Civil Rights Act, 20 U.S.C. § 1681 *et seq.*

194.     The foregoing allegations are incorporated herein by reference.

195.     Title IX of the Education Act Amendment of 1972, 20 U.S.C. § 1681 (a) (1988), also known as "Title IX", provides in relevant part "[n]o person in the United States shall, on the basis of sex be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal assistance."

196.     Title IX is enforceable through an implied right of action affording an individual discrimination due to his or her gender pecuniary damages and equitable relief. Retaliation

COMPLAINT
Doe v. Liberty University et al.
Case 6:19-cv-00029-NKM   Document 1   Filed 05/15/19   Page 56 of 65   Pageid#: 56

197.     LIBERTY receives federal funding in various forms, including, but not limited to federal student loans. LIBERTY has discriminated against Jane, on the basis of her sex, through its discriminatory, inequitable implementation of LIBERTY's remediation process against Jane. This subjected Jane to different rules than those of her male classmates.

198.     LIBERTY has retaliated against Jane for submission of a Title IX complaint.

199.     In disciplinary proceedings, the University must provide a fair and equitable process – not one that is arbitrary and capricious – for the accused and "must formulate, interpret and apply its rules so as to protect academic freedom and free speech rights." Additionally "in both public and private schools, additional or separate rights may be created for … students by ….institutional regulations and policies, such as … student handbooks…" "Moreover, in regulating the conduct of its students and faculty to prevent or redress discrimination prohibited by Title IX (e.g., responding to harassment that is sufficiently serious as to create a hostile environment), a school must formulate, interpret and apply its rules so as to protect academic freedom and free speech rights." See https://www2.ed.gov/about/offices/list/ocr/docs/shguide.html.

200.     LIBERTY CES itself create this hostile educational environment as detailed above.

201.     A university violates Title IX regulations when it subjects students "to separate or different rules or behavior, sanctions or other treatment…" (C.F.R. 1211.400(b)(4)..

202.     The above events evidence that Jane, a female student, was treated differently, to her detriment, on multiple occasions.

203.     LIBERTY further violated Title IX by failing to accord Jane the opportunity to complete submission of a Title IX case through its Title IX office.

204.     LIBERTY further violated Title IX by failing to accord Jane the opportunity to respond to the allegations that supposedly led to her remediation and to her ouster from the LIBERY CES program.

COMPLAINT
Doe v. Liberty University et al.
Case 6:19-cv-00029-NKM   Document 1   Filed 05/15/19   Page 57 of 65   Pageid#: 57

205.     LIBERTY violated Title IX by not keeping a Title IX complaint confidential and indeed, by sending an email to alert one of the defendants that a case was brewing.

206.     LIBERTY violated Title IX by not even giving Jane a summary of the allegations against her so that she could prepare a sufficient defense.

207.     LIBERTY violated Title IX by not allowing Jane to present her case in person to Dr. Moitinho on two occasions, as well as to Dr. Boatner, and Dr. Myers.

208.     LIBERTY did not even follow the preponderance of evidence standard on multiple occasions, yet took no corrective action.  Given the power differential between Jane and her accusers, LIBERTY should have at minimum used the "clear and convincing" standard of proof to mitigate at least to some extent the lack of due process.  See *Brandeis, supra*.

209.     Jane filed a FERPA request for all records – quote here – yet did not receive all records.  Cite a few cases here.

210.     The outcome of the "Remediation" process was fundamentally flawed as well as clearly erroneous, arbitrary and capricious.  LIBERTY was on notice (supply documentation) about many procedural irregularities yet refused to correct them.  This severe denial of due process- pervasive and objective – denied Jane equal access to education as Title IX guarantees.

## COUNT III

### Breach of contract

211.     The foregoing allegations are incorporated herein by reference.

212.     Plaintiff intends to show that at all times relevant hereto, a contractual relationship existed between LIBERTY and Jane through LIBERTY's 2016-2017 PhD CES ("CES Handbook") and Honor Code.

213.     Though this honorable court has dismissed similar claims involving LIBERTY in the past (i.e., *Cameron Jackson v. Liberty University et al., Case 6:17-cv-00041-NKM-RSB*), this case is unique and distinguishable.

COMPLAINT
Doe v. Liberty University et al.

214.    The PhD CES program Jane was enrolled until Spring 2017 had already started the process of accreditation.  The process was started by the submission of the self-study. The application for Accreditation under the 2016 Standards, available at CACREP.org, requires the organization to abide by all CACREP standards, starting with when the self-study was submitted:

> "To insure the integrity of this process, it is imperative that professional conduct be exemplified in the application and self-study materials submitted to CACREP…. For the process to be effective and fair, it must follow the established review procedures and the information submitted during the review process must be based on clear statements and documentation describing how the program operates.  The self-study narrative and supporting evidence must not misrepresent the program by implying resources or any level of strengths that exceed the program's level of operation."

Furthermore, in policies covering the pre-application and application review stages on CACREP's website, standard 1.a. Integrity of process, repeats virtually the same wording, further underlining the importance of this standard.

Finally, according to CACREP.org's listing of CACREP accredited programs, graduates are retroactively able to state they attended a CACREP program if they graduated after July 12, 2016, with site visit September 2017 according to Liberty's 2017-2018 Annual Annual Report 2016-17 Assessment Cycle Data (URL: https://www.liberty.edu/behavioral-sciences/counselor-ed/wp-content/uploads/sites/19/2018/12/5.1_CES_2017-18_Annual_Report.pdf).

215.    Since Dr. Deacon is the site coordinator for CACREP and Dr. Pride and Dr. Sosin are part of the leadership team, all of them must have seen these requirements and thus had knowledge that they were binding Liberty and themselves to these requirements.

COMPLAINT
Doe v. Liberty University et al.
Case 6:19-cv-00029-NKM   Document 1   Filed 05/15/19   Page 59 of 65   Pageid#: 59

216.     This agreement is binding on Liberty because without having signed this policy, Liberty would not have this accreditation.

217.     CACREP thus requires that Liberty strictly abide by the University's own written policies. Specifically, Section 1.N of the Section Academic Unit of CACREP's document:

> "The student handbook includes (1) the mission statement of the academic unit and program objectives, (2) information about professional counseling organizations, opportunities for professional involvement, and activities appropriate for students, (3) matriculation requirements, (4) expectations of students, (5) academic appeal policy, (6) written endorsement policy explaining the procedures for recommending students for credentialing and employment, and (7) policy for student retention, remediation, and dismissal from the program.
>
> Counselor education programs have and follow a policy for student retention, remediation, and dismissal from the program consistent with institutional due process policies and with the counseling profession's ethical codes and standards of practice. "

218.     Furthermore, as a PhD CES student, Jane had reason to believe that Dr. Deacon, Dr. Pride and Dr. Sosin would follow the due process required by the Handbook.

219.     The Code of Virginia § 55-22 "An immediate estate or interest in or the benefit of a condition respecting any estate may be taken by a person under an instrument, although he be not a party thereto; and if a covenant or promise be made for the benefit, in whole or in part, of a person with whom it is not made, or with whom it is made jointly with others, such person, whether named in the instrument or not, may maintain in his own name any action thereon which he might maintain in case it had been made with him only and the consideration had moved from him to the party making such covenant or promise. In such action the covenantor or promisor shall be permitted to make all defenses he may have, not only against the covenantee or promisee, but against such beneficiary as well."

220.     Liberty also breached its contract with Win4Life when it was unilaterally canceled, despite the terms of the contract not allowing this.

COMPLAINT
Doe v. Liberty University et al.
Case 6:19-cv-00029-NKM   Document 1   Filed 05/15/19   Page 60 of 65   Pageid#: 60

221. As a result of the forgoing, Jane is entitled to damages, the amount to be determined at trial.

222.

## Count IV

### Torturous interference with business practices

223. The foregoing allegations are incorporated herein by reference.

224. Plaintiff believes and intends to show that one or more of these defendants did in fact interfere with her ability to practice her business in a manner which is detrimental and therefore tortious.

225. As a result of the forgoing, Jane is entitled to damages, the amount to be determined at trial.

## Count V

### Breach of the covenant of good faith and fair dealing

226. The foregoing allegations are incorporated herein by reference.

227. Plaintiff believes and intends to show that one or more of the defendants breached the covenant of good faith and fair dealing.

228. As a result of the forgoing, Jane is entitled to damages, the amount to be determined at trial.

## Count VI

### Torturous interference with business practices

229. The foregoing allegations are incorporated herein by reference.

230. Plaintiff believes and intends to show that one or more of these defendants did in fact interfere with her ability to practice her business in a manner which is detrimental and therefore tortious.

231. As a result of the forgoing, Jane is entitled to damages, the amount to be determined at trial.

## Count VII

### Negligence

232.     The foregoing allegations are incorporated herein by reference.

Plaintiff believes and intends to show that one or more defendants breached the duty of care.

233.     As a result of the forgoing, Jane is entitled to damages, the amount to be determined at trial.

## Count VIII

### Defamation

234.     The foregoing allegations are incorporated herein by reference.

Plaintiff believes and intends to show

235.     One or more defendants defamed Jane, as recently as Fall 2018.

236.     As a result of the forgoing, Jane is entitled to damages, the amount to be determined at trial.

## Count IX

### Defamation *per se*

237.     The foregoing allegations are incorporated herein by reference.

238.     Plaintiff believe and intends to show that one or more defendants breached the duty of care required.

239.     One or more defendants defamed Jane, as recently as Fall 2018.

240.     As a result of the forgoing, Jane is entitled to damages, the amount to be determined at trial.

COMPLAINT
Doe v. Liberty University et al.

## Count X

## Civil and Statutory Conspiracy

241.      The foregoing allegations are incorporated herein by reference.Plaintiff believes and intends to show that more than one of the defendants was involved in a conspiracy.

242.      One or more defendants defamed Jane, as recently as Fall 2018.

243.      As a result of the forgoing, Jane is entitled to damages, the amount to be determined at trial.


## Count X

## Intentional Infliction of Emotional Distress

244.      The foregoing allegations are incorporated herein by reference. Plaintiff believes and intends to show that one or more defendants inflicted emotional damage against Jane.

245.      As a result of the forgoing, Jane is entitled to damages, the amount to be determined at trial.

## Count XI

## Negligent Infliction of Emotional Distress

246.      The foregoing allegations are incorporated herein by reference. Plaintiff believes and intends to show that one or more defendants inflicted emotional damage against Jane.

247.      As a result of the forgoing, Jane is entitled to damages, the amount to be determined at trial.

COMPLAINT

## PRAYER FOR RELIEF

248.      Accordingly, Plaintiff prays for judgment in his favor and against Defendant:

249.      Declaring that Defendant violated the Americans with Disabilities Act by discriminating against Plaintiff on the basis of disability, and/or retaliating against Plaintiff for engaging in protected activity;

250.      Declaring that Defendant violated the Americans with Title IX by discriminating against Plaintiff on the basis of disability, and/or retaliating against Plaintiff for engaging in protected activity;

251.      Awarding Plaintiff lost past and future wages and benefits as a result of Defendant's violation of Title IX , plus interest thereon;

252.      Awarding Plaintiff compensatory damages in an amount to be proven at trial, plus interest thereon;

253.      Awarding Plaintiff punitive damages in an amount to be proven at trial, plus interest thereon;

254.      Awarding Plaintiff lost past and future wages and benefits as a result of Defendant's discrimination and/or retaliation, plus interest thereon;

255.      Awarding Plaintiff relief necessary due to breach of the covenant of faith and fair dealing. Awarding Plaintiff lost past and future wages and benefits as a result of the Defendant's discrimination and/or retaliation, plus interest thereon.

256.      Awarding Plaintiff relief necessary due to Tortorous Interference with business practices

257.      Awarding Plaintiff lost past and future wages and benefits as a result of Defendant's discrimination and/or retaliation, plus interest thereon

258.      Awarding Plaintiff relief as necessary for Liberty's Defamation.

259.      Awarding Plaintiff relief as necessary for Liberty's Defamation *per se.*

260.      Awarding Plaintiff relief as necessary for Liberty's Civil and Statutory Conspiracy (including treble damages pursuant to Virginia Code §§18.2-499 and 18.2-500)

261.      Awarding Plaintiff relief as necessary for Liberty's Intentional Infliction of Emotional Distress.

262.      Awarding Plaintiff relief as necessary for Liberty's Negligent Infliction of Emotional Distress

COMPLAINT
Doe v. Liberty University et al.

263.     Awarding Plaintiff the costs of bringing and maintaining this civil action and the investigation that preceded it, including reasonable attorneys' fees and costs;

264.     Awarding Plaintiff pre- and post-judgment interest;

265.     Enjoining Defendant from discriminating or retaliating against Plaintiff in the future

266.     Awarding Plaintiff such other and further relief as the interests of justice may require.

267.     Enjoining Defendant from discriminating or retaliating against Plaintiff in the future.

## PLAINTIFF DEMANDS A TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a jury trial for all claims and issues so triable.

### Certification and closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and believe that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support, or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11. Additionally, I, Jane Doe, declare under penalty of perjury that the foregoing is true and correct pursuant to Virginia Code §8.01-4.3.

Respectfully submitted,

*Jane Doe*

Jane Doe

Julia.Witherspoon@gmail.com

431 St James Ave. #171, Suite h

29445 Goose Creek, SC

843-608-9712

COMPLAINT
Doe v. Liberty University et al.