# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Lynchburg Division

SARAH LEITNER

                    Plaintiff          Case No. 6:2019cv00029

v.

LIBERTY UNIVERSITY, INC.

and,

MELVIN PRIDE,
both individually and in his official capacity as Liberty
University Counselor Education and Supervision (CES)
faculty and Director of Clinical Training for the CES
program, and,

LISA SOSIN,
both individually and in her official capacity as Liberty
University CES faculty and Dean of the CES department,
and,

MARY DEACON,
both individually and in her official capacity as Liberty
University CES faculty, member of CES leadership, and
CACREP liaison, and

ELIAS MOITINHO,
Both individually and in his official capacity as Liberty
University faculty and as Department Chair, and

SHIELD MINISTRIES, and,

DAVID TRULUCK,
both personally and in his official capacity as Executive
Director of Shield Ministries and as Minister at Shield
Ministries, and,

MELODIE TRULUCK,
both personally and in her official capacity as a Shield
Ministries board member, treasurer, and as Program
Coordinator

                        Defendants.

CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

SEP 1 8 2019

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

COMPLAINT
Leitner v. Liberty University et al.

# COMPLAINT

## SUMMARY OF ACTION

1.  Plaintiff Sarah Leitner (hereinafter "Sarah" or "Sarah Leitner"), *pro se*, files this Complaint against Liberty University, Inc., its faculty members Defendants Sosin, Pride, Deacon, and Moitinho, in their personal and official capacities, Shield Ministries, as well as David Truluck and Melodie Truluck at Shield Ministries, both in their personal and professional capacities.

2.  Sarah attests to a long standing pattern of discrimination by Liberty University based on Sarah's membership in several protected classes, including gender and disability discrimination due to her relationship with a close family member and due to the disability Liberty created through its negligent handling of Sarah's case in 2015 and 2016. Additionally, Liberty University retaliated against Sarah due to her report of discrimination to Liberty University.

3.  Defendant Liberty chose not to fulfill the terms of its contract with either of Sarah's internship sites as well as the contract it signed with the Counsel on Accreditation of Counseling and Related Programs (CACREP).  The last date of discrimination was in 2019, with numerous occasions between Fall 2015 to the present.  The totality of Liberty's actions resulted in extreme negligence, as well as fraud and multiple other charges.

4.  Defendant Shield Ministries, as well as Defendants Truluck and Truluck, chose to deny existence of its oral contract with Win4Life, which commenced in November 2016, reaffirmed on or around December 20th, 2016, and was referenced in multiple emails to Shield Ministries.  Sarah Leitner, and her site supervisor at Shield Ministries, Ms. Stokes, entered into a partnership with Shield Ministries.  This partnership would not have occurred if Defendant Shield Ministries, Truluck and Truluck had not omitted pertinent information.

Shield Ministries, Truluck and Truluck were negligent in their treatment of the partnership and of Sarah Leitner.

5. In her complaint, Sarah seeks redress for actions that were taken by all defendants. While under severe constraints on many occasions due to Liberty's unclear and ambiguous PhD in counselor Education Manual, Sarah asked for, and was denied, assistance when she emailed Defendant Liberty multiple times documenting the unsafe, coercive and abusive hostile educational environment she endured at her first internship site, which will be shown throughout this document. Sarah finally had no choice but to involuntarily resign to avoid further harm to her psychologically, physically, mentally, as well as to her family and finances.

6. Sarah will show that great harm to Sarah's well-being, professional career, and familial relationships including negligence, defamation, defamation *per se*. Dr. Pride and Dr. Sosin's repeated denial of Sarah's multiple reasonable requests documenting the urgent necessity of leaving a coercive and unsafe internship site[1], Liberty's repeated refusal to investigate Sarah's allegations[2], frequent use of terms such as alleged "abuse" for manners that remained alleged due to Liberty's refusal to meaningfully investigate the allegations[3], and continual reference to Sarah's lack of "professionalism" and "competency" due to inaccurate and uninvestigated complaints by the previous supervisor, comprise only a part of the allegations.

7. Liberty University's refusal to uphold multiple contractual relationships, including with internship sites and with the Counsel on Accreditation of Counseling and Related Programs

---

[1] 29 Code of Federal Regulations ("*CFR*") §§ 553.101
[2] . For instance, in the Summer of 2018 Provost Hicks stated that safety issues were to be dealt with by the Title IX office, even though in 2016 Title IX staff had claimed they did not have jurisdiction. Worse yet, in 2018 the Title IX department had taken around ten days to even email Sarah back, something that would mean **that a critical safety issue, such as Sarah experienced in 2015 and 2016, could remain unaddressed until too was too late.** Thus, it is unknown if Provost Hicks was broadening the scope of the Title IX office or not.

[3] Dr. Sosin March 2017

(CACREP), Liberty's discriminatory and retaliatory actions, which led to great personal and professional harm as well as Sarah's dismissal from the PhD program.

8.  Liberty's often contradictory guidance due to the chaos throughout the department of Counselor Education and Supervision, within the internship program, as well as throughout the University, and innumerable substantive and procedural due process errors due to underlying bias, ambiguous manuals and procedures, as well as the use of incorrect "information" from Shield Ministries, including David and/or Melodie Truluck, due to excessive haste by Liberty personnel.

9.  In summary, Liberty's flawed, and missing, processes and procedures were used to bolster hasty, arbitrary and decisions in a perfect storm of error.  This created a system in which the report of an unsafe internship site cannot be reported or investigated without the student experiencing retaliation including being told she is unprofessional.  This system, as well as the trauma of enduring the system throughout 2015 and 2016, set Sarah up for failure when she re-took the internship class under the hostile educational environment created and maintained by Liberty University.  <u>Even a report to Dr. Falwell in late 2018 about student safety was deemed to be adequately investigated due to the negligence of Liberty University staff</u> and the negligence of Dr. Falwell, who has been on the news for making jokes about the #metoo movement and due to his use of exceptionally crude language[4].

Sarah in support thereof respectfully alleges the below:

---

[4] Example: 1.Patheos, Susan Wright, June 27th, 2019:
https://www.patheos.com/blogs/susanwright/2019/06/the-moral-rot-of-jerry-falwell-jr-highlighted-in-attack-on-russell-moore/ , 2. June 5th, 2019, Falwell deletes vulgar tweet.
https://relevantmagazine.com/current/update-jerry-falwell-jr-deleted-his-vulgar-tweet-to-david-platt/

## JURISDICTION AND VENUE

10. For diversity purposes, Sarah is a citizen of the state of South Carolina and Liberty Defendants are citizens of or a business with its principle office in the Commonwealth of Virginia.

11. This court has original diversity over this claim pursuant to 28 U.S.C § 1332 because the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states.

12. This court also has original jurisdiction under Title IX of the Education Act Amendments of 1972, 20 U.S.C § 1681, *et seq*. and 28 USC § 1331, and jurisdiction over related state common law and statutory claims under the principles of ancillary and/or pendent jurisdiction pursuant to 28 U.S.S. § 1367.

## INTRADISTRICT ASSIGNMENT

13. Venue is proper in the Western District of Virginia pursuant to 12 U.S.C. § 1391(b)(2) and Code of Virginia § 8.01-262(1) because a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in the Commonwealth of Virginia and because defendant Liberty's principal office and/or residence and principal place of employment are in Virginia.

## PARTIES

### Plaintiff

14. Plaintiff Sarah Leitner is a natural person who resides in South Carolina.  Throughout the course of events described herein, Sarah was a student at Liberty University and/or appealing the University's arbitrary and capricious decision to expel her.  She was dismissed in Spring 2017 from the doctoral program despite a stellar academic record.  Sarah kept meticulous business records of all communications and hereby certifies the authenticity of such records included as Exhibits attached hereto, pursuant to Virginia Codes §§ 8.01-390.3 and 8.01-4.3.

## Defendant

15. Defendant Liberty University (hereinafter "Liberty"), is a private, Christian, Liberty arts, research university with a principal address of 1971 University Boulevard, Lynchburg, Virginia 24515.  Liberty is the largest nonprofit university in the United States, and the largest university of any kind in the Commonwealth of Virginia.  At all times material hereto, Liberty acted by and through its agents, employees, and representatives, at least some of who were acting in the course and scope of their employment and/or in the promotion of Liberty's business, mission and/or affairs.

16. Defendants Melvin Pride, Lisa Sosin, Mary Deacon and Elias Moitinho are natural persons who are residents and domiciliaries of the Commonwealth of Virginia.  Though defendants Pride, Moitinho, Sosin and Deacon were all acting in their official capacities as salaried, full-time, non-adjunct faculty members of Defendant Liberty, at times material herein one or more of them also acted in manners that fell outside the scope of their employment duties while continuing to act in concert with other Liberty faculty in order to effect a lack of investigation into Sarah's allegations as well as Sarah's dismissal from the Liberty CES program.

17. Defendant Shield Ministries is a non-profit corporation in South Carolina.

18. Defendants David and Melodie Truluck are natural persons who are residents and domiciliaries of the State of South Carolina.  Each was employed in official capacities as employees or contractors at Shield Ministries.  Though defendants Truluck and Truluck were all acting in their official capacities as salaried employees and/or contractors of Shield Ministries, at times material herein one or more of them also acted in manners that fell outside the scope of their activities as employees or contractors of Shield Ministries, while acting in concert with Liberty faculty to effect Sarah's dismissal from the Liberty CES program.

## NATURE OF THE ACTION

19. This case arises out of outrageous and egregious actions taken by Defendants Liberty, Pride, Sosin Deacon, and Moitinho concerning false and unsupported allegations of misconduct made against Sarah, a female student at Liberty, involving several faculty members in collusion with Shield Ministries, Truluck and Truluck.

20. Sarah was a doctoral student in LIBERTY's Counselor Education and Supervision program (CES) through Spring 2017. In 2015, Sarah completed all coursework for the PhD degree, including practicum, leaving only the internship and the dissertation to complete. She had around a 3.8 grade point average and an A in previous practicum courses. She also presented at a counseling related conference in Fall 2015 where licensed practitioners received Continuing Education Units (CEU's) for attending her presentations. She obtained a provisional license, as a Licensed Professional Counselor Associate (LPCA) in South Carolina in January 2017. Sarah has also been a Principal Investigator on many awarded proposals in her role as a Department of Defense Civilian. She also has been an interface, many times, between the contracting department at her installation and contractors, keeping an eye on the contract and ensuring contractors perform as expected. These accomplishments document Sarah's high level of academic proficiency, competence, expertise and professionalism throughout a twenty year career.

21. No Liberty staff or faculty voiced any concerns to Sarah regarding Sarah's conduct in her capacity as a doctoral internship student until December 2015, even though Sarah had completed three months of internship prior to December 2015 and six months of practicum experience.

# FACTS

## Summary of legal points of contention

22. Sarah reported a lack of safety at an abusive and coercive internship site is crushing, even if it only occurs once. When the coercion continues for months due to the indifference of Liberty University, the trauma multiplies. When faculty at Liberty University then give the student a failing grade 24 hours after the student leaves the site, without considering the written evidence the student sent – CRUSHING.

23. Sarah found it traumatic to be told that it was "grace" she was not expelled after the coercion and abuse went through, but this was only the beginning of the trauma Liberty inflected. The lack of any investigation – or even a serious discussion of what occurred – was absolutely devastating. And having to send extra videotapes to those who did nothing in the face of reports of trauma, absolutely unconscionable.

24. To this day, no investigation has occurred. The only way that Sarah was even given to bring her allegations was through a grade appeal, obviously a place where a trained investigator is not available for an investigation.

25. The following documents Sarah's many requests for an investigation and Liberty University's clearly illegal attempts to prevent an investigation from going forward. Liberty's conspiracy included saying one thing in emails to Sarah Leitner and other things in Liberty University databases, writing undated, unnamed "summaries" of what occurred. These were clearly prejudicial and often directly contradicted by previous documentation between Sarah Leitner and Liberty University. Multiple other clear, blatant errors occurred, such as, in February 2019, the Liberty Legal department telling Sarah they did not have the Inspector General report, when Liberty had the summary report.

26. No documentation has occurred of why a faculty member, redacted but instead to be Dean Sosin, told a representative of the Inspector General that Sarah had not reported being

COMPLAINT
Leitner v. Liberty University et al.

"abuse" prior to leaving the internship site. *As is shown in this document, this is clearly in error.*

27. Liberty University has told Liberty University employees – in one case, with a smiley faced emoji in emails no one at Liberty expected Sarah to ever see – that Sarah had had plenty of opportunities to ask for an investigation. This emoji sums up Liberty University's conspiracy to prevent the investigation Sarah requested, and that *Liberty University is required by law to provide.*

28. This Complaint will show that the situation was far more complicated than the "competency" and "professionalism" that Liberty University Defendants claim it to be. The central facts in dispute seem to be as follows:

> Did Sarah Leitner notify Liberty University of the safety issues prior to leaving the first internship site?
> Is Liberty University required to follow contracts it signed with internship sites or with CACREP?
> Were all defendants conspiring against Sarah Leitner?
> Did Liberty University retaliate against Sarah for protect activity, due to her gender, her child's disability due to Sarah's disability which Liberty created?
> Was Sarah Leitner granted a fair chance to pass internship in Fall 2015 through February 2016, Fall 2016 and Spring 2017? Is submitting paperwork to substantiate a grade 5 months after giving the grades fair?
> Was Liberty University negligent in causing crushing trauma?
> What about Defamation and defamation *per se*?
> Why did David Truluck of Shield Ministries require Sarah to stop counseling due to the "Board of directors" when he had not told the Board of directors prior to starting the partnership? Was this an attempt to protect his own position?
> Is the evidence throughout this lawsuit sufficient to show ill will by all defendants? What about fraud?

### Overview

29. From Sarah Leitner's July 18, 2018 email to Dr. Sosin summarizing previously emailed reports from January and February 2016 describing how Sarah was unsafe at her first site, the

Naval Consolidated Brig.  Sarah included a quotation from an email she had sent to

Defendant Liberty in 2016:

> "... **at this point I do not feel safe going into the brig**. ..." ....  Sarah Leitner goes on to state to Dr. Sosin: "... This is only one of several emails I have found as I have been reviewing all past emails and other documentation as my daughter is finally improving. I felt threatened for 3 months at my site, as a complete listing of correspondence would show.

> I felt extremely **threatened** to be ordered to return to my internship site after I sent this email to Dr. Pride. I believe the only response I received was that I was ordered to return to my site by Dr. Pride via telephone. I found it threatening to return to any internship site in fall 2016 without Liberty having dealt with this.

30. From a colleague at Sarah's job, Anna C., who observed Sarah's dilemma at the brig[5]:

> I am glad to hear you are pursuing justice for how you were treated when you volunteered to help out at the Brigg, to support your degree. I am so proud to know you are in pursuit of a degree that will assist so many who seek guidance and do not have access to counseling resources.
> I know how excited you were when you were granted this opportunity to apply you skill set to those in need, a lifelong dream of yours, that you worked so hard to pursuit. Your past research work here at NIWC, to assist those in the Military with brain injuries to overcome, is outstanding.
> Unfortunately, when it came to seeing how this impacted you, how you became so nervous, how you could come to work without any sleep, I will never know.  The conflicts you encountered were so unexpected, as I assumed any internship opportunity would have been more structured, monitored, managed properly, per case study policy by your education institution. The conflicts you dealt with seemed to built on personal opinions and attitudes versus a structured program, open to innovative assessment procedures and recommendations to be considered, rather than met with a brick wall  of personal opinions. Any correction institute, I would assume would have a policy and set of procedures in place, and as an intern, you would  be able to offer new ideas based on your training and education received from your institution of higher learning.
> I am disappointed to hear they would not allow you any consideration when you continuously attempted to  be heard and shot down at every prescribed process the education institute had put in place.
> Your family neglect in being forced to follow every detail of the recommendations for reconsideration, I don't see how it can be considered justified  Your stress level, and

---

[5] Typos in original as received from Anna Calessa

impact on your life style, your career here at NIWC, your personal self-worth all took a more than noticeable negative impact.

I am continuing to pray for you to be lifted up with real concern and consideration of all the facts, which obviously may have been overlooked. I recall our many discussions, and my concern for you is great. I am more comfortable now that you have sought legal advice and remain a listening ear for if you ever need to talk through your ordeal.

31. Anna Calessa's email only begins to scratch the surface of the stress caused by Liberty's negligence. From November 2015 to present, Sarah has had two surgeries, including a hysterectomy. Her husband has had two or more surgeries, one of which was major, as well as one major hospitalization. Sarah's child has had three psychiatric hospitalizations, including a hospitalization accompanied by a Judge's order in November 2018. **The trauma that ensued due to Liberty's inaction in the face of the extreme trauma Sarah underwent at the brig made it difficult to impossible for Sarah to explain the situation in grade appeals – as any trauma therapist would know.**

32. Sarah's email to Dr. Pride on February 13, 2016 at 7:33 PM, detailed her need to leave the brig due to its coercive atmosphere and is only one of multiple emails Sarah sent Dr. Pride about the lack of safety at the brig, also referencing a previous email to Dr. Pride about the crisis: "…I have been afraid to bring up what it has really been like, because at times it has been **so extreme I feared I would not be believed**…" explicitly stating "… I am thinking **I was not clear enough** in that email or you or Dr. Sosin would have sent me some sort of an reply already. **Fortunately Monday is a federal holiday so I cannot be [at the site].** I desperately need to talk to you Monday as at this point **I do not feel safe** going into the [internship site]. I have no problem with physical safety there, but I do have a problem with emotional and psychological safety

33. Sarah Leitner reported to Title IX on July 18, 2016, 11:13 AM: "…It is **unreal that I believe I was a crime victim** and nothing was done at the time or since…".

34. Liberty faculty disagreed, repeatedly refusing to remove her from a coercive internship site despite Sarah's written and oral pleas between December 2015 and February 2016. This

forced Sarah, ultimately, to involuntarily resign from the internship site, a site that had a

history of torture of detainee terrorists.

35. Email from Susan Sample, whose brother was in Shield Ministries, to Sarah Leitner, August

2019[6]:

> "Sarah, I am writing this letter in reference to Shield Ministries. These are the
> complaints I have and I hope some action is taken to improve the living conditions and to
> hold Mr. Truluck accountable.
>
> Most of the trailers did not have AC and those that did, were not allowed to run them
> during the day – not even on days that were over a 100 degrees!  The trailers were **bug
> invested** (cockroaches, bed bugs, etc)  and dirty.   When my brother was at Shield
> Ministries, no one could help him with his insulin, so I had to come down, three and a
> half hours each way, every two weeks to prepare his syringes which were stored in the
> refrigerator.   My brother had to self administer even though he was not capable due to a
> major stroke and multiple mini-strokes.   **There was a listing in the main sanctuary of
> where each individual had to go to therapy each week.  Listed (for the public to see)
> were when and why they were receiving therapy. Also listed was who was receiving
> psychiatric/psychological services from the county.  This is certainly not appropriate
> for everyone to view.**
>
> My brother was charged $400.00/month  for a room which he shared with another
> resident.  This was not considered rent due to the fact that David did not want to claim
> this money.  I did not mind paying for my brother to stay here because there was no
> where else for him to go, but this money came out of my pocket (I paid taxes on it) until
> he finally started receiving a disability check and I think Mr. Truluck should do the
> same....claim this income. Mr. Truluck suggested that I pay on his donation website
> which I did a few times but just didn't feel comfortable doing business in this matter so I
> just decided to mail the check and keep records. Many of my **brother's personal
> belongings seem to disappear** which we replaced often. **There was also extra charges
> for cleaning up the property, which the residents had to do themselves.** Also
> involved was **inadequate heating/cooling.**  I had to purchase a space heater for his
> bedroom and also purchased one for the living room  so he didn't have to carry his
> heater back and forth from bedroom to living room.  This also helped the other residents
> which they thanked me for often.  Also, **David Truluck forced my brother to do
> manual labor (building a sanctuary) even though he was disabled.**   Many residents

---

[6] Please note that I do not have personal knowledge of everything Susan is alleging here,
especially of whether the Trulucks did or did not pay taxes on participant fees (although it
appears from tax records property taxes are behind).  I also have limited exposure to details of
the trailer's conditions.  The newest trailer was built around 1980 according to tax records.

were disabled and yet the steps leading up to the trailers were either **rotted and broke and certainly unsafe.**

I am not sure what the solution is but I do know, something needs to be done. There is no where else for these men to go so shutting it down might not be the best solution. I do know this situation needs immediate attention and **weekly monitoring** by the state or county. Mr. Truluck needs to be held accountable for the thousands of dollars he receives each month and the living conditions he provides.

**Sarah, you did great. I know you the reason my brother got to the hospital and received medical attention right away when he had his second major stroke.** Thanks again!" [Emphasis Sarah Leitner's].

36. This email from Susan Sample underscores the **untrustworthiness** of Shield Ministries as well as David and Melodie Truluck as well as Shield Ministries.

37. Resultant harassment, coercion, retaliation and intimidation at Liberty University, as well as Shield Ministries's duplicitous comments to Liberty University, ultimately led to Sarah Leitner's expulsion from Liberty University in February 2017.

38. In fall 2016, while Sarah was enrolled in internship, <u>Sarah Leitner requested a withdraw from the course due to catastrophic family circumstance, this was denied.</u> This was <u>against established Liberty policy</u> as well as common sense.

39. From Dr. Taylor, emeritus professor at Clemson University, a Counsel on Accreditation of Counseling and Related Programs (CACREP) accredited program discussing the stress Sarah was under due to her family situation, the trauma from the first internship site at the brig, as well as Shield Ministries:

"Please reconsider your decision to terminate Sarah Leitner from your doctoral program. She is an incredibly dedicated and gifted who has worked **through horrific situations with her family as well as at the Naval Brig here in Charleston."** Dr. Taylor then goes on to state,

"In my vocation of serving as adjunct faculty at the Citadel for thirteen years and as a professor at Clemson University for eight (both CACREP accredited programs), I have seldom experienced a student attempt to overcome such **great adversity. Sarah has displayed incredible resilience, emotional regulation and integrity.** This resilience and emotional regulation will only enhance her abilities as a clinician..."

Dr. Taylor continues: "I was unaware of the agreement between Win4Life and Shield Ministries when it was negotiated due to weekly chemotherapy. **Due to an ongoing role as a volunteer therapist within the South Carolina Department Corrections**

> system, I have had numerous dealings with Mr. Truluck. I am a licensed
> Supervisor and would <u>never</u> place a supervisee at Shield
> Ministries…..Readmitting Ms. Leitner will not only assist her, it will speak volumes
> to the quality of the professors and programs at Liberty University" [emphasis mine].

40. Thus reads one of several recommendations written by colleagues and supervisors of Sarah
    Leitner, some of which are included in this document.

41. Also "Reverend" Truluck" is a sex offender who did not notify Win4Life of his status.

42. The expulsion occurred when Dr. Stringer and Sarah Leitner reported to Dr. Deacon of
    Liberty University that the partnership between Win4Life and Shield Ministries would be
    dissolved due to the actions of an erratic individual she was interacting with at Shield
    Ministries, who Dr. Deacon then proceeded to trust instead of Sarah.  The expulsion did not
    occur because Dr. Deacon "discovered" the "unauthorized" internship site; instead Dr.
    Deacon was notified that the partnership between Win4Life and Shield Ministries was being
    dissolved, something *far* different.

43. This erratic individual, David Truluck, is a "Reverend" with a serious criminal history as a
    sex offender[7].  If this had been revealed to Win4Life prior to the beginning of the
    partnership, the partnership would **never** have occurred.

44. David Truluck located Shield Ministries within 1000 feet of a community center, which was
    not allowed by South Carolina law.  He, or someone else at Shield Ministries, emailed Sarah
    asking for her phone number because he had lost it, more information that shows David
    Truluck is not to be trusted.

45. At no point did Sarah Leitner fill out <u>any</u> application of any type to work with Shield
    Ministries, further evidence that Sarah Leitner's internship was under the control of
    Win4Life, not Shield Ministries.

46. Truluck and Truluck, of Shield Ministries, made false reports to Dr. Deacon of Liberty
    University about Sarah Leitner and the partnership.  Dr. Deacon chose to believe the words

7

of this individual without giving Sarah, Dr. Stringer, or her site supervisor, Ms. Stokes of Win4Life, a chance to respond. *Dr. Deacon of Liberty University decided on this extreme course of action despite having refused documentation that Sarah Leitner attempted to give her.*

47. Later, Liberty University did not allow Sarah Leitner access to the "evidence" until February 2019, which did not allow Sarah Leitner to defend herself in the grade appeals as required by due process.

48. The "evidence" Liberty chose to use was extremely flimsy and often incorrect. For example, in February 2019 she discovered that one piece of "evidence" against her was that she had a profile on Psychology Today, something many individuals with a license do. Second, another piece of "evidence" was that Liberty University claimed Sarah had been threatening to call a lawyer for two years, something Sarah Leitner did not do. Third the listing of "evidence" against Sarah Leitner was undated and had no name on it, leaving it unknown who created it. This, if Liberty University faculty needed more information on what was written, there was no one to go to for clarification and to provide needed corrections.

49. New evidence included in the FERPA documents Liberty University sent to Sarah Leitner included additional evidence of discrimination and retaliation, which was unavailable until February 2019.

50. Other individuals, **up to and including Liberty's whistleblower office and Dr. Falwell in Fall 2018, repeatedly refused to investigate** either of these situations. The whistleblower office not only refused to investigate a whistleblowing case, **it reported Sarah's attempt to whistleblow to others at Liberty**.

51. This, as well as Dr. Deacon's harsh attitude, as described below, left Liberty unwilling to dialogue with Sarah when she experienced **additional family problems and attempted to withdraw from the internship** around when the Shield Ministries and Win4Life partnership began.

52. Liberty University made many false and outrageous statements throughout the entire process. On one occasion, on an unsigned letter from department "leadership", Liberty University faculty told Sarah Leitner she lacked "emotional regulation" days after Sarah Leitner found out her child had been sexually assaulted, even though Liberty University individuals knew her daughter had been assaulted.

### Ethical and contractual standards violated by the defendants

53. Sarah interned at the Naval Consolidated brig, a facility in South Carolina. Conditions at the internship site were relatively uneventful between August 2015 and October 2015. Sarah received a good mid-term evaluation in November 2015. The agreement between Liberty University and the US Navy Consolidated brig, signed by Linda J. Rankins on February 18th, 2015 on behalf of Liberty University, and on February 19th, 2015 by Joseph Michael Cole on behalf of the Naval Consolidated Brig, page 2, Liberty University bound itself to: "Make periodic visits to the Agency to review student progress and consult with the Field Instructor(s) about learning patterns, problems and other matters pertinent to the operation of the program". **Thus, Liberty bound itself to visit and did not do so, much to Sarah's peril**.

54. This internship was covered under a contract signed by Liberty University and the internship site on or around February 2015. This contract contained, as all contracts do, an implied covenant of good faith and fair dealing, which includes *safety of the student* at the internship site.

55. After leaving the site, Sarah began to realize that her "gut feeling" that she had been treated unfairly at the brig was more than a "gut feeling". She found that standards related to Counseling confirmed that how she was treated was wrong and went against accepted standards, and not just the syllabus and course manual.

56. Please note that Sarah's very first appeal, in Spring 2016, described deficiencies in the internship site. Liberty University denied that, and subsequent appeals, without *ever* asking Sarah Leitner for the evidence that supported her allegations. On many occasions, such as a recorded meeting in the Spring of 2017, Liberty Faculty denied that Sarah had *ever* submitted *any* complaints of ill treatment prior to leaving the brig, such as those recorded earlier in this document.

57. Excerpts from these standards are placed here because they are relevant to *many* sections of the document. Most importantly, *these standards highlight just how poorly Sarah was treated by Liberty Defendants.*

### American Counseling Association Code of Ethics (2014)

a. Section F.6. Counseling Supervision Evaluation, Remediation, and Endorsement, F.6.a. Evaluation requires "Supervisors document and provide supervisees with ongoing feedback regarding their performance…".

b. F.8.a. Program Information and Orientation: "…Counselor education faculty provide prospective and current students with information about the counselor education program's expectations, including … 2. the type and level of skill and knowledge acquisition required for successful completion of the training; …5. bases for evaluation; … 7. the type of supervision settings and requirements of the sites for required clinical field experiences; 8. student and supervisor evaluation and dismissal policies and procedures…"

c. F.9. Evaluation and Remediation F.9.a. "Evaluation of Students Counselor educators clearly state to students, prior to and throughout the training program, the levels of competency expected, appraisal methods, and timing of evaluations for both didactic and clinical competencies. Counselor educators provide students with ongoing feedback regarding their performance throughout the training program.F.9.b. Limitations Counselor educators, through ongoing evaluation, are aware of and address the inability of some students to achieve counseling competencies. Counselor educators do the following: …2. seek professional consultation and document their decision to dismiss or refer students for assistance, and 3. ensure that students have recourse in a timely manner to address decisions requiring them to seek assistance or to dismiss them and provide students with due prounablecess according to institutional policies and procedures."

d. F.4. Supervisor Responsibilities F.4.a. "…Supervisors inform supervisees of the policies and procedures to which supervisors are to adhere and the mechanisms for due process appeal of individual supervisor actions…"

e. F.10.c. F.10.f , G.2.a all describe how Counselors educators need to be aware of power differentials between faculty and students.

f.   F.6.b. Gatekeeping and Remediation …recommend dismissal from training programs, applied counseling settings, and state or voluntary professional credentialing processes when those supervisees are unable to demonstrate that they can provide competent professional services to a range of diverse clients.

**Association for Counselor Education and Supervision (ACES) best practices**

**The ACES Best Practices emphasize**

a.   the importance of the working alliance and a supervisor/supervisee relationship that is "collaborative and egalitarian" (1.c),
b.   the importance utilizing a supervision contract (8.a),
c.   the importance of balancing "challenging and supportive" and "clear" feedback that is "constructive… specific, concrete and descriptive"  (3.a & b),
d.   that the supervisor must recognize that "so 3ame level of conflict is inevitable…", and that the supervisor must handle this conflict in "productive ways" (5.b),
e.   that the supervisor "*attends to strains, gaps and/or ruptures in working alliance*" (5.b),
f.   that the supervisor "*elicts*" and is open to feedback (5.b),
g.   that the supervisor discusses supervisee strengths as well as limitations (7.c, 9.a),
h.   that the supervisor is attentive to the power differential (5.c),
i.   that remediation must include "clear objectives, requirements, a timeline, and consequences" (9.d), and
j.   that the Supervisor has the "courage to be imperfect" and does not require supervisees to be perfect (11.d).

Similar guidelines from the APA emphasize the supervisory relationship and its link to the assessment, evaluation and feedback of supervisees[8].

**American Psychological Association Guidelines**

a.   Requiring "*openness and transparency*" (E.1),
b.   That multiple counseling sessions should be included in an evaluation (E.2 & 3),
c.   That feedback should be "*direct, clear, and timely, behaviorally anchored, responsive to supervisees' reactions, and mindful of the impact on the supervisory relationship*" so that "*evaluation is not a surprise" (E.3),*
d.   Highlight the possibility of supervisee "*demoralization*" (E.3),
e.   Emphasize the importance of the power differential (C, C.3), and
f.   Emphasizing the importance of a collaborative relationship (Executive Summary).

---

[8] http://apa.org/about/policy/guidelines-supervision.pdf

58. The <u>way</u> Liberty University treated the situation at the brig and at Shield Ministries *did not meet these ethical standards, which means the treatment did not meet CACREP's standards as adherence to the ACA 2014 is required for CACREP accreditation.*

59. Naturally, after the horror of what had occurred at the brig, it took Sarah some time to process and describe the horrors that had occurred as well as the ways the experience did not meet current standards. **This naturally impeded her attempts to describe the situation to Dr. Pride and others at Liberty prior to leaving the internship site, as well as subsequent attempts to right this injustice through the appeals process, Title IX and the like.**

60. When Sarah's reasonable request in May or June 2017 for more time to file an appeal because her child had been raped and had been in the psychiatric hospital twice was denied, this further compressed the time she had available to write a good appeal. Meanwhile, Liberty University faculty often took over a month to write a short response to Sarah's appeal.

### Sarah interns at the brig – a chaotic and unsafe internship site

### The dark history of the brig

61. An Inspector General's report that showed evidence of what most people would call torture, or at the minimum something that makes the site ***untenable and inappropriate*** *as a learning environment for an intern*[9]. One detainee Jose Padilla, had his sentence reduced by a federal judge due to Post Traumatic Stress Disorder from what he had endured at the brig, only to see the sentence re-instated in appeal.

62. In 2015, Ms. Brown-Voeltz asked Dr. Noble if he would supervise her. After leaving the brig, Sarah found out Dr. Noble had been sued as part of a lawsuit pertaining to possible

---

[9] https://www.wired.com/2012/07/gitmo/

detainee mistreatment at the brig. *The American Psychological Association censured this practice as unethical after Dr. Noble was involved with detainees*[10].

63. While Sarah Leitner, and likely Liberty University, did not know of these concerns prior to Sarah beginning the internship, the situation could have been remedied as soon as Sarah notified Liberty sometime in 2016.

64. The low level of harassment at Sarah had endured at her internship site increased to an extreme level as Sarah's family experienced a severe mental health crisis. This crisis was precipitated by her child's inability to remain at her therapeutic boarding school due to her child's deteriorating mental state.

**Dr. Pride appeared to be "asleep on the job" and even lazy**

65. Starting with Sarah's early contacts with Dr. Pride, the new internship coordinator, in June 2015, she immediately began to notice a pattern in which Dr. Pride would answer email very slowly - sometimes not at all – and would sometimes miss course requirements. A few examples:

   a. Sarah emailed Dr. Pride with questions on 6/19/2015 and 7/22/2015 without receiving a response. Finally, on 8/8/2015, as the deadline to sign up for the Fall Semester approached, Sarah finally emailed the Dean, Dr. Sosin, at which point the previous Liberty Practicum and Internship supervisor approved Sarah for the course.

   b. On September 22, 2015, Sarah Leitner emailed Dr. Pride and did not receive a response until October 5, 2015.

   c. This pattern also occurred in Blackboard, the online course software. On October 13, 2015 at 4:33 PM Dr. Pride finally announced the deadline for the mid-term evaluation would be the end of the week as apparently he had missed setting the deadline. Since Sarah's supervisor had been persistently slow in meeting Liberty course requirements

---

[10] See, for instance, https://www.apa.org/news/press/statements/interrogations

and somewhat lackadaisical about supervision, Sarah Leitner emailed Dr. Pride as she did not believe her supervisor would be able to meet this date.

    d.   Dr. Pride replied at 10:21 PM, stating "These are not hard dates. You are fine. I am trying to get things updated that I missed, but you nor anyone else will be penalized in any of this corrections."

    e.   This reply highlighted another part of the pattern of Dr. Pride's: "I am trying to get things updated that I missed". Altogether things seemed very haphazard and chaotic.

66. Dr. Pride also did not seem to understand the complexities of working in a corrections environment. For example, in an email on Friday, November 6, 2015 12:21 PM, Dr. Pride mentioned how Sarah had stated the "way in which contact being made with your clients is sometimes very disruptive. Be certain to have your supervisor aware of the situation and get his help…" – *leaving Sarah to wonder how Dr. Pride could think Sarah's supervisor was not aware of the disruptiveness of the situation,* <u>since in most cases a prison *is* disruptive</u>. If Dr. Pride did not understand a prison environment, he should have consulted with someone else, as ethically required.

**Ms. Brown-Voeltz also appeared to be "asleep on the job" and often excessively slow**

67. The environment at the brig and at Liberty University was chaotic as shown below.

68. Sarah Leitner's supervisor at the brig and director of the Clinical Department, Ms. Brown-Voeltz, a licensed social worker, also seemed very slow and unresponsive, barely supervising Sarah enough to meet Liberty University's requirements as well as the industry standards. As a result:

    a.   Notes were often returned to Sarah two weeks after Sarah had written them, mid-term evaluation for the course was returned around 30 days late.

    b.   Sarah had to frequently consult with another licensed clinician at the site, who saw many of the same clients if official supervision was unavailable.

    c.  Ms. Brown-Voeltz in February 2016 also stated, in an email to Dr. Pride that she had been behind, a violation of the standards described above.

    d.  Ms. Brown-Voeltz returned the mid-term evaluation to Sarah in mid-November 2015 around a month late, as substantiated by email documentation.

69. Around October 26, 2015, Sarah Leitner was suddenly ordered by her supervisor, the Director of the Clinic at the brig, Ms. Brown-Voeltz, to change to a new supervisor as soon as possible. Sarah was initially happy with this due to the attitude of her previous supervisor, Ms. Brown-Voeltz.

### November 2015

70. Sarah submitted the information to change supervisors to Dr. Pride, Clinical Director at Liberty University, on or around November 2nd, 2015. Two days later, November 4th, 2015 at 8:34 AM Sarah checked with Dr. Pride to see if he had looked at it. On November 5th, 3 days after the form was initially submitted, Sarah again asked Dr. Pride about the form. At the same time Sarah also checked with Dr. Pride as the mid-term form, due around 3 weeks previously, had still not been submitted by her supervisor at the site. Furthermore, she did not expect her supervisor to return the form until November 17th, because the new supervisor, Dr. Pshenishny, would be out for new employee training. Finally, on November 6th, four days after Sarah began asking Dr. Pride, he finally said the supervisor information form "looks good", thus meaning the supervisor change could go ahead, and stating that he was "sorry for the delay".

71. At that same time, on Friday, November 6, 2015 12:21 PM, Dr. Pride sent to Sarah Leitner asking for information on the supervisor's qualifications and the submission of the "Supervisor information form" to Blackboard, the course software. Even though this form had not been completed, Dr. Pride still put November 2nd as the effective date.

72. On Friday, November 6, 2016 at 1:11 PM, Sarah notified Dr. Pride the form would likely be completed no earlier than November 16th – ten days later – due to the supervisor's absence.

73. During October and November 2015, Sarah multiple times about adding a new and/or additional site due to the problems Sarah had observed and communicated to Dr. Pride.

74. The midterm evaluation was *finally* submitted on or around November 17th, 2015, a month late, and was a positive evaluation.

75. The supervisor form was completed by Dr. Pshenishny around November 17th and emailed to Dr. Pride by Sarah Leitner.  The form revealed that the supervisor **did not meet Liberty University requirements** as she did not have a state of South Carolina License, but only a North Carolina license.  While the North Carolina license *was* sufficient to practice on government property, it *was not* sufficient to meet Liberty University's requirements.

76. Dr. Pshenishny's frequent abscenses made the turn over extremely chaotic.

77. **Note how long Dr. Pride took to resolve the supervision form and how little importance he appeared to assign to the task.  However, later when Defendant Liberty wanted to expel Sarah, suddenly forms became of extreme importance.  The pattern of slow, or no response, continued throughout Sarah's experiences with Dr. Pride.**

78. The same week Sarah had a client who seemed to have symptoms of psychosis.  Since the supervisor, Dr. Pshenishny, was out, the Director of Clinical Training and Sarah worked out a plan to have Sarah do "well checks" on this client in lieu of hospitalization.  When Dr. Pshenishny returned the end of the week, around November 20th, 2015, Sarah asked Dr. Pshenishny to sit in due to Sarah's lack of experience dealing with this population.

79. Around November 21st, 2015, Sarah's child had been picked up by the police after having run away from her boarding school, necessitating Sarah to spend a lot of time dealing with the emergency situation and figuring how she could have her child at home.

80. Prior to Sarah's child's sudden return on or around December 10th, 2015, planning for her child's return was a significant stress.  Of course, at that point having a child at home that a

psychologist would later say Sarah and her husband would be unable to keep at home increased the stress Sarah and the family were undergoing to stratospheric levels.

81. Sarah went ahead with the session on or around November 23rd, 2015, only because it was a client well-check and thus had to be completed and could not be postponed. Sarah's supervisor came in late, disturbing the session. Sarah did poorly due to the underlying stress from her child's condition.

82. Even though Sarah had only been in clinical around seven times since the last evaluation and Dr. Pshenishny had been offsite most of those days, Dr. Pshenishny put Sarah on a "remediation plan" on Friday, November 27th. Sarah had only come in that day – a holiday and her husband's birthday - as Dr. Pshenishny had required it.

83. Sarah was blindsided by Dr. Phenishny's insistence on remediation. Sarah *was not even allowed five minutes to decide what to do* as she was told to hurry because clinical would be closing early in a few minutes. She had not received any advance warning that there might be a problem as her last evaluation had been good, another violation of guidelines and practices within the industry and also of common sense, as shown throughout this complaint.

84. The coercive environment of the brig meant that Sarah felt she had to sign the form even though she did not agree with it. Sarah understands from numerous resources on the internet that common practice is that if an employee in any organization does not agree with an improvement plan, he or she must sign it anyway. However, Dr. Pride seems to have taken Sarah's signature as being of *agreement* rather than *receipt*.

85. This was only the only second time she had "live supervision" that semester, as she had only been supervised once previously, in early September 2015, both times for about 15 minutes each, another violation of standards.

**Coercive, <u>constant</u> writing and re-writing of clinical notes from November 2015 to February 2016**

86. **Sarah earnestly believed that when Dr. Pride realized how coercive the situation was, he would find a way to release her from this ethical obligation**, and that if he did not, Defendant Sosin would, since Sosin knew Jane more than Defendant Pride did.  This is part of the reason it came as a shock when, a year later in late 2016, Dr. Deacon refused to allow Sarah to withdraw due to overwhelming family difficulties.

87. Sarah testifies that from November or December 2015 to February 2016, she was required to write and re-write each note 8 to 10 times, <u>clearly</u> inappropriate.  Sarah  asked for help with her notes from her supervisors, but received little help, other than comments such as "this is another example of you not listening".   Dr. Pshenishny would later tell the Inspector General's representative – the XO of the brig – that each note was written 6 to 8 times.

88. Between December 2015 and February 2016, **during this time period she spent in excess of four hours writing and re-writing each note, exclusive of time spent before December 2015.  <u>Typically each note takes less than 15 minutes, or 20 at the most</u>**.

89. In desperation, Jane spoke to Dr. Pride, who stated he could not help her since she was not allowed to take notes away from the internship site.

90. Sometime in December 2015 or January 2016, a psychologist, apart from the internship site, reviewed note taking with her and found that she was writing notes at a Doctoral Student level.

91. In contrast, the external supervisor, Dr. Stringer, who supervised her later in her second internship, reported no problems with Jane's note writing.  This "external supervisor" remains Sarah's supervisor for state licensure.

92. The **only** conclusion that can be drawn is that Sarah Leitner was being treated unfairly at the brig, particularly as there is NO pedagogical reason to require a student to re-write notes over and over.

93. It is sincerely believed by Sarah December 2015 was the point when she began begging Dr. Pride to come see the site himself. Sarah sincerely believed that if Dr. Pride visited the site for a half day – a six hour drive each way – <u>he would see the **coercive** environment for himself and find a solution.</u> Instead, he stated this was impossible even though it was required by the signed contract between Liberty University and the internship site. Sarah found this very puzzling and frankly, confusing. **Why would a supervisor choose not to visit if the student is reporting multiple deviations of standard practices?**

**December 2015**

94. December 2015 began a period of ill health for the entire family due to the affect of the brig's hostile environment. This ill health has continued, as since December 2015, Sarah has had two surgeries, Sarah's husband has had two or more surgeries and one hospitalization, and Sarah's oldest child has been in the psychiatric hospital three times.

95. Sarah Leitner was out of the brig for most of December 2015, due to her illness, her child's sudden return from the therapeutic boarding school and her husband's surgery. The stress of the coercive internship site and Ashley's condition led to a lack of sleep, sickness, and other health problems for Sarah and the family. Constant replaying of the events kept Sarah from sleep as well.

96. Dr. Pshenishny later used these absences against Sarah in an evaluation in January or February 2016, a violation of law as these were based on her child's disability, an example of associational discrimination.

97. <u>Despite the extreme situation that Sarah was enduring at home, complicated by her husband's surgery in December 2015 or January 2016 due to Liberty's inaction to Sarah's reports of abuse at the brig, Sarah was **forced to continue returning to the brig**.</u>

98. Sarah asked in an email around December 15, 2015, to withdraw from the internship. The previous year, Dr. Pride had stated in email on or around 16 December 2015 that Jane would

be allowed to withdraw.  Sarah decided to take an incomplete instead, because ethically she could not leave notes incomplete, even though **other professionals had stated her notes met doctoral standards** before the extensive and unwarranted re-writes.

### January 2016

99. In January and February 2016, Sarah began spending extra hours each day at the internship far beyond what was required by the now expired contract, *which had expired in December*[11].

100.    Throughout this time, Sarah still thought that Dr. Pride would do the right thing and investigate and allow her to leave the internship site due to Sarah's extreme reports to Dr. Pride and Dr. Sosin.

101.    On Friday, January 8, 2016 10:32 AM Dr. Pride sent to Sarah Leitner : "…I will also follow up on the remediation process at that time. Have a great weekend."

102.    On Tuesday, January 26, 2016 3:05 PM, Sarah Leitner still had not received an answer from Melvin Pride about remediation: "Has the remediation committee met yet then? If not, is there anything I can prepare to help the process along?"

103.    On  Tuesday, January 26, 2016 4:11 PM, Dr. Pride sent the following to Sarah:  "Yes, that committee has met **and is aware of your situation. I am certain that you will be involved in the process when they have enough to contact you.** Is the final evaluation still on target? I am certain that the report will be necessary for them to see as well as all of the other information that you have sent. "

104.    *Sarah knew from what she had sent to Dr. Pride that it was obvious the final evaluation was not on target- whatever that meant – and **could not understand why there was not enough information to allow Sarah to leave the internship site.***  She again wondered if Dr. Pride was even reading her emails.

105. *Throughout January and February, Sarah increasingly began to wonder when* Dr. Pride would let her leave an obviously coercive site and why he had not allowed her to leave already.

106. On Wednesday, January 27, 2016 Sarah sought to discuss the situation with the Director of Clinical at her internship Ms. Brown-Voeltz, who was Dr. Pshenishny's supervisor. Without being given any chance to discuss her concerns with Ms. Brown-Voeltz, Sarah was immediately told that she needed to make an appointment to speak to the supervisor, Dr. Pshenishny, about the situation, and that everything in the evaluation was correct, even though Ms. Brown-Voeltz had not seen it previously.

107. Sarah was unsure about what was the best words to email the supervisor, as it seemed that asking for an appointment to meet with Dr. Pshenishny would be pointless, and wanted to take some time to calm down. However, at 10:36 AM – around an hour later - the supervisor sent the following to Sarah: "The very behavior you exhibited today is what I was referring to when we discussed you not following guidance. I specifically instructed that you speak with Dr. Pshenishny to schedule a date next week to sit and chat and that over the next few days you develop some questions and concerns... I suggested you do this to take the emotion out of the conversation and that Dr. P. would be more than happy to sit and explain to you what she is seeking. You, however, I have found did not speak with Dr. P and schedule this despite my having said to do so during our meeting and again before I went to lunch. Please explain..."

108. Sarah responded later that day, at 2:56 PM, in an attempt to de-escalate the conversation, by stating the following: " ...Thank you for the email. I figured I needed to wait to make sure I took the emotion out of the conversation...."

109. Sarah immediately reported this to Dr. Pride at 11:06 AM: "...I really wanted to go over it with my new and old supervisor before giving it to you, but after talking to my old supervisor this morning, I do not think that will work..." Sarah went on to state she was

concerned about the grade she would get in the course – Sarah  did not know how else to tell Dr. Pride the evaluation was a bunch of bunk – and continued "...I don't think I've ever worked on a class as hard as I have worked here this entire month.... I know I do good work, and I am proud of it. If I did not do good work, I would not have prisoners opening up to me as they are..."

110.    In the site evaluation that Sarah Leitner submitted to Liberty University through Blackboard, on or around January 30th, 2016:

    a.  Sarah labelled Dr. Pshenishny, her internship supervisor at the first site as <u>1 out of 5</u>. One out of 5 was defined by Liberty University as "A *very* inadequate learning experience", with *very* italicized in the original.

    b.  At that point, Sarah gave Liberty supervisor Dr. Pride a 3 out of 5 – Satisfactory – as <u>Sarah thought at that point that after Dr. Pride received this evaluation Dr. Pride would</u> finally follow his ethical duties and order Sarah to leave the site due to the safety issues.

    c.  Sarah also again requested Dr. Pride to visit the site, and observed that she was not allowed to take any video, audio-taping, or notes out of the site in order to substantiate her concerns and to *show* Dr. Pride the good work she was doing. Dr. Pride's refusal to visit, or to require the site to send this documentation, continued.

    d.  On or around this time she again notified Dr. Pride of the coercive requirement to constantly write and re-write notes.

111.    Sarah now spent from around 7:30 am to 12:15 pm at the site, instead of her previous unwritten hours of 7:30 am to 11 am.  She then worked at her job within site of the brig, for six hours a day until 6 pm, sometimes later.  She then went home each night to constant nighttime interruptions, suicidal threats and the like from her child.

112.    The six hours at work each afternoon Sarah's were <u>only</u> haven from the constant chaos and craziness of home and her site.

113.    Despite the many hours recorded on Sarah's internship hours, Dr. Pshenishny still recorded that Sarah had arrived late and left early on the January or February 2016 evaluation.  Dr. Pride could have verified the inaccuracy of this statement by looking at the logs signed by Dr. Pshenishny but apparently chose not to.

114.    Previous to January 2016, Sarah had asked Dr. Pride in one or more telephone calls to visit the site.  At this point, Sarah also began asking in writing for Dr. Pride to visit the site so he could view the <u>extreme conditions for himself and act</u>.  For example: Around January 30, 2016: As Sarah wrote the site evaluation she was concerned about how best to describe the abusive and coercive internship site.  Please realize how difficult this report was to make due to the power differential between Dr. Pshenishny and Sarah, Dr. Pride and Sarah, and Dr. Pride's previous lack of response to previous reports.

115.    In addition to Dr. Pride's lack of request of objective documentation from the brig, the Brig was steadfast in its **refusal** to allow Sarah to videotape her performance or to send copies of her notes to Dr. Pride so he could **help her and objectively rate her performance. Dr. Pride did not help resolve this even though it was against Liberty's contract with the brig.**

### February 2016

116.    Throughout December 2015 and January and February 2016 Sarah repeatedly notified Defendant Liberty about unsafe conditions at her internship site, for instance: "It is unsafe for me to return to my internship site" in February 2016.  In February 2016, Sarah appealed directly to Dr. Pride, via telephone, who told her she had to go back.  Sarah returned because she felt she had been threatened by Dr. Pride.  Sarah finally resigned when resigning became the only option to escape the coercive and abusive atmosphere at the site and its effect on her psychological and mental health as well as her family's.  *Sarah was afraid she would be in even more trouble if she called the police.*

COMPLAINT
Leitner v. Liberty University et al.

117.    Conversations and emails with Dr. Pride were troubling as **Dr. Pride never seemed to understand the severity of the situation.** Sarah began to wonder **if Dr. Pride was even reading her emails.** For instance, much to Sarah's surprise, in early February 2016, Dr. Pride said to Sarah something to the effect of "it's better now, isn't it?" Sarah stammered out a reply, unbelieving what she was hearing. Time and time again, she tried unsuccessfully to get Dr. Pride to fulfill his ethical responsibilities, but yet, **Dr. Pride continued to act in a negligent manner.**

118.    Sarah Leitner to Dr. Pride to Sarah Leitner, Monday, February 1, 2016 8:08 AM: " ... I am most anxious to hear if I can change sites soon, as I do not think things are going to work out here…. I know the new program manual states one cannot switch in the middle of the semester, but I just completed the incomplete. I have been waiting until the committee completes its work and we know what is going on with the incomplete. Can you please clarify and/or explain... Is there any idea how long it will be until I can receive a grade and the committee can complete their work? "

119.    Dr. Pride to Sarah Leitner, Monday, February 1, 2016 8:49 AM: "I am going to review your information today and advise the committee ... I will get back to you this week when I am given some guidance. This information that you have sent are essential pieces of what is needed to move forward. I will get back to you immediately when I get any information."

120.    On Monday, February 1, 2016 9:50 AM, Sarah Leitner once again sent an email – in this case a very long email – describing the events of January 26 and 27 to Dr. Pride. She also notified Dr. Pride that she would have to spend the entire month of February re-doing 15 or so re-doing each therapy note nine or ten times, when no one at Liberty had every had a problem with her writing. **She went on to state that she did not think five or six hours per note was appropriate and that continuing the site would take around 1000 hours to get 260 more hours of face to face time with clients – which obviously could not be done and should not be done due to the coercive environment.** This once again notified Dr.

Pride of the <u>inappropriateness</u> of the site and the impossibility of completing 240 face to face hours in the amount of time allowed to complete the course.  This email **was never answered** by Dr. Pride and it is <u>unknown if he ever sent any of this information to the</u> **mysterious** <u>remediation committee</u>.

121.   Due to the <u>mysterious lack of action of this mysterious</u> committee, Sarah wonders if this committee is <u>solely an attempt by Liberty to protect its reputation and keep from being sued</u>. She also wonders if the committee has ever found that a student did NOT do what the student was alleged to have done – and if the committee is targeting women, those who are disabled and/or associated, usually through familial connections, with those who are disabled. **Regardless, Dr. Pride constantly pointed back to the remediation committee rather than acting in a crisis situation**.

122.   On Wednesday, February 3, 2016 12:57 PM, Sarah Leitner <u>again</u> mentioned her child's health problems to Dr. Pride, stating that currently they were in the ER and asking if Dr. Pride needed anything else from her.  Dr. Pride <u>again</u> demonstrated his lack of understanding of the seriousness of the problem by stating, on Wednesday, February 3, 2016 3:20 PM: "Okay.  I pray that your daughter is well quickly.  Nothing else needed for now".

123.   **Sarah was actively waiting from Dr. Pride to find out what the plan forward was since the semester agreement with the site <u>had ended on or around December 18, 2016</u>, and the incomplete had ended at the end of January.  Was Dr. Pride finally going to listen?  Why was Dr. Pride NOT listening.**

124.   Dr. Pride's lack of understanding was demonstrated on Thursday, February 4, 2016 11:20 PM Dr. Pride sent to Sarah: "I pray that everyone feels better shortly".  When a child keeps threatening to run away?  When a husband has just had surgery?  When Sarah was being forced, every day, to return to a coercive internship site?  How in the world could anyone feel better shortly?

125.    Four days later, on Monday, February 8, 2016 3:56 PM, Sarah again asked what was
going on with the remediation committee, emphasizing that in addition to the coercion she
had described previously, she saw **no way to  complete the internship** by August at the
internship site.  She again asked about interviewing a new supervisor to move to complete
the internship site at recovery homes that she knew of that actively wanted her to complete
the internship there.

126.    On Monday, February 8, 2016 4:36 PM, Dr. Pride to Sarah Leitner: "Go ahead and
investigate the possibilities for a site since you cannot get your hours here... I will try to get
guidance from the remediation committee this week. Either way, I will get back to you
before the week is over...."

**127.**    On February 9, 2016, 11:07 am, Sarah emailed Dr. Pride to appraise him of <u>another</u>
<u>emergency</u>: "I just spoke to [Dr. Pshenishny & Ms. Brown-Voeltz].  Sarah's site supervisor
found out yesterday that F. had written a letter on my behalf... I felt pushed a few minutes
ago to tell them that I was planning to find another site...[supervisors state] that I am
splitting staff since I wrote an email to someone else who used to be in clinical about the
situation yesterday....Other than yesterday, I have almost 100% stopped talking to other staff
about anything to make sure no one thinks I am splitting. The only exception is that I have
needed Frank's encouragement to stay within this situation..... Yesterday I even reported
when I asked another staff member where more toilet paper was, just so [Sarah's two site
supervisors] would know I am not splitting.... I was told yesterday by [Sarah's site
supervisors] that I had told someone I did not want to take instruction from my supervisor
because she is a GS 12 in the federal system [and I am a GS 13]... I was also upset because
this "rumor" was taken as truth without asking me about it. .... I worked so very hard to work
things out this January, arriving early and staying late....." . – **PARANOIA and
RETALIATION!**

128.    Dr. Pride's response to Sarah's extreme situation, which came just over an hour later,

   **did not even address the critical and extreme nature of the situation,** stating only:

   "Thank you. As previously indicated, I will get guidance from the committee this week."

129.    On Friday, February 12, 2016 10:22 AM, Dr. Pride to Sarah Leitner: "The remediation

   committee has indicated that I must follow the procedures as indicated in the manuals

   pertaining to the PhD. In the meantime, I received the notice from Dr. P. that you had

   submitted your resignation with a date of February 26 to complete the paperwork. Are they

   giving you a new evaluation? The one that I have lists a "D" for your grade. How did you

   leave it with them? I am still carrying an "I" for you for last semester at the moment. Please

   advise. If I don't get back to you right away today, I am not ignoring you, I just have back to

   back commitments and cannot get to my email timely." **– Once again, Sarah has presented**

   **an emergency and been told that Dr. Pride may not be able to get back to her the same**

   **day.  Procedures seemed to be more important than student safety**.

130.    On Friday, February 12, 2016 12:15 PM, by Sarah Leitner, to Dr. Sosin and Dr. Pride,

   describing the site director's erroneous statement for which no proof could be provided for

   the statements truth or un-truth:  "…we have already established that there are

   misinterpretations in what is said to you by myself and Dr. Pshenishny and what you hear,

   process and feedback".  No evidence was ever given of any establishment of any

   "misinterpretations" by Sarah Leitner – cruel!

131.    Sarah believes that **Dr. Pride or Dr. Sosin, who were designated mandated reporters**

   **for Title IX by Liberty University,** should have reported this situation to Title IX by

   February 13th, 2016 at the *very* latest.  The mandated report did not occur until Summer 2018

   within days of Sarah's husband's surgery and just after Sarah's husband had almost died in

   the emergency room and subsequently had been hospitalized for five days.  Dr. Sosin and Dr.

   Pride were, and are not, experts in interviewing subjects in abusive situations; thus the need

   for an **end to the internship activities at that site and an investigation by a trained**

**investigator.** Mandated reporting is important, as at times, such as this, an individual is unable to think clearly enough to make a report.

132.    From  Leitner, Saturday, February 13, 2016 7:33 PM, to Dr. Pride, Sarah <u>once again notified Dr. Pride she had had an emergency with her daughter</u> the previous day, <u>asked her if he had received her email from Tuesday as she was amazed</u> **Dr. Pride had not answered a clear cry for help**, and clarified the email as follows: "…I desperately need to talk to you Monday as at this point **I do not feel safe** going into the brig. I have no problem with physical safety there, but I do have a problem with emotional and psychological safety…". Sarah stated twice that  "things have gone from bad to worse".  She also asked Dr. Pride to please omit the last evaluation since it would not provide any new information.  She wanted to state that receiving an evaluation would give Dr. Pshenishny and Ms. Brown-Voeltz another time to accuse her of triangulating when she was simply asking Frank Ruse for advice on dealing with yet another of her daughter's emergencies, tell her that her work at her place of employment was no good even though Ms. Brown-Voeltz and Dr. Pshenishny had not even been to her workplace or met her supervisor, or come up with yet another false accusation against her.

133.    On Saturday, February 13, 2016 10:49 PM, Pride to Sarah Leitner, Dr. Pride indicates he day is "just slowing down", that he is "sorry to hear this", that the committee's remediation plan must be followed, that "We can't ignore anything at this point, your comments included", that he will be unavailable tomorrow while on a five or six hour drive, and that he will continue to "I trust and pray that your daughter is doing better." **This makes it appear as if following the committee's plan was more important than Sarah's physical and psychological health**.

134.    Due to Dr. Pride's inability to provide **any guidance in this emergency situation**, and trying to be mindful of the **power differential**, Sarah Leitner sent additional notes about the previous week on Sunday, February 14, 2016 7:51 PM by Sarah Leitner to Pride, stating "I

think perhaps I have a better idea how to handle it now than I did yesterday, but I would still like to talk tomorrow if possible."

135.    On Tuesday, February 16, 2016 9:20 PM, Sarah Leitner to Dr. Pride: "... The last few days I have dealt with my family that is still grieving the loss of our little boy 9 years ago, as well as my daughter's sickness and my husband's surgery. But, things are looking up in all of those areas....I really liked the supervisor I interviewed tonight and it gives me quiet a bit of hope we can get it all straightened out." –this is most likely the email where Sarah's first draft had explicitly contained the word "abuse" in it, where Sarah had removed the word "abuse" from the final draft in order to appear professional.

136.    On Wednesday, February 17, 2016 8:51 AM, Sarah Leitner to Sosin, Pride and Hinson: "...Dr. Pride said I could arrange a new supervisor and site since I am unable to get enough face to face hours at this site. Last night I interviewed a supervisor who seems to be a great fit. She even has been reading the same book on utilizing Positive Psychology in supervision that I was reading this past spring. She helps me to have the confidence to finish up at my current site well, and reminds me that God is going to help me.... **Somehow I find this email of mine overly positive**...." – yet Dr. Pride did not respond to Sarah's description of the email as overly positive.

137.    On Wednesday, February 17, 2016 2:37 PM, Dr. Pride to Sarah Leitner: "No problem. Thanks for the follow up. You are in my prayers."

138.    Dr. Pshenishny on Wednesday, February 24, 2016 1:33 PM, **after Sarah had left clinical early due to an emergency,** stated to Sarah Leitner: "You have completed your notes and have quit the internship. Therefore, there is no need for you to return other than to turn in your intern brig badge. I wish you would have done that before you left this morning. **Please bring that to me or Ms. Pshenishny asap. We need to have it prior to 1500.** Since you did not meet with me to go over your eval this morning, I will scan and send you a copy

and will also send it to the school. Again, **please return your intern brig id that gives you access to the cipher door locks...**"

139.  On Wednesday, February 24, 2016 1:41 PM, Sarah Leitner sent to Dr. Pride and Dr. Sosin, attaching Dr. Pshenishy at the internship site's outrageous demand that Sarah return the badge immediately: "...my daughter's emergency from yesterday has continued into today. I am not at [my job a quarter of a mile away] and am with her, and am unable to leave the badge by 3 pm today... I was about to email you that I could come anytime at all on Friday if you would just give me a time."

140.  On Wednesday, February 24, 2016 2:04 PM, Sarah Leitner sent to Dr. Pride, Hinson and Sosin, seeking advice/consultation in this emergency situation in which she had been given less than 90 minutes to return the badge: "I almost had to hospitalize my daughter yesterday. I arranged with my internship site to finish today as I had to leave early yesterday because of my daughter's issues. I sat there until 11 am today, completing things, knowing my supervisor was very busy today....She is also demanding I return my ID badge by 3 pm today, which is impossible... Please advise."

141.  **Sarah finally went back to the internship site and returned the badge by 3 pm to the guard at the desk, keeping her child in the car within site at all times as she was unsure what her child would do as another psychiatric hospitalization might be necessary that day. *Sarah believed this placed Sarah and her child in danger, but in less danger than if Sarah had refused to return it that day.***

142.  On Thursday, February 25, 2016 8:11 AM Sarah Leitner stated to Dr. Pride, Sosin and Hinson: "I did manage to return my badge yesterday. I have attached my final evaluation from this site. I have been deeply disturbed by the accusations within it, as I do not believe I am deceptive, unethical, or most of the other claims within. ... All I can do is question its validity since it runs counter to the prior experiences I have had in my life as well as counter to all the evaluations I received in practicum and internship before I had this supervisor."

143.    Note throughout this these emails how many times Sarah asked what the next steps were and/or described **frightening** situations – i.e., was he ready to get her out of the brig as he was required to ethically – yet received no answer, a very late answer, or an answer that vastly underestimated the crisis – something that seemed unexplainable.  <u>It seems as if Dr. Pride was actively trying to heighten Sarah anxiety and was not merely negligent. It was like pulling a fire alarm for a major fire and having no response.</u>

144.    On Thursday, February 25, 2016 4:56 PM, Dr. Pride tells Sarah Leitner ""**I am sorry that things have ended this way at this site.  Unfortunately, it was necessary for me to post a grade of "C" for the semester.** I am praying for you and your family, asking God for clarity, healing and peace. Blessings…." ***Unfortunately, "sorry and healing and peace and prayer" was Dr. Pride's only response to Sarah's desperate cries for help.***

145.    In summary, Dr. Pride refused to investigate, or even allow Sarah to speak to the remediation committee, and ultimately orders Sarah to return to the coercive internship site. This triggered Sarah's involuntary resignation.

146.    The next day, along with multiple untrue statements, Director of Clinical at the Naval Consolidated Brig, Ms. Brown-Voeltz, acknowledged "dropping the ball" in an email on or around February 27, 2016 to Dr. Pride.  Ms. Brown-Voeltz also blamed Sarah's performance on a disability in <u>blatant</u> violation of the law.  **This was <u>especially</u> egregious since Dr. Pshenishny and Ms. Brown-Voeltz were well aware that Sarah was dealing with her child's extreme psychiatric condition.**

147.    Ms. Brown-Voeltz also alleged that Sarah had left her first practicum site in January 2014 due to ethical problems, even though she admitted she did not know.  Dr. Pride checked with the previous supervisor at Liberty, Dr. Jenkins, and told her **that was not true**, and told her that Sarah had left the previous site because of the supervisor at that sites' unethical behavior, and asked Ms. Brown-Voeltz not to contact him again.

148.    Sarah still wonders if the reason Dr. Pride asked Ms. Brown-Voeltz not to contact him
again is because he was experiencing a small amount of the problems Sarah had with her.

149.    The situation was severe enough that week that Sarah's child's previous therapist, that
week, told Sarah and her husband that they would be <u>unable to keep their child at home</u>.
Sarah and her husband were of course devastated.

150.    On the last day Sarah was at the brig, Sarah had to return home due to her child's
emergency.  However, she received an email, around quarter of two, from Dr. Pshenishy,
stating she *had to return her badge to the brig immediately, no later than 3 pm,* due to her
former supervisor's emails.  Sarah sought advice with Liberty faculty because she had to
remain with her ill child, but Liberty University faculty did not answer.  Sarah thus had to put
her ill child in the car, take her on the base, and drop the badge off, keeping her child in site
at all times.  *This could have harmed Sarah or her child.*

151.    Liberty chose to believe Sarah was not competent and professional, and held the
resignation against her.  Dr. Pride choosing only to say he was "sorry" to give her a C, which
led directly to expulsion until reconsidered a month later in the first appeal to Dr. Pride and
Dr. Sosin.  Sarah still was not given any reason for the remediation, other than
"professionalism" and "competency", which of course is vague and global.

152.    In February or March 2016 Sarah Leitner notified Dr. Pride and/or Dr. Sosin of
*retaliation within the brig against an employee at the brig who had stood up for her.*  Sarah
may or may not have reported retaliation against herself, since due to the many emails she
had sent to Defendant Liberty, it was obvious she was being retaliated against.

### Relevant Contracts law in an educational setting

153.    Due to the implied safety implicit in every contract, such as the contract that Liberty
University signed with the brig around February 27, 2015, Liberty University should have
responded to Sarah's emails by investigating the situation **as it was occurring**.

COMPLAINT
Leitner v. Liberty University et al.

154.   *Example: Kleinknecht vs. Gettysburg College, 9890 F.2d 1360* (3rd circuit court), where a University was successfully sued for wrongful demise because school did not have the proper preventative policies and procedures necessitated by the special relationship between the student and university, thus, not meeting its standard of care;   *Conclusion: A University can be liable for not having proper preventative policies and procedures.*

155.   *Example: Rinsky v. Trustees of Boston University*, 2010 U.S. Dist. L.E.X.I.S. 136876 (2010) quote: "Given that Rinsky's BU supervisors were allegedly on notice that she was subjected to regular sexual harassment at her internship, it is plausible that their failure... or take any other similar action was unreasonable.  At this stage, it would be premature to dismiss Rinsky's Title IX claim against BU."  And "As the internship progressed and Rinsky continued to complain to Dobek that Client B was touching her... evaluations of her became increasingly negative. Rinsky reported .. to her BU supervisors ...While they instructed her to file a complaint ... they also told her that if she brought up her sexual harassment ... she would be demonstrating a "lack of commitment to the social work profession" and, "Rinsky's allegations arguably make out a claim of a "serial violation" (rather than a systemic violation)");   *Conclusion: Failure to take action when supervisors are on noticed of danger may be unreasonable.*

156.   *Example: Nova Southeastern University, Inc. v. Gross*, 758 So. 2d 86 (Fla. 2000).  In discussing if duty of care existed to warn student of danger at practicum site where gross was subsequently raped:  "We read this statement broadly as an indication that the duty, one of ordinary care under the circumstances, could include but is not necessarily limited to warning of the known dangers at this particular practicum site." *Similarly, once Sarah Leitner notified Liberty of the dangers and Liberty did not practice ordinary care, as required, Liberty was liable.*

157.   *Examples: Doe v. Board of Regents of the University of Michigan, et. al (*Case #2:18-cv-11776, 6th Circuit*)  Doe v. Baum, Pritzel, University of Michigan et. al, and Doe v. Rhodes*

*College, Case No. 2:19-cv-02336-JTF-tmp* show that Title IX requires due process.

*Conclusion: The Rhodes College case requires due process in private Universities.*

158. *Example: Tina Varlesi v. Wayne State University ,et al., (No. 14-1862, 6th Circuit),* While Varlesi, a pregnant student who filed a Title IX lawsuit, completed an internship outside the University, the University is still liable and an investigation is required when discrimination is alleged.

159. Example: <u>Deskins v. Dep't of the Navy</u>, 29 MSPR 276 (1985) – The employee was subjected to verbal abuse, insults, and harassment that interfered with his ability to perform his job.  In addition, employee was denied privileges other employees were granted. Employee was denied reasonable opportunity to demonstrate improved performance. This shows the government does not usually tolerate "abuse, insults and harassment".

160. *These cases lead to the following conclusion:*

    a. *First, Liberty's lack of ordinary care when Dr.  Pride was notified of danger was unreasonable.*

    b. *Second, a University can be sued for a lack of policies and procedures, as occurred in the Counselor Education and Supervision Department at Liberty University.*

    c. *Third, due process is required **even in a private university**.*

**Defendant Liberty's violations of Liberty's <u>own</u> course manual and syllabus**

161. Throughout 2015 and 2016, Sarah worked hard at maintaining professionalism in light of Liberty University's course manual and its emphasis on professionalism, allowing a failing grade simply for being "Unprofessional", with no definition of what could or should be considered unprofessional[12] – without any specific procedure for a student to show this was

---

[12] Liberty University's 2015 to 2016 internship manual, p. 32

not the case. This strong emphasis on professionalism, coupled with NO instruction of what to do in a case in which a student is abused or harassed, and Dr. Pride's continual lack of response to Sarah's cries for help, put Sarah in a **no-win situation**. Sarah wondered **how** she was supposed to report abuse when those in **the chain of command at her internship site were involved and Dr. Pride and Dr. Sosin did not listen.** Dr. Pride's lack of response made Sarah believe that her report of abuse would be considered "unprofessional" especially since sometimes it seemed as if Dr. Pride was <u>not even reading her reports</u>. [emphasis throughout mine].

162. However, the same section of the manual promised that only "...**verifiable** complaints about the student from the Site Supervisor or the site director" would be considered – yet Dr. Pride refused to give Sarah an opportunity **to show the complaints were not verifiable**.

163. The same section also stated: "If the supervisor and/or Liberty University faculty determines that the student's current emotional, mental, or physical well-being compromises the integrity of the Practicum/Internship experience or potentially places the student, or others, in harm's way or an unduly **vulnerable** position." – **yet Sarah was never allowed to leave the intensely vulnerable situation which kept her constantly in harm's way** [emphasis Sarah Leitner's].

164. The following few points are relevant to Fall 2016 to Spring 2017, but are collected here for sake of clarity as these comments address the ambiguity of the Liberty University PhD internship manual.

165. Throughout the course of 2015 to 2017, Liberty University utilized several versions of the Internship manual, leading to a chronic state of confusion and chaos. It is believed that at times, such as Fall or Spring 2016, the "authoritative" version of the manual on Liberty

University's website differed from the version given in Blackboard, the course management software.

166.    Throughout all manuals Sarah has seen between 2015 and 2017, the manual does not give any precise definition of an "approved" or an "unapproved" internship site.  In the current (2019) version, Liberty University does clarify this, explicitly stating that a site in a different location is a separate site, <u>even if it is under the same site supervisor and external supervisor</u>. Without this clear statement, Liberty University was able to decide that Sarah had an unapproved internship site due to its discriminatory intent.  **This is a lack of clarity and a source of ambiguity.**

167.    Liberty gives only a procedure on how to get an approved internship site. It **does not** state that if there is a different geographical location, it is a new site. Therefore, since Liberty University did NOT include this, Sarah's decision to follow her supervisor's instruction is entirely reasonable and expected.  Liberty University's decision to **not speak to Sarah's supervisor** before labelling the site as an "unauthorized internship site" is wrong, **unexpected, and shows a fundamental and complete lack of due process**.

168.    Throughout 2015 to 2017, Sarah is responsible to obey what **is** written in the documentation, **not what Liberty University intended to write or did write or meant to write because of CACREP standards**.

**Appeals & investigations**

**Academic appeals**

169.    Sarah discovered around April 2016 that Dr. Pride assumed Sarah had signed it as assuming that Sarah *agreed, not simply received it*.  This is **unreasonable** as often individuals sign performance plans that they vehemently disagree with.  Regardless, it appears Dr. Pride was given an unsigned copy of the agreement by the site, impeding the

investigation of what occurred.  **This leaves it unclear if Dr. Pride even notified the committee that Sarah did not agree with the remediation plan since Sarah has not received any of the notes from the meetings of the remediation committee, something else not provided as required by FERPA.**

170.   **Sarah cited standards, guidelines and best practices in appeals and other documentation to Liberty.  Liberty has not responded or asked Sarah to substantiate <u>any</u> of her allegations at <u>any</u> point.**  In summary these three sets of guidelines/best practices and standards, particularly the ACA ethics codes, require the program to cover all student expectations, have clearly written dismissal policies and procedures, require ongoing feedback throughout the internship period, to document decisions to dismiss, and provide due process to students.  Violations of these standards will be found throughout this document as well as violations of the syllabus and course manual.  **It is believed that if CACREP knew of these violations, CACREP would never have approved the program at Liberty University.**

171.   Throughout Sarah's academic appeals, Dr. Myers stated that Sarah had not demonstrated proficiency so she could not receive a passing grade.  This is <u>contrary</u> to the ACA ethical code makes it clear that when a student is *unable* to demonstrate to demonstrate that they can provide competent professional services to a range of diverse clients – not that the student has not demonstrated a skill, as interpreted by Dr. Myers in Summer and Fall 2016.

### Title IX attempts to file a complaint in 2016

172.   After deciding Sarah's Title IX report was out of scope, on Wednesday, June 8, 2016 3:21 PM Brittney D. Warlaw of the Title IX office sent the following Dr. Sosin and Dr. Moitinho as released via documentation released under Sarah's FERPA request: "All – I have some concerns about this report.  I spoke with  over the phone and I'm not sure I understand what she's alleging but I have a feeling it will not be the last that any of us hear

from her. Please give me a call at your earliest convenience so I can provide updates. Thank you!"

173.   It appears obvious that if a Title IX official <u>does not understand the allegations, he or she should ask questions prior to dismissing a complaint and not let one of the parties the report was about know about the complaint</u>.   <u>It appears this triggered relation, targeted to Sarah, in the Counselor Education and Supervision department</u>.

174.   Brittany Wardlaw then sent Sarah to EEOC, which <u>did not even have jurisdiction</u>.  Since Brittany Wardlaw was **supposed to be an expert at Title IX, it is believed she would know when something should or could go to EEOC**.

175.   Retaliation appears to have continued in the Summer of 2016 when Sarah notified Dr. Sosin that she was speaking to Title IX with intent to file a complaint with the Title IX office of Liberty University.

176.   December 1, 2016, Brittney Wardlaw to Sarah, cc'ing Russell Monroe: "…we do not have the jurisdiction or authority to do anything about the internship site …the extent of our response would be to never recommend that site for internships again and allow you to appeal within the program which I believe you have done. Federal guidelines are very clear that the Title IX application is *at the institution that is receiving the federal funding*.  I would encourage/advise you to report the internship to the Equal Employment Opportunity Commission…." [emphasis Brittney Wardlaw's]

177.   December 1, 2016, Brittany Wardlaw to Sarah, cc'ing Russell Monroe: "…we do not have the jurisdiction or authority to do anything about the internship site …the extent of our response would be to never recommend that site for internships again and allow you to appeal within the program which I believe you have done. Federal guidelines are very clear that the Title IX application is *at the institution that is receiving the federal funding*.  I would encourage/advise you to report the internship to the Equal Employment Opportunity Commission…." [emphasis Brittney Wardlaw's]

178.    This is but one example, taken from the FERPA documentation released in February 2019, of where Sarah was defamed within Liberty.  This defamation made individuals such as Elias Moitinho  <u>unable to look at the appeal in an unbiased manner</u>, such as Elias Moitinho, who saw many of the emails that defamed Sarah Leitner.

**Additional attempts to seek justice within Liberty University during Summer and Fall of 2016**

179.    Since the department and Title IX were unwilling or unable to address, or even acknowledge what had happened at the internship site, Sarah reached out to other offices within Liberty University.

180.    Sarah attempted to report the situation to the office of disabilities in the Summer of 2016. The attempt was unsuccessful as Sarah was not allowed to file a grievance because her supervisor at the internship site perceived that Sarah had a disability, despite sending relevant sections, verbatim, of the Code of Federal Regulations to the Disabilities office at Liberty University, containing the pertinent federal law.

181.    In Summer and Fall 2016, Sarah also emailed the legal office and the Dean's office, seeking to appraise them of the illegal activity and/or activity that went against the Code of Federal regulations.

**Fall 2016**

182.    After taking a minimal amount of recovery time after the trauma of the previous internship, Sarah enrolled again in internship.  Misunderstandings due to Sarah's child's mental disorder resulted in a department of social services investigation on or about September 30, 2016 through on or around November 9th, 2016.  Sarah was the <u>only</u> parent for this time and was thus unable to accumulate hours towards her internship.  She had to

provide data to Social Services, take her children to counseling appoints, and keep a job, leaving Sarah <u>unable</u> to complete internship.

    a. Sarah's younger child remained distressed until very recently (September 2019), as Sarah's youngest child reported in 2017 or 2018 that <u>the social worker had asked her</u> <u>if she wanted a new family</u>. This has led to attachment difficulties and periods of acting out, now decreasing in intensity.

    b. Sarah's youngest child's acting out was so extreme enough during Fall 2016 – while Sarah was attempting internship as a suddenly single parent - that Sarah frequently feared she would have to seek medical assistance due to injuries from her child. <u>This</u> <u>made the situation much worse than it likely appears.</u>

    c. <u>However, when Sarah requested to withdraw from the internship, it was not allowed.</u>

183. Throughout this process, Sarah Leitner was told multiple times that she was taking complaints to the wrong individuals, taking this "up the chain" without reason, etc.

184. Some of this occurred because Sarah Leitner had been told by a Liberty faculty member or Dean (Likely Dr. Meyers) that if new information became available, an appeal could always be reopened, starting with the professor who had initially given the grade.

185. On or around November 2016, when Sarah Leitner attempted to give new information to Dr. Pride about the case, as new information had developed as part of the Inspector General Investigation, he told her that he could not help her. Sarah Leitner likely took this reply up the chain only to be told that was inappropriate and one sign of a lack of "emotional regulation".

186. At the same time, e.g., around November 2016, Sarah Leitner was also penalized for sending a request above Dr. Deacon's head about the grade appeal agreement. This occurred because Dr. Deacon was interpreting the agreement as stating Sarah Leitner had to complete the clinical portion of the internship first, when the agreement explicitly stated Sarah Leitner could start with ANY portion of the internship first. To the best of Sarah's knowledge, she

received **no answer** to her query from Dr. Myers or Dr. Warren, instead being told that she had to complete the clinical portion first.

187.   The following occurred within days of each other, making the <u>already difficult situation even worse</u>:

    a.   At virtually the same time she had just found out her child had been assaulted repeatedly at camp.  Sarah Leitner was left confused as she was called by a police officer at Liberty University who seemed intent on making a Social Services report but **did not seem to care about the crimes that had occurred against Sarah Leitner at the brig, or any of Liberty University's responses that may have been illegal**.

    b.   Since she was now being told that she had to complete the clinical portion first, **this appeared to be an attempt to make sure Sarah Leitner did not graduate** by making sure she did not have enough time to complete the program within the ten years.

188.   On November 29, 2016 8:39 PM, Sarah Leitner to Russell Monroe, subject: Internship abuse query: "I understand from the LU PD officer I spoke to today that you are looking into the issues I have had in the counseling department. ….But the larger issues are with my PhD in counseling internship in Fall 2015. I reported issues to the Director of Clinical Training, Dr. Pride. He did not do anything until my new supervisor at the site reported problems around a month later". Despite the fact that I had a B/B+ evaluation 8 days earlier according to the first supervisor, when the new supervisor said I needed remediation, he did not let me even present my side to the remediation committee." At that point, the situation was somewhat abusive but steadily grew worse.

189.   November 30, 2016, Russell Monroe to Sarah: "Thank you for contacting me. I understand you spoke to Officer Brown yesterday and believe some clarity may be needed. All university employees are required to direct any report of possible abuse of a minor to

LUPD… I understand that you are seeking resolution to some issues related to your internship site. Unfortunately, LUPD or myself are not in a position to investigate those concerns. As I understand it, the best use of your time would be to continue to pursue this through the Center for Counseling and Family Studies, which it sounds like you already are."

190.    Later that same day, November 30, 2016, Sarah to Russell Monroe, cc'in Brittney Wardlaw and Steven Warren in response: "What I am not understanding is how Liberty is able to not look at a claim of discrimination at an internship site. Although the claim is not against a Liberty employee, Liberty has taken action based on information provided as part of retaliation or discrimination against me.  It seems that make Liberty a partner to discrimination once Liberty was notified of the discrimination involved, but yet chose to do nothing…"

191.    Later on November 30, 2016, Sarah to Brittney Wardlaw and Russell Monroe: "I may not mentioned in the emails this summer that the supervisor at my site breached my confidentiality with Liberty as far as what I understand is protected health information … Since Liberty already knew the information the privacy breach was much less of a problem than it could have been…"

### December 2016

192.    On or around December 5 or 6, 2016, Sarah wrote to the Student Advocate, only to cancel after <u>Liberty's threatening letter of concern **incorrectly** stated that she was out of appeals and hinted strongly that if she kept appealing she would be expelled.</u>  Sarah's attempt to address the incorrect information to Dr. Sosin was not allowed, as Dr. Sosin made it clear she only wanted Sarah to complete internship.

193.    The letter of concern also said that Sarah needed to watch her emotional regulation, which seemed insulting because she had just learned her child had been **assaulted** and was not given an opportunity to explain.

## Chaos at Shield Ministries

194.    The partnership with Shield Ministries was orally agreed to between Shield Ministries
and Win4Life or around November 18th, 2016.  The partnership was affirmed again around
December 18, 2016, in a meeting with Sarah Leitner, Ms. Stokes of Win4Life, and David
Truluck.

195.    Sarah Leitner had been told via email, by Dr. Pride, in Spring 2016 that a situation such
as this was allowed, as long as there was a connection between the two non-profits. In a
meeting in late March or early April 2017, a Liberty University faculty member second-
guessed this by saying that Sarah should not have trusted a communication from so long
before.  However, it was reasonable  for Sarah to trust previous communications from Dr.
Pride.

196.    Counseling began three or so days after Dr. Pride received a **courtesy email** notifying
him of the situation when the University stated emails were to be returned within 48 hours
AND when Dr. Pride had not responded to many emails in the past.

**Dr. Deacon's bias as well as lack of time and attention to the course she was teaching**

197.    In Fall 2016 Dr. Deacon cancelled class frequently, mainly because she was busy with
the CACREP accreditation. <u>Please note that she was doing things that were disallowed under
CACREP in order to get CACREP accreditation.</u>

### Dr. Deacon quickly decides Sarah has an "unauthorized" Internship site

198.    Dr. Deacon somehow decided – as is recorded in the audiotape of late March 2017 – that
Sarah Leitner was doing this as an "end run" around Liberty University rules.  She apparently
assumed that the possible internship site Sarah Leitner had sent her in late October was the
site at Shield Ministries and Sarah was trying to go around the rules in order to get started at
the site quickly.  Sarah had quickly realized the site would not work because the site because
too many people were going to be out due to the Thanksgiving and Christmas holidays.

199.    In reality, emails to Dr. Deacon and Dr. Pride show that the site Sarah Leitner proposed
in late October or early November already had an internship agreement signed with Liberty
University.  Additionally, Sarah Leitner did not even know of the existence of Shield
Ministries until around November 13, 2016.

200.    In February 2017, Dr. Deacon decided that worked as an intern for Win4Life at Shield
Ministries was an unauthorized internship site, despite the fact that there was no guidance to
allow Sarah to know that it was an unauthorized site and Dr. Deacon had refused to see
Sarah's documentation.

201.    Sarah still does not understand how Dr. Deacon came to this conclusion.  While Dr.
Deacon was making this quick and discriminatory decision, Sarah was on a business trip and
trying at the same time to determine if her child needed to go to a psychiatric hospital.  Dr.
Deacon had been **too busy to have class that week – something that often occurred - but
not too busy to decide Sarah Leitner had an unauthorized internship site.**

**Dr. Deacon's bias & unfair evaluations  & lack of grading**

202.    **As of around May 2017, Dr. Deacon STILL had not graded Sarah Leitner's
assignments from the previous semester,** i.e., Fall 2016, greatly impeding Sarah's learning.
Since Dr. Deacon was heavily involved with the CACREP accreditation, it seemed **that
accreditation was more important than actually having and following necessary
procedures and providing necessary documentation,** including **definition of terms** used
in the documentation.

203.    On or around July 2017, **five months after the course ended, Dr. Deacon further
showed her bias** by completing a checklist about Sarah Leitner's counseling around **5
months after she had given Sarah an F.  She also graded Sarah much lower than Dr.
Stringer,** her external supervisor – another sign of bias.  **Sarah is unsure if she ever
received grades for her assignments from Fall 2016 as the last time she checked, likely
around May 2017, they still had not been graded.**

204.   Dr. Deacon received one or two videos of Sarah's counseling before the end of the Fall Semester in 2016 yet still had not given Sarah any feedback in February 2017.  This was an **unfair evaluation,** as this was one or two of the first counseling sessions Sarah did after the horrific abuse at the brig **– abuse Defendant Liberty refused to investigate or even acknowledge could have occurred.**

205.   Knowing that individuals who had refused to listen, investigate, or even validate Sarah's concerns made it very hard for her to record **any** videotapes as it seemed **any videotape would be treated poorly – in this case with silence.**

206.   Finally, Dr. Deacon broken ethical standards by not giving Sarah **any** feedback on her videotapes.

### Warning Signs at Shield Ministries – Chaos continues, eventually not allowing Sarah to ethically provide counseling services

207.   Sarah Leitner saw many warning signs at Shield Ministries, which she shared with Dr. Stringer and Ms. Stokes.  She did not share them with Dr. Deacon because Dr. Deacon cancelled class quite frequently and did not seem to be available.

208.   Below are some of many examples of the chaos and unprofessionalism at Shield Ministries.

209.   For instance, on December 26, 2016, David Truluck emailed Sarah Leitner, stating he had lost the contacts in his phone and needed Sarah to resend her phone number.

210.   Also on Monday, Dec 26, 2016 at 5:09 AM, someone from Shield Ministries emailed Sarah Leitner as follows: "… Also, please be sure you have a release form signed by everyone you are counseling with.  The weekend events with XXXXX XXXXX concluded with him being admitted to Trident Hospital.  Without the form, we are putting ourselves and the men at risk".

211.   On another occasion, Thu, Dec 29, 2016, 8:28 AM via text, "David, Melodie, this is Sarah. XXXXX needs a medicine consult with mental health ASAP this morning.  He is

experiencing some issues with his schizophrenia…".  To the best of Sarah Leitner's knowledge, they stated they would make sure he was at mental health that morning, but instead waited for the afternoon - on a day right before a major holiday – which meant XXXX did not get the necessary care.

212.   The Trulucks did not appear to know the emergency mental health number for Charleston County even though they ran a "ministry" that housed sex offenders and others and had had multiple occasions where someone was removed in an ambulance.  Sarah Leitner (Thu, Dec 29, 2016, 9:13 AM) sent the following:  "(843) 414-2350 is the emergency number at mental health. It is available 24/7. It can be called about concerns with any Charleston county resident…"

213.   On December 30th, 2016, David or Melodie Truluck emailed Sarah Leitner, and others, asking if **anyone knew where the key to the backroom was**.

214.   Sometime in January Sarah Leitner was told that David Truluck was on the sex offender registry and so was Kevin Belt, a frequent volunteer and member of the Board of Trustees. This had not been revealed previously to Win4Life or the partnership agreement would NEVER have been executed in November 2016.

215.   The Trulucks <u>stated that they wanted Sarah Leitner to counsel at Shield Ministries, but constantly made it difficult and sometimes impossible for her to counsel</u>. On Saturday, January 14, 2018, 11:20 AM, Sarah Leitner notified David Truluck that it was too loud to counsel <u>with demolition occurring</u>.  On multiple other occasions, David or Melodie agreed that Sarah Leitner could use the sanctuary/meeting area to counsel, only to have it not available when Sarah showed up.

216.   David and Melody Truluck, by text on  Monday, Jan 23, 2017 at 6:03 AM notified Sarah Leitner that she had to  stop counseling "**My** board of trustees has concerns about the relationship between SHIELD MINISTRIES and you They have told me to suspend all counseling effective immediately…" [emphasis mine]

217.　At 7:28 AM the same day, Sarah Leitner asked, via text: "Are there specific concerns I should be aware of? How long do you think it will take to have a written contract?". She received no answer.

218.　In the next days, Sarah Leitner had to cancel appointments with all clients, and on Fri, Jan 27, 2017, 12:50 PM today David via text: "… **I am concerned if this requirement not to counsel goes on too long it will cause problems with clients**…" She received no answer.

219.　David and Melodie Truluck spent the next few weeks putting off when a decision would be made <u>repeatedly</u>.  Dr. Deacon asked at some point why Sarah had not notified her that she had left Shield Ministries – but **<u>she had not left, she was continually being put on hold, much to the detriment of her clients.</u>**

220.　Finally, David and Melodie Truluck, on Friday, February 17, 2017 7:31 AM, sent via email to Sarah Leitner and Dr. Stringer:  "We will need to re-schedule the meeting on the 23rd, with you, Chaplain Golden, David and myself.  Chaplain Golden's wife is having a medical procedure.  He will let me know of his availability." This was a HUGE ethical problem because Sarah was not able to provide care to clients as David Truluck kept not allowing her to counsel.

221.　At that point, Sarah once again spoke to Dr. Stringer at her next scheduled supervision appointment about the situation.  **Sarah stated that due to the Truluck's erratic nature, as well as questionable ethical decisions, she thought she should not return to Shield Ministries.**   Dr. Stringer, with Sarah Leitner in her office, wrote Dr. Deacon an email stating that the partnership was being cancelled due to an individual's erratic behavior or nature.

222.　<u>Instead of asking Sarah Leitner or Dr. Stringer who the "erratic" individual was, or what problems had occurred, Dr. Deacon immediately began to investigate Sarah.</u>

COMPLAINT
Leitner v. Liberty University et al.

**Dr. Deacon apparently and erroneously let it be known at Liberty that she discovered Sarah was at an unauthorized internship site – DEFAMATION!**

223.    Later grade appeals stated, **erroneously**, that Dr. Deacon had discovered Sarah was at an unauthorized internship site. **This is untrue, as this email was sent as well as the end of November email appraising Dr. Pride of the situation. This appears to have biased the appeal reviewers against Sarah Leitner**.

224.    Sometime on or before 2/21/2017: Shield Ministries notifies Sarah Leitner that she will be unable to counsel until she sees Chaplain Goldman (sp?) sometime in the indeterminate future. This was the last of many incidents that made it clear Trulucks were not really concerned about their clients. All Sarah had been told, in a month or so, was that Sarah had "one or two things" to fix.

225.    On Tuesday, February 21ˢᵗ, 2017, Sarah notified David Truluck, via telephone, that as well as having issues with patient care due to the long time without care, Sarah Leitner would most likely fail and be expelled because she was not able to get the hours she needed to complete the class. At 5:30 PM, as a follow up, David recommended to Sarah that she speak to "Leroy Moore Mobile (843) 640-6202 Call Leroy at TriCointy Family Ministries".

226.    Sarah Leitner not believe David Truluck would have sent her to TriCounty Family ministries if David Truluck was as "upset" as he stated to Dr. Deacon, or at least, as Dr. Deacon thought he was.

227.    **Due to David Truluck's lack of interest on 2/21/2019, Sarah notified Win4Life that she could not ethically continue her part of the partnership with Shield Ministries.**

228.    On Feb 22, 2017, 1:55 PM , via email, Sarah notified Ms. Stokes of Win4Life: "I am going to have to stop Counseling at Shield Ministries. David has had too many demands that seem to impair patient care….". Please not that Sarah Leitner specifically cited **David's "too many demands that seem to impair patient care."**

229.   On Tue, Feb 28, 2017, 8:18 AM Sarah Leitner texted David Truluck: "I've been expelled now" while at 3:47 PM David Truluck stated: "I am very sorry to hear that. If I can help you in any way let me know" – yet another sign of David's contradictory answers to Sarah Leitner and Liberty University.

230.   Sarah Leitner stated to Ms. Stokes of Win4Life at Mar 28, 2017, 12:57 PM: "The entire process was <u>so fast that I couldn't even figure out what was going on before a decision was made.</u>"

**Bias against Sarah Leitner at Liberty University cause deeply flawed and hurried decisions**

231.   When Sarah Leitner notified Liberty University that the "Reverend" that they were trusting was also a sex offender, DEFENDANT LIBERTY chose to disregard this information.

     a.   Sarah Leitner could not find a policy at DEFENDANT LIBERTY about this but there may be one in Liberty's website in a directory would not open[13]. However, news reports show that in 2007, DEFENDANT LIBERTY asked a contractor to fire three sex offenders who were working at the school[14]. Thus, it would appear that Liberty University *is concerned* about sex offenders and that this is an example of Liberty's bias against Sarah Leitner.

232.   Defendant Liberty appears to have not taken into account Sarah's external Supervisor's report that David Truluck of Shield Ministries was erratic.

233.   **Sarah Leitner notified Dr. Deacon that she had not seen all pertinent emails. Dr. Deacon disregarded this statement by Sarah Leitner.**

234.   Since Dr. Deacon did not speak to Sarah's site supervisor prior to ending her investigation, Sarah's site supervisor did not have a chance to affirm that she had been in

---

[13]   https://www.liberty.edu/index.cfm?PID=763
[14]   https://forums.aseaofred.com/forums/viewtopic.php?f=13&t=3107

meetings in which the Win4Life / Shield Ministries discussed the contract.  Even Defendant

Liberty's internal documents did NOT even mention Sarah site supervisor, but instead stated

only Dr. Stringer.

235.    **Sarah was not even allowed to present her case before the expulsion occurred** as

**Sarah Leitner assumed Dr. Deacon would speak to her site supervisor** before deciding

that Sarah Leitner had an "unauthorized internship" .  This is against the clear policies of the

ethics code, that require policies and procedures, such  as here:

> "F.7.i. Field Placements Counselor educators develop clear policies and provide
> direct assistance within their training programs regarding appropriate field placement and
> other clinical experiences. Counselor educators provide clearly stated roles and
> responsibilities for the student or supervisee, the site supervisor, and the program
> supervisor. They confirm that site supervisors are qualified to provide supervision in the
> formats in which services are provided and inform site supervisors of their professional
> and ethical responsibilities in this role".

236.    FERPA: March 10th, 2017, Mary Deacon to Lisa Sosin and Russell Monroe: Mary

Deacon goes on to state the following:  "Sarah stated that she was planning to seek

consultation before deciding whether to attend a meeting with faculty later that month."

Mary Deacon goes on to explain that she feels this is a threat of legal action and a threat to

her licensure.  **DEFAMATION!**

237.    However, consultation is a key part of Counselor Education, and in fact is mentioned **26**

**times** in the American Counseling Association 2014 code of ethics, which governs Mary

Deacon's license and which Liberty Universities Counseling program subscribes to.  Sarah

believes the plain meaning of consultation with another counselor educator was clear.  This

shows yet another  time Mary Deacon jumped to a conclusion without hearing all of the

evidence and biasing those Sarah would be taking her case to later.

238.    Additionally, according to the documents received under FERPA, this email was opened

at some time by Stephany Steger, Title IX, a possible indication of bias in the Title IX

process, a process that is supposed to be <u>impartial</u>.

239.    Around March 2017, Defendant Sosin chose to state to Sarah in an email that she should

not bother appealing, as a decision had already been made.  <u>This was one of many</u>

<u>occurrences that show that the reasons Sarah was expelled were in fact pretextual.</u>  Dr. Sosin

did NOT back down until the Student Advocate told her that Sarah <u>had</u> to have a chance to

appeal.

### 2017 Appeals

**240.**    Sarah Leitner's appeals in 2017 were also rejected on the grounds that she would not

have been able to achieve competency by the end of the semester anyway, so it did not matter

that Sarah was not allowed to complete the course.  Dr. Stringer stated to one or more Liberty

University Deans that if Sarah had been allowed to complete the course **she would have**

**achieved competency.  The argument that Sarah would not have achieved competency**

**was particularly cruel and discriminatory since Liberty University Defendants had**

**created the disability by their inaction while Sarah was at the brig.**

241.    Much of the details of how the academic appeals were treated by Liberty University is

unknown since Liberty University did not release an incident report, notes from the

remediation committee, as required under FERPA.

242.    On at least one occasion, Sarah's grade appeal was rejected by individuals who had

already received biased information from others at Liberty University.

243.    One email that Sarah Leitner sent seems to sum of the situation at the brig:

> Things got steadily worse and many sections of the Code of Federal Regulations and
> ethical codes were ignored by the site, a US Navy facility outside Charleston, SC.  Dr.
> Pride left an incomplete open, somehow expecting things to get better. As things
> deteriorated, I asked to get out of an abusive site, and was told to go back by Dr. Pride. I
> cried every day at my desk for months [while at the internship]….. The situation has
> become acute because I have been trying to re-do internship this semester. I finally filed a
> complaint to the Independent Government Investigator since my site was federal
> government... I described loss of my confidentiality to Liberty by my supervisors and
> associated possible discrimination …I feel very invalidated by Liberty's handling of the
> situation with my prior internship. **This makes me feel unsafe and unable to perform,**
> **particularly when Dr. Pride is involved.**  I believe if he had listened in October and

November 2015, this situation would not have occurred, yet he is supposed to be a part of the solution. I tried to talk to him via email two weeks ago to clear the air, and he did not even know the air needed to be cleared. When I described the issue in more detail, he did not even bother to answer my email. **At this point in many ways Liberty's response has been more wounding than the original abuse**.

### 2018 report to the Title IX office

244.    In May or June 2018, Sarah called the Title IX office because she wanted to submit a complaint about the abuse at her internship site as well as Liberty's negligent and discriminatory handling of the situation.

245.    Sarah Leitner begged to be able to speak to the Title IX investigator because the trauma was still difficult to speak about at that time and even harder to write about. However, she was notified that all communication had to be in writing. Much later she learned that this was a violation of Liberty's Title IX policy as it stated that written or oral communication was permitted.

246.    For about two weeks, Sarah Leitner emailed the Title IX office asking what was required for submitting the case. Each reply was something similar to "oh, just write down the discriminatory behavior that occurred". However, as is evident from this write up, writing down all charges in a paragraph or two is difficult and she received no help from Liberty University.

247.    Sarah Leitner specifically asked who was responding to the Title IX emails since responding to an un-named individual, who continually said words such as "alleged" was almost impossible. Was this person someone who had already pooh-pooed her complaint? Was this an individual such as Dr. Myers, who had told Sarah that her complaint was very serious and was she sure, therefore invalidating what she had to say?

248.    Sarah emailed the investigator stating the 2016 investigation had been closed for reasons that appeared to be against federal regulations, as discussed above. The investigator stated that the record stated the investigation had been closed because Sarah Leitner had not responded.

249.   To the best of Sarah Leitner's knowledge, Sarah did not receive even an apology when she sent previous emails showing that in 2016 the Title IX office had refused to investigate as described above.

250.   Title IX prematurely closed the case on or around July 13, 2018, telling Sarah that she could re-submit at any time.  Sarah immediately stated that she had meant to email, but that in the past few weeks her husband had been hospitalized after almost dying and had surgery that very day (e.g., July 13, 2018).

251.   On July 18, 2018 Dr. Sosin sent report of what happened to Title IX due to the email Sarah Leitner had sent to Defendant Sosin earlier that day.  Sarah included a quotation from an email she had sent to Defendant Liberty in 2016:

> "… **at this point I do not feel safe going into the brig**. …" ….  Sarah Leitner goes on to state to Dr. Sosin: "… This is only one of several emails I have found as I have been reviewing all past emails and other documentation as my daughter is finally improving. I felt threatened for 3 months at my site, as a complete listing of correspondence would show.
>
> I felt extremely **threatened** to be ordered to return to my internship site after I sent this email to Dr. Pride. I believe the only response I received was that I was ordered to return to my site by Dr. Pride via telephone. I found it threatening to return to any internship site in fall 2016 without Liberty having dealt with this.
>
> Let us work towards reconciliation, and as a result, create the needed policies and procedures to ensure this does not happen again. I will not stop advocating for my fellow students in this matter. It was truly a hopeless feeling to be told I had to return to an unsafe internship site. Overall at times I did fear for my physical safety just apparently not at the time I wrote this particular email [emphasis mine]"

252.   Dr. Sosin's email does not seem to have been reported in the very incomplete FERPA records received from Liberty University in February 2019.

253.   Around a week or so later, the Provost told Sarah Leitner that allegations such as this needed to be dealt with by the Title IX office and that **she was out of appeals – something almost irrelevant to the safety issues Sarah had raised in the email.**

      b.  Sarah Leitner was angry because she had already been to the Title IX office multiple times, with NO assistance.

      c.  Sarah Leitner was even angrier because the Title IX office had often taken ten days to respond to a complaint. Obviously the Title IX office was unable to respond quickly in a crisis!

      d.  Instead, around July or August 2018, Sarah was told in an email from the Provost stating to Sarah Leitner that she was out of appeals.

254.    Sarah Leitner finally sent the office 27 pages of documents – mainly previous emails - because she was unable to respond in the matter that Liberty required of her. These 27 pages of documents do not even appear to have been mentioned in the Title IX database as sent to Sarah Leitner in February 2019.

255.    Around ten days later, Defendant Liberty sent a number of questions to Sarah about what she had written. After Sarah was unable to respond quickly to their requests, it appears that Liberty again closed the case, without documenting the re-opening and second closure of the case in internal documents received under FERPA in February 2019.

256.    **In summary, the Title IX office had acted in bad faith to Sarah Leitner by making it almost impossible to submit a complaint, yet stated internally that she had been offered the opportunity to submit and had not. As shown elsewhere, one individual even responded to another Liberty individual stating Sarah Leitner had been offered the opportunity to submit – with a smiley face!**

**Summary of Pretextual Factors**

257.    Sarah identifies the following 24 specific irregularities that she believes demonstrate gender, and/or associational discrimination as well as retaliation for making a Title IX report in Summer 2016. This is but a partial listing of the many factors that show that these activities by Defendant Liberty were pretextual in nature and not based on Sarah's performance or competency.

a. Sarah was not given key evidence, or even a complete list of allegations against her, in order to prepare her grade appeal;

b. Evidence was used by Defendant Liberty on grade appeals that did not even exist until a day or two before the appeal was denied, five months after the expulsion was ordered;

c. That this same evidence was created by Dr. Deacon in retaliation against Sarah, as evidenced by her Counseling checklist, written around five months after the grade was given, and much lower than previously given by Sarah's external supervisor on either of two occasions;

d. Liberty claimed to high level administrators, such as Jerry Falwell, that the case had been adequately investigated, when in actuality, it appears no investigative report was ever been written by any individual that had any background or training in investigations. If an investigative report was prepared beyond Liberty's flawed summation of the case, as shown below, Sarah has never received a copy, even in the documents she received from FERPA;

e. That the documents referenced below, titled "LU Individuals Involved with Matters Related to Ms. XXXX", and released via FERPA, include multiple pieces of "evidence" that is not substantiated by various records, is plainly contradicted by the existing records, and/or is cited as evidence without any statements on why or how the item is in fact evidence;

f. That Liberty, rejected her appeal, having already seen previous information, including from Title IX, that biased them against her and prompted them to act in a discriminatory and retaliatory manner;

g. That Dr. Deacon did not grade papers from Fall 2016 prior to giving Sarah a failing grade in February 2017, impeding Sarah's ability to meet course standards;

h.  That Dr. Deacon did not grade or give any feedback on videotapes, depriving Sarah of the opportunity to improve and show that she had met course standards;

i.  That Sarah was required to submit videotapes in her internship when she knew of no one else who had to submit a single videotape, let alone a total of six to complete the course;  Furthermore, she was required to submit these videotapes to individuals who had already actively minimized her previous experiences, and thus showed extreme bias.

j.  That "evidence" included in Liberty's "case summary", received through the FERPA request was her daughter's illness, a disability, as shown below.

k.  That Liberty chose to state in a grade appeal that even if Sarah had been able to continue to attend in the course, she would not have achieved competency, despite Sarah's external supervisor having attested otherwise.

l.  That defendant Liberty chose to state in a grade appeal that even if Sarah had been able to continue in the course, she would not have achieved competency, despite knowing that Sarah from Sarah's multiple reports that she felt unsafe returning to internship, and stated that the abuse suffered at the internship site had decreased her sense of professional competency.

m.  That Liberty in an unsigned document, from "Leadership" of the CES program, emailed to her by the administrative assistant of the CES Department, Bonnie Gold, on December 5, 2016 (but with attachment dated internally December 6, 2016) that made various untrue statements, including that Sarah had no appeals left;

n.  That Sarah notified Student Advocacy, Erin Bass, that she had withdrawn her general complaint, recommended to her by Dr. Warren, due to defendant Liberty's threat to expel her from the CES department, in an unsigned document

from leadership of the CES program,  **if she made any more complaints she would be expelled, clearly retaliation**.

o.  That Sarah attempted to notify Liberty, through Dr. Sosin, of the errors in the unsigned document from leadership, such as that she had not completed the grade appeal process, but was told only to continue to continue working on internship.

p.  That Defendant Sosin told an official government investigator that all standards had been met at the government affiliated site, even though she knew that Sarah had submitted many standards that had not been met at the site.

q.  That Liberty knew that Sarah's family was experiencing catastrophic and traumatic experiences, yet still chose to tell Sarah she could not withdraw from the course, **thus setting her up for failure;**

r.  That Liberty knew that Sarah had just found out her child had been sexually assaulted, yet still chose to tell Sarah, within days afterwards, in a document from the Leadership of the CES program, that she was having difficulties in "emotional regulation".

s.  That Liberty, including Defendant Sosin, had seen a list of standards that the government-affiliated site had not met, **yet did not ask Sarah for any information to substantiate her allegations.**  Thus, defendant Liberty knowingly rejected Sarah's appeals without having done due diligence by gathering necessary information.

t.  No known documents, including in documents obtained through FERPA, show any sort of explanation of how the purported evidence was processed in as related to allegations at both internship sites.

u.  That Sarah, after working for Liberty as Adjunct Faculty for six years, teaching three terms a year, suddenly received no more course assignments from

Defendant Liberty, in close proximity to the time Sarah filed her first official Department appeal in Spring 2016, an example of discrimination.

v.   Defendant Liberty stated in a document, "Repeatedly contacted SAO to discuss events including "Abuse" suffered at internship and difficulties with daughter. This statement is evidence of discrimination against Sarah by defendant Liberty, since Sarah is being discriminated against due to her familial association with her child.

w.   Defendant Liberty stated in a document, "Repeatedly contacted SAO to discuss events including "Abuse" suffered at internship and difficulties with daughter. This statement is evidence of discrimination against Sarah by defendant Liberty, since Sarah's allegations of being a victim of a crime were described as "Abuse" without any investigation. Other documents, including one from Dr. Sosin, even use the term alleged "abuse", again without any investigation.

**Select discriminatory, defamatory, and negligent Liberty University documents**

258.   As received in documentation from Defendant Liberty in 2019, multiple non-dated documents, with no author name, appear to describe how Defendant Liberty, includes additional information showing how all Liberty Defendants wrongly portrayed the above events. For the sake of clarity, a copy of each document, in whole, is placed in-line in this document, followed by information related to that document is placed together. That is then followed by comments and evidence refuting Liberty's assertions.

**Liberty's discriminatory summary, titled "LU Individuals Involved with Matters Related to Ms. Sarah Leitner" AND "SUMMARY OF ACADEMIC EVENTS LEADING TO MS. LEITNER's DISMISSAL"**

*LU Personnel Involved with Matters Related to Sarah Leitner*

- **Brittney Wardlaw** – Director of Title IX, LU
- **Russell Monroe** – Senior Associate Director of LUO/Graduate Community Life, LU

- **Dr. Mark Meyers** – Associate Dean of Counselor Education, LU
- **Dr. Kevin Strubel** – Chair, Graduate School, LU
- **Dr. Steve Warren** – Interim Dean, School of Behavioral Sciences, LU
- **Gene Brown** – LUPD Officer
- **Dr. Mary Deacon** – Director of Counseling Programs, Behavioral Sciences, Faculty Supervisor, LU
- **Dr. Kathleen Stringer** – Internship Site Supervisor
- **Dr. Melvin Pride** – Director of Clinical Training, Behavioral Sciences, LU
- **Dr. Lisa Sosin** – Director of PhD in Counselor Education and Supervision Program, LU
- **Erin Bass** – Student Advocate, LU
- **Dr. Jeffery Boatner** – Associate Dean, Behavioral Sciences, LU
- **Dr. Elias Moitinho** – Department Chair, Behavioral Sciences, LU

*Summary of Academic Events Leading to Ms. Leitner's Dismissal*

- Sarah brought forward allegation of abuse occurring at a non-LU affiliated internship site in Fall 2015.  Issue addresses by Title IX and Office of Community Life, determined out of jurisdiction, recommended recourse through the program and outside resources. Outcome provided to Sarah via email.
- Sarah wanted to add a new internship site and was informed at the beginning of November both the Site Approval form and the affiliation Agreement were required prior to seeing clients.
- Sarah communicated that her current site Win4Life asked her to provide counseling services to clients affiliated with a different site, Shield Ministries.
- Sarah was told that an affiliation agreement would be necessary for the new site, Shield Ministries.
- Sarah started seeing clients at Shield Ministries WITHOUT a signed copy of Liberty's Affiliation Agreement.
- Sarah was told three separate times to discontinue seeing clients at all Internship locations until all paperwork had been adequately completed.
- In correspondence with the Director of Shield Ministries, it was determined Sarah has misrepresented the relationship between Win4Life and Shield Ministries, Which potentially created a conflict of interest for the two organizations and jeopardized their ability to provide services.
- Sarah advertised through Psychology Today to see clients independently, without approval or supervision from program coordinators.
- Repeatedly contacted SAO to discuss events including "Abuse" suffered at internship and difficulties with daughter.
- Sarah was dismissed from the LUO PhD Counseling Education program in March 2017.
- Sarah appealed the decision, but it was upheld.
- Over the course of the last two years, Sarah had threatened "legal action", but declines when asked to clarify her intentions.

### Rebuttal of the inaccurate "summaries", above, from Defendant Liberty

259.   Sarah's site supervisor, Ms. Vanessia Stokes, is <u>not</u> listed here by Liberty.  Instead, the external supervisor, Dr. Stringer, is listed as the site supervisor in error.  The decision was <u>unilaterally made by Liberty to revoke the internship site, without speaking to the Site Supervisor OR following the Liberty University-Win4Life Affiliation agreement.  It appears Dr. Deacon assumed that Sarah's external supervisor was Sarah's site supervisor.</u>  Thus, Dr. Deacon did all her "investigation" by speaking <u>only</u> to Sarah's external supervisor and not to Sarah's site Supervisor.  **Sarah was on a business trip at the time and was going to answer Dr. Deacon's emails when possible.  Sarah knew that Dr. Deacon had not even spoken to her site supervisor, thus making the reasonable assumption that the investigation would not end until after Sarah had spoken to her supervisor.**  When Sarah's external supervisor was unsure or did not have an answer to a question, it appears **Dr. Deacon assumed Sarah had been unethical when in actually she was speaking to the <u>wrong</u> individual.  Additionally, the positive comments of Sarah's site supervisor, or of Sarah's external supervisor, are not even mentioned in the FERPA files received from Liberty University as far as Sarah can tell.  Sarah was <u>barred from submitting critical information</u> to Dr. Deacon prior to her decision.**

260.   **Liberty alleges:** Sarah brought forward allegation of abuse occurring at a non-LU affiliated internship site in Fall 2015.  **Sarah asserts:**  <u>this site was affiliated with Liberty</u> according to the affiliation agreement signed between the site and Liberty in February 2015 and referenced above.

261.   **Liberty alleges:** Issue addresses by Title IX and Office of Community Life, determined out of jurisdiction, recommended recourse through the program and outside resources.  Outcome provided to Sarah via email.

   a.   **Sarah asserts:** As shown by the following **<u>covered Educational Programs</u>** have <u>jurisdiction within Title IX as Title IX covers **all educational activities**.  Thus,</u>

this finding was in error and is one of many pieces of evidence to support an

allegation of pretext in the context of Title IX related discrimination.

*b.* See the following from the Department of Justice at

https://www.justice.gov/crt/title-ix [emphases by Sarah]:

> "In conducting such factual inquiries, it is important to remember that *determinations as to what constitutes a covered education program must be made as broadly as possible.*
>
> "*If the recipient does have education as its primary purpose, such as colleges, universities, school districts, training institutes, and academies, then the federal funds result in institution-wide coverage.*"
>
> "Sexual harassment may be prohibited even when it does not occur on the program provider's premises, *as long as the off-premises activity during which the sexual harassment takes place relates to the covered educational program.* Crandell, D.O. v. New York College of Osteopathic Med., 87 F. Supp. 2d 304 (S.D.N.Y. 2000) (off-campus misconduct actionable under Title IX where harassment occurred in clinic during the student's paid internship)....it is well established that the covered education program or activity encompasses *all of the educational institution's operations including, but not limited to, "traditional educational operations, faculty and student housing, campus shuttle bus service, campus restaurants, the bookstore, and other commercial activities....*"

262.   **Liberty alleges**: Sarah wanted to add a new internship site and was informed at the

beginning of November both the Site Approval form and the affiliation Agreement were

required prior to seeing clients.

*a.*   **Sarah Asserts**: Liberty emails here were a source of confusion because the site

Sarah attempted to add, the local drug and alcohol center, was already a Liberty

affiliated site.  Dr. Deacon passed Sarah's emails to Dr. Pride before she had all

the details and thus did not know the site name or that it had an already-existent

agreement with Liberty University.

*b.*   In an in person, recorded meeting between Sarah and the Liberty faculty on or

around March 27, 2017, Dr. Deacon acknowledged that she had assumed Sarah

had decided that since it was going to take too long to get the previous site

approved Sarah had decided to do an end-run around the requirements through

this partnership.  It appears Dr. Deacon <u>assumed</u> that the process would not be quick because she was not aware of the existence of the signed affiliation agreement between Liberty and the previous site, the County drug and alcohol facility and thus thought Sarah was taking a shortcut.

263.   **Liberty alleges:** Sarah communicated that her current site Win4Life asked her to provide counseling services to clients affiliated with a different site, Shield Ministries.

  a.  **Sarah asserts: At no point in November or December 2016 did Dr. Pride or Sarah state that this was a different site.**  Email to Dr. Pride of Late November 2015 makes it clear that Sarah believed Shield Ministries to be the same site as Win4Life, as she remained under the supervision of Win4Life.  Additionally, if Sarah had been attempting to do an "end run" as Dr. Deacon assumed, logically she would not have told Dr. Pride about the situation.  **Instead, this is a difference of opinion over a few words, when Sarah's family was in extremis and a request to withdraw from the internship had been denied by Dr. Deacon who knew Sarah's family was in extremis.**

  b.  **At no time was Shield Ministries represented by Sarah as a different site** as defendant Liberty suggests.  At no time did Sarah report to **any** personnel at Shield Ministries.

  c.  Sarah did communicate with David Truluck of Shield Ministries when necessary, but <u>only when there was signed release of information between the client and Shield</u> Ministries so that Win4Life could release the information.  Moreover, David Truluck clearly knew Shield Ministries was <u>not</u> the internship site as he was pushing, in an existing email, for Sarah to ensure <u>all</u> clients had signed releases to him, whether or not the client wanted to sign a release, which Sarah considered to be <u>unethical</u>. On multiple occasions Sarah refused to give David Truluck information because the release had not been completed.  Sarah's refusal

to give information David Truluck requested, may have given David Truluck, an individual with a serious crime record, motivation to allege incorrect information to Defendant Liberty.

d.   Internship was conducted at Shield Ministries under supervision of Win4Life, using Win4Life forms, etc. – in other words, everything except for location was conducted identically as at Win4Life as Sarah had told Defendant Pride in her November, 2016 email.  This was affirmed by Sarah's site supervisor via letter to defendant Liberty.  **All** counseling was conducted under the Win4Life rubric, as explained to Shield Ministries as well to each client seen.  **The Win4Life site supervisor has previously affirmed that she was in a meeting where the partnership between Win4Life and Shield Ministries was discussed and approved by both parties, despite to David Truluck's allegations to the contrary**.

e.   The *current* Liberty internship manual at the URL: states:  "Counseling clients prior to receiving the email from the internship department verifying their approval of the site and/or supervisor, including sites affiliated with an approved site".  However, **this was not in the manual at the time Sarah was in the course**, source:[15].

f.   It is logical that Liberty included this due to Sarah's case.  *If this had been written in the manual or syllabus when Sarah took the course, this issue would not have occurred* as Sarah was very careful to *observe ALL details* of the course manuals, syllabus, and emails from professors. In fact, during discovery many emails can be provided that show many occasions where Sarah asked for clarification.  **Thus,**

---

[15] https://www.Liberty.edu/behavioral-sciences/counselor-ed/wp-content/uploads/sites/19/2019/01/COUC_999_Internship_Manual.pdf , page 15, compare with manual with heading PhD Practicum and Internship Manual 2015-2016 edit 3-9-16, which was in effect when Sarah took internship

**it would appear that Liberty is acknowledging that an error was made in Sarah's case, or at the minimum, that the existing documentation, and Dr. Pride's emails, lacked clarity**.

g. Since **Sarah did not complete at any time an application to be an intern, volunteer, or in any other capacity at Shield Ministries**, it appears unreasonable for David Truluck to expect that she was completing her internship under Shield Ministries and not Win4Life and to tell Liberty University this.

264. **Liberty alleges**: Sarah was told that an affiliation agreement would be necessary for the new site, Shield Ministries. **Sarah asserts**: A plain reading of Dr. Pride's email of December 2016, as referenced above, particularly in light of Dr. Pride's email of late Spring 2016, leads to an entirely different conclusion than what Liberty states.

265. **Liberty alleges**: Sarah started seeing clients at Shield Ministries WITHOUT a signed copy of Liberty's Affiliation Agreement. **Sarah asserts**: no affiliation agreement was necessary because Sarah met all the criteria of Dr. Pride's emails of December 2016 and Spring 2016.

266. **Liberty alleges**: Sarah was told three separate times to discontinue seeing clients at all Internship locations until all paperwork had been adequately completed.

   a. **Sarah asserts**: Sarah was on a business trip during all of these three times, and thus apparently did not respond as quickly and as Dr. Deacon **assumed** appropriate;

   b. Sarah did not believe it was appropriate for Dr. Deacon to order her to cease and desist from <u>all</u> counseling as a licensed professional;

   c. Sarah had already told Dr. Deacon that she had quit counseling clients, so Sarah was confused when, after Sarah had voluntarily told Dr. Deacon she was no longer seeing clients and Dr. Deacon kept asking her <u>three more times</u>!

267.   **Liberty alleges:** In correspondence with the Director of Shield Ministries, it was determined Sarah has misrepresented the relationship between Win4Life and Shield Ministries, Which potentially created a conflict of interest for the two organizations and jeopardized their ability to provide services.

    *a.*   **Sarah asserts:** Sarah and her site supervisor Ms. Stokes, <u>both</u> attested to Defendant Liberty that Shield Ministries <u>HAD</u> agreed to the same terms and thus it was not a misrepresentation.  Multiple emails in January and February 2017, where Win4Life sought to write down the verbal agreement, served as notice to Shield Ministries that Win4Life considered the verbal contract/ partnership between Shield Ministries and Win4Life to be fully in effect starting in late November 2016.  <u>Thus, if Shield Ministries did not think a contract was in force, Shield Ministries had multiple opportunities to speak to Win4Life about this matter.  Thus it is Shield Ministries that has grievously misrepresented the relationship between Win4Life and Shield Ministries.</u>

. Dr. Deacon to Sarah Leitner on February 21, 2017 9:40:33 PM explicitly acknowledged the stress of the situation and asked form NO clarifying documents, something **incomprehensible** since Dr. Deacon **did not have the whole story**. "I am blessed that your daughter does not need to be in court. As far as sending me clarifying documentation, there is not a pressing need for it. Your earlier email provided sufficient information for me. At this point, I need to get additional information directly from the site.  Because there is not a signed affiliation agreement between Shield Ministries and the university, you cannot see clients at that site as a part of your internship. I need to have you confirm that you understand that this is the case, and that you will not see clients at Shield Ministries until there is a signed agreement in place....Please respond to this email indicating that you are no longer seeing clients at Shield Ministries."

COMPLAINT
Leitner v. Liberty University et al.

b. Sarah was left in confusion because she did not understand why Dr. Deacon would think that Sarah would be seeing clients at Shield Ministries, since Dr. Stringer and Sarah Leitner had notified her that the partnership was dissolved.

c. Sarah Leitner to Dr. Deacon February 22 at 7:09 AM explicitly stated she was <u>no longer</u> "I am no longer seeing clients at Shield Ministries…." Yet Dr. Deacon, on February 22 8:10 AM **again** asked Sarah for confirmation.

d. Sarah was very confused by this whole interaction because when Sarah and Sarah's external supervisor notified Dr. Deacon that the agreement between Shield Ministries and Win4Life due to the erratic nature of David Truluck, it seemed obvious Sarah was not returning to the site. Sarah also does not believe Dr. Deacon can order Sarah to stop all counseling, including counseling under Sarah's provisional license, only the counseling in the internship **after all procedures in the manuals are followed, and only then**.

e. After Dr. Deacon kept asking if Sarah was still seeing clients at Shield Ministries **after Sarah and Dr. Stringer had already made it clear she was not** Sarah remained if fear that Dr. Deacon would try to force her to return there, similarly to Dr. Pride's threat in 2016.

268. **Liberty alleges**: Sarah advertised through Psychology Today to see clients independently, without approval or supervision from program coordinators.

a. **Sarah asserts**: Sarah was never even told as part of the appeals process that Dr. Deacon was using the Psychology Today page as "evidence" against her.

b. Sarah does not know of Defendant Liberty having any policy disallowing a student, particularly one that is licensed, from advertising for internship clients **at an approved internship site**, through Psychology Today.

c. Logically, it would appear that many Liberty PhD students also advertise through Psychology Today as they have to make a living while attending school.

COMPLAINT
Leitner v. Liberty University et al.

    *d.* The one client seen through Psychology today was notified, verbally and in writing, using the same Win4Life agreement form, that she was under supervision as well as an intern at Liberty University and thus under Defendant Liberty's supervision.  This was not included in the ad because there was no place to include this.

    *e.* Therefore, Sarah does not understand what or how Liberty thinks this is evidence against her, particularly since defendant Liberty does not appear to have explained how any of this "evidence" was evidence;

269.   **Liberty alleges**: Repeatedly contacted SAO to discuss events including "Abuse" suffered at internship and difficulties with daughter.

    a. **Sarah asserts**: This statement is evidence of discrimination against Sarah by defendant Liberty, since Sarah is being discriminated against due to her familial association with her child.

    b. Logically, Sarah does not understand how a grade can even be given based on the allegations of an abusive supervisor without an investigation to determine what occurred.  Without an investigation or any other attempt to resolve issues, the relationship between Sarah Leitner and Liberty faculty members who had been involved in the faulty decision making was irrevocably poisoned.

    c. Sarah did discuss the issues of abuse with the Student Advocate various times. Since this undated memo from Defendant Liberty does not even state when these contacts occurred, Sarah is unable to respond.  Sarah likely contact the Student Advocate when the Title IX office refused to consider her case and she wanted to know how she could report the allegations so an investigation could occur.

    d. As a faculty member, Sarah believed that it was her duty as an employee to ensure the systemic issues that occurred were investigated, as she believed they were a significant risk of liability to Liberty.  **Thus, as an employee she had to discuss**

**these events to the attention of Defendant Liberty and that Sarah was**
**performing a whistleblowing function.**

    e.   Sarah did discuss issues with her daughter because she <u>was unable to find any</u>
<u>accommodation</u> with Liberty University, as <u>she had been discriminated against</u>
<u>due to her child's disability.</u>

270.   **Liberty alleges**: Sarah was dismissed from the LUO PhD Counseling Education program
in March 2017.  **Sarah asserts***:* see comments about lack of due process throughout this
document.

271.   **Liberty asserts**: Sarah appealed the decision, but it was upheld.  **Sarah asserts**: that
necessary information for her defense was withheld throughout the appeal, such as this
document, as well as in her attempt to file with Title IX.  *Sarah was also refused an*
*extension of time when her child had been raped and been in the psychiatric facility during*
*the time Sarah had to write the appeal.*

272.   **Liberty alleges**: Over the course of the last two years, Sarah had threatened "legal
action", but declines when asked to clarify her intentions.

    a.   **Sarah asserts***:* Since it is unknown when this document was written, Sarah does
not know when the "two years" started or ended.  Moreover, she does not know of
**any** time before early 2018 that **she even mentioned legal action**, let alone
declined "when asked to clarify her intentions".  Thus, this is **flagrant** defamation
and defamation *per se.*

    b.   Sarah *did* ask for mediation on multiple occasions between the Summer of 2016
and early 2018.

    c.   Sarah did everything in her power to avoid filing a lawsuit, including contacting
Godly Response to Abuse in Christian Environments (GRACE), in March 2017,
as well as several other mediators.

**Defendant Liberty's flawed "Timeline of Title IX Activity"**

273.    Below is the Liberty University document titled "Timeline of Title IX involvement", in

full.  Comments on each point, including how <u>each</u> point is invalid, are included below.

While some of this is included elsewhere, it is included again here in order to **underline the**

**inaccurate and incomplete nature of the "evidence" used against Sarah Leitner.**

| Date | Description of Event |
|------|---------------------|
| June 8 2016 11:41 AM | Email to Title IX [Brittney Wardlaw] from Sarah Leitner: Looking for a "sense of safety". claims "no allegations of abuse are investigated even if only informally" and would be satisfied with "mediation or dispute resolution." |
| June 8 2016 Afternoon? | Possible phone call between Brittney Warlaw (DTIX) and Sarah Leitner no notes available. |
| June 9 2016 2:17 PM | Email to Sarah Leitner from Title IX (Brittney Wardlaw) "Alleged abuse is emotiona/psychological and alleged abusers are not employees of the university or even independently contracted."  Options available to Sarah at that time were "complaint with the board file a complaint with the directors of the site or appeal to the Associate Dean in Counseling Education." Acknowledged Sarah was granted grace to stay in the program despite the dismissal policy.  "I will not be able to assist you further with this matter from the perspective of the Title IX Office." |
| June 14 2016 1:54 PM | Email to Dr. Mark Myers (Assoc. Dean of Counselor Education) from Sarah Leitner: "I remain upset that I received a C due to an abusive supervisor.  I do not believe I should have to keep a C for all time simply because an abusive |

| | |
|---|---|
| | supervisor decided I was incompetent when I had live supervision in front of her on one occasion." |
| Jun 15 2016 4:58 | PM Email to Sarah Leitner from Dr. Mark Myers (Assoc. Dean of Counselor Education).  Registrar was contacted to determine options for academic accommodations. Recommended Sarah use "established protocol" to address issues experienced while in the program. Admonishes "If you are alleging that a licensed counselor at your site abused you. You need to make sure that it is what you mean. Accusing someone of abuse opens them up to serious repercussions as well as opens you up to a law suit if that accusation is unfounded or exaggerated.  You previously told me that it wasn't that serious and that it 'was not reportable'."  Reiterated following appeal instructions previously provided by Dr. Elias Moitinho.. |
| June 15 2016 4:58 PM | Email to Title IX (Britney Wardlaw) from Sarah Leitner: to reference to the email received to her from Dr. Mark Myers.  Sarah writes "Here is an example of the minimization of the abuse I incurred this one by a Liberty professor.  I have forwarded it to Dr. Warren as well." |
| June 26 2016 9:23 AM | Email to Sarah Leitner from Title IX (Brittney Wardlaw): "By no means are we neglecting your concerns or ignoring that we are here for you.  However we have done due diligence in exhausting all efforts to give you the necessary support as we would any individual who is part of the community we server.  Moreover we have followed through with the protocol that gives us the ability to respond to the allegations." |
| November 25 2016 4:48 PM | Email to Dr. Steve Warren (Interim Dean School of behavioral Sciences) from Sarah Leitner: "I spent months being told daily by my supervisors at the brig that I was no good as a counselor."  She states faculty "only listened to the |

words of two abusive supervisor" and she was "blamed in a situation where she really needed support." Sarah then details some personal events involving her daughter's health including that her daughter revealed she was sexually abused while at summer camp.

**Rebuttal on Liberty's heavily flawed and defamatory "Timeline IX involvement"**

274.    Below are comments on Defendant Liberty's document "Timeline of Title IX involvement", detailing <u>where</u> Defendant Liberty's comments were clearly <u>discriminatory, retaliatory or intimidating</u>.

275.    June 9, 2016 2:17 PM – Email to Sarah from Title IX (Brittney Wardlaw) "Alleged abuse is emotional/psychological and alleged abusers are not employees of the university or even independently contracted." Options available to Sarah at that time were "complaint with the board, file a complaint with the directors of the site, or appeal to the Associate Dean in Counseling Education." Acknowledged Sarah was granted grace to stay in the program despite the dismissal policy. "I will not be able to assist you further with this matter from the perspective of the Title IX Office."

25. **Sarah notes**: Please note comments above about Title IX above as this is clearly NOT how Title IX works, as <u>all educational programs are covered</u>. P

276.    June 14, 2016 1:54 PM Email to Dr. Mark Myers (Assoc. Dean of Counselor Education) from Sarah: "I remain upset that I received a C due to an abusive supervisor. I do not believe I should have to keep a C for all time simply because an abusive supervisor decided I was incompetent when I had live supervision in front of her on one occasion."

277.    **Sarah notes**: This is yet another time when Sarah notified Defendant Liberty of the abuse that had occurred.

278.    Jun 15, 2016 4:58 PM Email to Sarah from Dr. Mark Myers (Assoc. Dean of Counselor
Education) "...Recommended Sarah use "established protocol" to address issues experienced
while in the program.  Admonishes, **"If you are alleging that a licensed counselor at your
site abused you.**  You need to make sure that it is what you mean. Accusing someone of
abuse opens them up to serious repercussions as well as opens you up to a law suit if that
accusation is unfounded or exaggerated..." [emphasis mine].  **Sarah notes: Sarah believes
this was a statement meant to <u>intimidate</u> Sarah.  Clearly, Sarah would not have
reported an abusive situation if it had not occurred.**

279.    June 15, 2016 Email to Title IX (Britney Wardlaw) from Sarah to reference to the email
received to her from Dr. Mark Myers.  **Sarah notes**: "Here is an example of the
minimization of the abuse I incurred, this one by a Liberty professor.  I have forwarded it to
Dr. Warren as well."

280.    June 26, 2016 9:23 AM  Email to Sarah from Title IX (Brittney Wardlaw): "By no means
are we neglecting your concerns or ignoring that we are here for you. However, we have
done due diligence in exhausting all efforts to give you the necessary support as we would
any individual who is part of the community we server.  Moreover, we have followed
through with the protocol that gives us the ability to respond to the allegations."

    a.    **Sarah notes**: Once again Sarah's experiences are **minimized** as the many events
cited above do not qualify as **"due diligence"** under <u>any</u> standard.

281.    November 25, 2016 4:48 PM Email to Dr. Steve Warren (Interim Dean School of
behavioral Sciences) from Sarah: "<u>**I spent months being told daily by my supervisors at
the [site] that I was no good as a counselor**</u>."  She states faculty, **"only listened to the
words of two abusive supervisors"** and she was **"blamed in a situation where she really
needed support."**  Sarah then details some personal events involving her **daughter's health,
including that her child revealed she was sexually abused while at summer camp.**
**Sarah notes**: Again, child's **disability** is noted in a **discriminatory** manner.

**Summary of the Case Factors**

282.   In summary, when Sarah reported a situation with an abusive internship supervisor at her site.  Liberty did not respond, even though mandated reporters were notified multiple times.  This exposed her to further abuse at her internship site, increasing her fear and subjective feeling of safety at her internship site.  **This also left Sarah wondering if she returned to internship in the future, if she would be protected or if she would face a hostile educational environment from Liberty faculty.**  Finally, Sarah quit the site to preserve her physical and mental health and to preserve what was left of her professional competency and to spend addiional time with family, and a daughter in extremis, which could not occur due to Liberty's inaction.

283.   Liberty University refused to investigate, sending her around in circles until she arrived back at the same office that had not helped previously.  Attempts to submit a Title IX investigation in the summer of 2016 resulted in retaliation.  Sarah attempted to report the retaliation to Liberty in 2018, but was hampered by Liberty's refusal to communicate orally with Sarah instead of via email.  This was a violation of Liberty's policy. Sarah's experience was constantly minimized by Liberty faculty, who were notified multiple times that Sarah felt unsafe returning to internship.

284.   Appeals were constantly marked by new information, information used that had been created up to five months after the expulsion, and information or allegations previously unknown to Sarah, as she was not even given a list of allegations.  Thus, some allegations, and some discrimination, were not even known until Sarah filed a FERPA request in 2019.  The extreme trauma of this situation from Fall 2015 to the present led to physical and emotional difficulties, increased the difficulties in the family dealing with a disabled child...

285.   Liberty's Title IX refused to process Sarah's Title IX complaint, in 2016, 2018, or 2019.

286.   Sarah was retaliated against for submitting a Title IX complaint.

287. Sarah attempted to resubmit complaint in Summer 2018 only to discover the documentation Title IX kept differed from the emails she had received from Title IX in 2016.

288. Sarah attempted to resubmit her Title IX Complaint in February 2019, but this was ignored.

289. LIBERTY CES faculty abused power and authority and may even be criminal behavior.

290. LIBERTY CES utilized a flawed remediation process, littered with blatant procedural and substantive due process that even included blatant untruths.

291. LIBERTY CES disregarded its own written processes and procedures.

292. LIBERTY CES ignored a student's attempts to report illegal/violations of the Code of Federal Regulations.

293. The conduct of LIBERTY CES is so brazen, pervasive, and intentional that it evidences a climate and culture of systemic incompetence within LIBERTY's entire School of Behavioral Sciences (SBS), to the detriment of students and their clients both now and in the future.

294. **The conduct of LIBERTY CES is brazen, pervasive, and intentional.** CES Faculty did not recognize signs of trauma, even though many had advanced training in trauma and all Faculty had at least some training in trauma. Mandated reporters did not send reports of events that occurred in January and February 2016 until Summer 2018.

295. LIBERTY CES faculty failed to follow the written policies and procedures that had been written by the CES department.

296. Beyond the CES faculty, Liberty employees appear to not have followed Liberty's procedures in multiple departments.

297. **Its attacks on Sarah constitute harassment, defamation *per se*, negligence, intentional inflection of emotional distress, and retaliation for the exercise of first amendment rights that LIBERTY had preserved for its students.** This intentional,

deliberate and malicious conspiracy retaliated against Sarah at every turn to harm Sarah personally and professionally as well as harming Sarah's family.

298.    Liberty's attacks on Sarah were arbitrary and capricious, as Sarah was not allowed to present evidence to the remediation committee and did not even receive a list of the allegations against her so that Sarah could prepare evidence properly. **Case law shows that disciplinary actions, involving expulsion, require much more due process than "academic" actions.**

299.    Told not to bother appealing as the department had made up its mind – and told to put documents Dr. Deacon had hurried by in the appeal – which they had said would not be listened to.

300.    In addition it took five months for Dr. Deacon to even prepare a survey of Sarah's counseling abilities. Thus, **Dr. Deacon was creating artifacts to justify decisions she had previously made.** Dr. Deacon marked Sarah's skills markedly lower than Sarah's external supervisor had on two occasions. **This is evidence of bias as well as retaliation for attempting to file a complaint with Title IX.**

**301.    LIBERTY CES's actions in this case are a flagrant violation, intentional and systemic violation of the Sarahs's rights in egregious violation of LIBERTY's own policies and procedures, going back over three years.**

302.    An incident report was put in the system regarding Sarah. However, Sarah was never notified of this, and did not know about the existence of the incident report until February 2019, when it appeared in the documents Sarah had requested via FERPA. Sarah still has not received a copy of the incident report. Liberty's CES seems to commonly utilize secret remediation meetings, creates no notes or even specific allegations from remediation meetings, and utilizes reports written after the fact (such as by Dr. Deacon) to substantiate the grade

303.    LIBERTY CES has added additional documentation to its newest internship manual, which if it had existed in previous manuals would have made it clear that the student was unauthorized to work at the same site at a different address.

304.    LIBERTY CES, due to ill will, malice, willful arrogance evinces a complete inability to identify actual problematic student behavior or to address problematic faculty behavior, as well as extremely selective application of the "remediation" process.  This systemic inability by LIBERTY CES faculty to adhere to its own written policies is problematic based on ethical concerns (American Counseling Association 2014 code of ethics)[16] as well as standards published by the American Psychological Association (APA), the Association for Counselor Education and Supervision (ACES)[17], the Virginia board of Counseling[18] and the Counsel for Accreditation of Counseling and Related Programs (CACREP) accreditation process[19].

305.    The written record **substantiates a systemic pattern of gross negligence** on the part of Liberty University faculty.

306.    Things got steadily worse and many sections of the Code of Federal Regulations and ethical codes were ignored by my site, a US Navy facility outside Charleston, SC.  Dr. Pride left an incomplete open, somehow expecting things to get better. As things deteriorated, I asked to get out of an abusive site, and was told to go back by Dr. Pride. I cried every day at my desk for months [while at the internship]..... The situation has become acute because I have been trying to re-do internship this semester. I finally filed a complaint to the Independent Government Investigator since my site was federal government... I described

---

[16]    https://www.counseling.org/resources/aca-code-of-ethics.pdf

[17]    www.saces.org/resources/documents/aces_best_practices.doc
[18]    https://www.dhp.virginia.gov/counseling/counseling_laws_regs.htm (which version is controlling depends on when the individual's license was granted).
[19]    http://www.cacrep.org/wp-content/uploads/2018/05/2016-Standards-with-Glossary-5.3.2018.pdf ;
http://www.cacrep.org/wp-content/uploads/2019/03/2016-Policy-Document-January-2019-revision.pdf ;

loss of my confidentiality to Liberty by my supervisors and associated possible discrimination …I feel very invalidated by Liberty's handling of the situation with my prior internship. **This makes me feel unsafe and unable to perform, particularly when Dr. Pride is involved.**  I believe if he had listened in October and November 2015, this situation would not have occurred, yet he is supposed to be a part of the solution. I tried to talk to him via email two weeks ago to clear the air, and he did not even know the air needed to be cleared. When I described the issue in more detail, he did not even bother to answer my email. **At this point in many ways Liberty's response has been more wounding than the original abuse**."

307.    Sarah has personal knowledge, in the form of emails, that she was defamed in this manner, starting in 2016 through Fall 2018 to one other or more individuals who reviewed her grade appeal.  Most recently, Sarah was defamed to the Provost in summer 2018 and the President of the University in the fall of 2018. Sarah believes much of the defamation occurred in telephone or in person conversations between Liberty affiliated individuals, such as in the case with Brittany Wardlaw above.

308.    FERPA: On August 6, 2018, Robert Mullen, Dean of Students, wrote to Mark Hine, Senior Vice President: "They have offered several times to hear her complaint".  Mark Hines reply, 16 minutes later: "Nice. But not according to her. ;) " (Yes the smiley face is in the original!)

309.    Some allegations against Sarah, as well as some discriminatory, negligent and fraudulent actions, were not even known by the Sarah until she filed a FERPA request in 2019.

310.    The 2019 email to the Title IX office was not answered by Defendant Liberty at any point between late February and April 2019.

# DAMAGES

## Count I

### All Liberty Defendants

### Breach of contract

311.  The foregoing allegations are incorporated herein by reference.

312.  Breach of contract requires a legally enforceable contract, breach of the contract, and actual damages.

313.  Plaintiff intends to show that at all times relevant hereto, a contractual relationship existed between Liberty and Sarah through Liberty's accreditation efforts with CACREP as well as with multiple internship sites.

314.  Although this honorable court may consider this case is unique and distinguishable. Sarah is not stating that Liberty University breached a contract with her, but instead that Liberty University breached a contract with CACREP, as well as Sarah's two internship sites.  Thus this case is markedly different from previous cases.

### Establishment of contract with CACREP

315.  The PhD CES program Sarah was enrolled in had already started the process of accreditation by the submission of the self-study prior to Fall 2017 and its site visit in September 2017[20].  The application for Accreditation under the 2016 Standards, available at CACREP.org, requires the organization to abide by all CACREP standards, starting with when the self-study was submitted:

> "To insure the integrity of this process, it is imperative that professional conduct be exemplified in the application and self-study materials submitted to CACREP…. For the process to be effective and fair, it must follow the established review procedures and the information submitted during the review

---

[20] https://www.liberty.edu/behavioral-sciences/counselor-ed/wp-content/uploads/sites/43/2019/07/5.1_CES_2017-18_Annual_Report.pdf , p. 15

COMPLAINT
Leitner v. Liberty University et al.

process must be based on clear statements and documentation describing how the program operates. The self-study narrative and supporting evidence must not misrepresent the program by implying resources or any level of strengths that exceed the program's level of operation."

316.     Furthermore, in policies covering the pre-application and application review stages on

CACREP's website, standard 1.a. Integrity of process, repeats virtually the same wording,

further underlining the importance of this standard.

317.     This agreement is binding on Liberty because without having signed this policy, Liberty

could not have applied for this accreditation and because Liberty promised it would follow its

own procedures and policies.

318.     Thus, Liberty is bound to follow what it has told CACREP it will follow, which includes

all of its processes and procedures, including in the internship manual and syllabus.  Since

Dr. Deacon is the site coordinator for CACREP and Dr. Pride and Dr. Sosin are part of the

leadership team, all of them must have seen these requirements and thus had knowledge that

they were binding Liberty and themselves to these requirements.

319.     As a PhD CES student, Sarah had reason to believe that Dr. Deacon, Dr. Pride, Dr. Sosin

and Dr. Moitinho would follow the due process required by the Handbook and various other

procedures that Liberty has promised to follow as part of its application to CACREP.

320.     Section 1.N of the Section Academic Unit of CACREP's document requires the

following:
"The student handbook includes (1) the mission statement of the academic unit and program objectives, (2) information about professional counseling organizations, opportunities for professional involvement, and activities appropriate for students, (3) matriculation requirements, (4) expectations of students, (5) academic appeal policy, (6) written endorsement policy explaining the procedures for recommending students for credentialing and employment, and (7) policy for student retention, remediation, and dismissal from the program.
Counselor education programs have and follow a policy for student retention, remediation, and dismissal from the program consistent with institutional due process policies and with the counseling profession's ethical codes and standards of practice."

## The breach

321.   This <u>legally binding</u> agreement was breached by one or more of the defendants, as
follows.

      b.   First, the internship manual that was in effect in 2016-2017, when Sarah was in
internship, did not define the term "unauthorized internship" and/or give examples of
what would be an unauthorized internship.   Thus, <u>the manual gave no clear guidance</u>
<u>on whether a new site agreement was necessary when the student worked as part of</u>
<u>the same internship site, simply at a different geographical location.</u>   Liberty has
updated the documentation in later versions of the handbook.

      c.   Second, according to the 2016 to 2017 manual, pages 30 and 31, deficits must be
"verifiable".   Once again, the word "verifiable" is not defined.   "Verifiable" implies
sufficient consideration, discussion with all parties as necessary, as well as document
review, again as necessary.   This did NOT happen as Dr. Deacon quickly decided that
Sarah was in an "unauthorized internship" <u>without even speaking to Sarah's site</u>
<u>supervisor at the internship OR reviewing relevant emails</u>. This rendered the decision
made by Liberty to expel Sarah <u>arbitrary and capricious</u> and fertile ground for
discrimination.

322.   These are only two examples of many examples of ambiguous procedures that leave
students at risk, requiring significant "interpretation" due to the arbitrary nature of the
guidelines.   <u>This hampers disciplinary procedures as ambiguous statements that can be read two</u>
<u>different ways, depending on the reader's pre-conceptions, and can be the difference between</u>
<u>whether a student is  expelled or not, as in this case.</u>

### Damages

323.   As a direct, proximate and foreseeable consequence, Sarah has experienced significant
monetary damages in current and future earnings as she  has been unable to complete her

PhD due to Liberty arbitrary and capricious application of multiple types of procedures, including disciplinary procedures. Sarah has also experienced emotional and psychological damages due to Liberty's arbitrary and capricious decision.

324.    As a result of the forgoing, Sarah is entitled to damages, the amount to be determined at trial.

**Count II**

**All Defendants**

**Tortious interference with business practices**

325.    The foregoing allegations are incorporated herein by reference.

**Regarding Liberty University Defendants**

326.    Plaintiff believes and intends to show that one or more of defendants, Liberty, Pride, Deacon, Sosin, or Moitinho did in fact interfere with her ability to practice her business in a manner which is detrimental and therefore tortious.

327.    For a count of tortious interference to be sustained, the plaintiff must show 1.) existence of a valid contract, 2.) that defendant had notice of the contract 3.) that the defendant's improper methods caused the breach of contract, and 4.) that damages occurred as a result of the contractual breach.

**Existence of a valid contract**

328.    Liberty breached its contract with Win4Life when it was unilaterally canceled the internship, despite the terms of the contract, which required that the other party be given a 30 day window of time to "cure" the breach, as shown in Section 10 Termination.

329.    At no point did this contract state that Liberty can cancel the agreement for no reason, without even contacting the site supervisor.

COMPLAINT
Leitner v. Liberty University et al.

330.     The Code of Virginia § 55-22 also speaks to this as follows: "An immediate estate or interest in or the benefit of a condition respecting any estate may be taken by a person under an instrument, although he be not a party thereto; and if a covenant or promise be made for the benefit, in whole or in part, of a person with whom it is not made, or with whom it is made jointly with others, such person, whether named in the instrument or not, may maintain in his own name any action thereon which he might maintain in case it had been made with him only and the consideration had moved from him to the party making such covenant or promise. In such action the covenantor or promisor shall be permitted to make all defenses he may have, not only against the covenantee or promisee, but against such beneficiary as well."

### Defendant had notice of contract

331.     The defendant had notice of this contract because Defendant Liberty signed the contract with Win4Life, and the contract is mentioned in multiple places, such as the internship handbook.

### Defendant's improper methods caused the breach of contract

332.     Defendant Liberty caused this breach of contract through its extremely quick, arbitrary and capricious review of Sarah's internship site in 2017.

333.     This extremely quick breach of the contract by Liberty University and total disregard for the contract's "cure" provisions, lends credence to the view *that Defendant Liberty did not intend to follow the contract as written.*

### Regarding all Shield Ministries Defendants

334.    The foregoing allegations are incorporated herein by reference.

335.    Plaintiff believes and intends to show that one or more of defendants Shield Ministries, David Truluck, and/or Melodie Truluck did in fact interfere with Sarah's ability to practice her business in a manner which is detrimental and therefore tortious.

336.    For a count of tortious interference to be sustained, the plaintiff must show 1.) existence of a valid contract, 2.) that defendant had notice of the contract 3.) that the defendant's improper methods caused the breach of contract, and 4.) that damages occurred as a result of the contractual breach.

### Existence of a valid contract & Defendant Shield Ministries had notice of the contract

337.    Shield Ministries and Win4Life entered into a valid, oral contract in November 2016.

338.    Shield Ministries and Win4Life affirmed said valid, oral contract on or around December 18th, 2016, in the presence of representatives of Win4Life and Shield Ministries.

339.    The oral contract was referenced in multiple emails as Win4Life attempted to write down the contract so all parties could sign it.  If Shield Ministries did not think a contract existed, it had multiple opportunities to say so.

340.    The Code of Virginia  § 55-22 also speaks to this as follows:  "An immediate estate or interest in or the benefit of a condition respecting any estate may be taken by a person under an instrument, although he be not a party thereto; and if a covenant or promise be made for the benefit, in whole or in part, of a person with whom it is not made, or with whom it is made jointly with others, such person, whether named in the instrument or not, may maintain in his own name any action thereon which he might maintain in case it had been made with him only and the consideration had moved from him to the party making such covenant or promise. In such action the covenantor or promisor shall be permitted to make all defenses he may have, not only against the covenantee or promisee, but against such beneficiary as well."

COMPLAINT
Leitner v. Liberty University et al.

### Defendant's improper methods caused the breach of contract

341.    Shield Ministries knew of the contract between Win4Life and Liberty University.

342.    Shield Ministries, e.g., Truluck and Truluck, intentionally and improperly interfered with the contract between Liberty University and Shield Ministries by denying the existence of its partnership with Win4Life.

### Damages

343.    As a direct, proximate and foreseeable consequence of all defendant's interference in a contractual relationship, Sarah Leitner sustained great harm as she was unable to complete the PhD and sustained emotional and financial damage to herself and her family as a result.

344.    As a result of the forgoing, Sarah is entitled to damages, the amount to be determined at trial.

### Count III

### Detrimental Reliance

### All Defendants

345.    The foregoing allegations are incorporated herein by reference.  Plaintiff believes and intends to show that one or more defendants committed detrimental reliance.

346.    Detrimental reliance requires that the plaintiff have relied upon a reasonable promise by the defendant, and that the reliance was detrimental, i.e. trusting the promise was harmful to the plaintiff, and that injustice resulted because the promise was not enforced.

347.    Sarah Leitner reasonably relied on the promises of Liberty University and Shield Ministries.  Moreover, Sarah's reliance on these promises was harmful and has caused a grave injustice.

COMPLAINT
Leitner v. Liberty University et al.

**Damages**

348.    As a direct, proximate and foreseeable consequence of defendant's interference in

established relationships Sarah Leitner sustained great harm as she was unable to complete

the PhD and sustained emotional and financial damage to herself and her family as a result.

349.    As a result of the forgoing, Sarah is entitled to damages, the amount to be determined at

trial.

**Count IV**

**Fraud**

**All Defendants**

350.    The foregoing allegations are incorporated herein by reference.  Plaintiff believes and

intends to show that one or more defendants committed fraud.

**Regarding All Liberty University defendants**

351.    Liberty University, and its faculty, utilized deception to secure unfair or lawful gain and

to deprive Sarah Leitner of her rights under the student appeals process, the Title IX process,

and other investigative processes, formal or informal.

352.    Liberty was notified by Sarah Leitner on many occasions of facts that had been ignored

and/or misrepresented by individuals at Liberty University between 2015 and the present.

These include numerous emails as well as a meeting of Sarah Leitner with senior faculty in

the Counselor Education and Supervision department – to include Dr. Sosin, Dr. Pride and

Dr. Deacon and Dr. Myers - in March 2017 as well as a second meeting between Sarah

Leitner and Dr. Warren, Acting Deacon of the School of Behavioral Sciences, in Fall of

2017.

353.    As an example, in Fall 2017 Sarah Leitner, in meeting with Dr. Warren, provided

numerous written and oral examples that contradicted Dr. Warren's conclusion in his

rejection of Sarah's final grade appeal.  However, it appears he decided not to look at this information. As a result, Dr. Warren's denial of Sarah's appeal contained new "information" and reasons for the denial that had never even been discussed with Sarah, as well as "reasons" that were contradicted by information Sarah Leitner had already supplied to Dr. Warren.

354.    On another occasion, in Fall 2016, Sarah Leitner relied on the multiple pieces of documentation, and on Liberty University long standing policy, to believe that she would be given a withdraw if it became necessary due to extreme circumstances.  When extreme circumstances did occur that Dr. Deacon *was* aware of, the request to withdraw from the course was denied.  This was wholly unexpected on Sarah's part, and if Sarah had known Liberty University would choose to deny her request to withdraw, she *never* would have enrolled in the class due to her ongoing family difficulties.

355.    Sarah Leitner naturally relied on the statements of Liberty University faculty, as well as Liberty University manuals, syllabi, etc., to believe that she would receive a fair hearing throughout the internship process, all grade appeals, and with other department of the University, to include Title IX.

356.    Sarah Leitner suffered ongoing and continuing harm throughout 2015 to the present due to Liberty University's misrepresentations due to Liberty University's actions that were contrary to its established procedures and indeed, Common Law.  This harm multiplied when Sarah was denied, in 2015, permission to leave a coercive internship site, then denied a hearing by *any* part of Liberty University to determine what had occurred.

357.    Since Dr. Pride was unwilling to discuss the coercive internship site as required for due process, Sarah Leitner asked Dr. Pride, in an email, to stop bringing up what had occurred previously.  Instead, Dr. Pride, and other Liberty University personnel, continued to bring up the previous internship experience again and again, many times repeating the mis-statements

that personnel at the first site had made. Many of which Sarah could have shown were untrue if she had been allowed to.

358. This caused great harm to Sarah as it left her unable to leave the past in the past – either by discussing it with Liberty personnel and coming to an understanding, or by burying it- and move forward.

359. This amounted to fraud as Sarah had good reason to assume that Liberty University would act in accordance with its own policies and procedures as well as in accordance with common law and with the promises it had made to CACREP and other accreditation boards.

### Regarding Shield Ministries defendants

360. Shield Ministries, as well as David and Melodie Truluck, committed fraud utilizing deception to deprive Sarah Leitner of her rights.

361. Shield Ministries, as well as David and/or Melodie Truluck, as a part of Sarah's effort to ensure the oral partnership between Shield Ministries and Win4Life was written down, received multiple texts and emails from Sarah Leitner inquiring about the status of the partnership and if Shield Ministries wanted any additions or changes prior to signing.

362. After approximately 3 weeks of inquiry, around January 20th, 2017, Sarah Leitner was notified that this action required board approval and that board approval was required prior to Shield Ministries utilizing Sarah Leitner or the other intern in any role.

363. Sarah Leitner naturally believed that David and Melodie Truluck would act with integrity and tell the truth to Liberty University, as he had been recommended by a former board member and was a minister but instead they chose to deceive Liberty University.

364. As a consequent and proximate result of this fraud, Sarah Leitner suffered harm from 2017 to the present as a result of these misrepresentations, due to being unable to complete her PhD as well as in the psychological and physical health of Sarah and her family.

365. As a result of the forgoing, Sarah is entitled to damages, the amount to be determined at

trial.

## Damages

366.   As a consequent and proximate result of this fraud, Sarah Leitner sustained great harm

and injury due to  fraud in the areas of trauma, psychological, financial harm, physical health,

and the health and well-being of herself and family members.

367.   As a result of the forgoing, Sarah is entitled to damages, the amount to be determined at

trial.

## Count V

## Breach of the covenant of good faith and fair dealing

## All Defendants

368.   The foregoing allegations are incorporated herein by reference.

369.   The fourth district, as well as Virginia courts, have consistently recognized an implied

duty of good faith and fair dealing in common law contracts.

370.   For example, in Stony Glen LLC v. Southern Bank and Trust Company, the court held

that plaintiffs had sufficiently pleased a breach of the implied duty of good faith and fair

dealing by the defendants, who had acted in bad faith without following ordinary and prudent

business practices.  See also Historic Green Springs, Inc. v. Brandy Farm Ltd, 32 Va Circ. 98

(Louisa county 1993), Virginia Vermiculite Ltd vs. Grace and Company of Connecticut (156

F.3d 535 – 4th circuit 1998), and Goodrich Corp. V. Baysys Techs., LLC (4th circuit, 2012).

### Regarding Defendants Liberty University, Sosin, Pride, Deacon, Moitinho

371.   Likewise, Liberty acted in bad faith against usual and prudent practices involving

students and universities on many occasions with Sarah by, *inter alia*, failing to provide

COMPLAINT
Leitner v. Liberty University et al.

Sarah with an impartial tribunals and refusing to assist Sarah when she was in extremis due to an unsafe, hostile educational environment in December 2015 through February 2016.

372.    Plaintiff believes and intends to show that one or more of the defendants Liberty Sosin, Pride, Deacon and/or Moitinho breached the covenant of good faith and fair dealing.

### Regarding All Shield Ministries Defendants

373.    The foregoing allegations are incorporated herein by reference.

374.    Plaintiff believes and intends to show that one or more of defendants Shield Ministries, David Truluck and/or Melodie Truluck. breached the covenant of good faith and fair dealing.

### Damages

375.    As a direct, proximate and foreseeable consequence of these breaches, Sarah's academic and career prospects, earning potential and reputation have been severely harmed.  She has sustained significant damages, including but not limited to, damages to well-being, emotional and psychological damages, damage to reputation, past, current and future economic losses, loss of educational and professional opportunities, loss of future career opportunities, and other direct and consequential damages.

376.    As a result of the forgoing, Sarah is entitled to damages, the amount to be determined at trial, plus prejudgment interest and attorney's fees and costs.

## COUNT VI

### All Liberty University Defendants

### Violation of Americans with Disabilities Act of 1990 as amended in 2008 Title III (28 CFR Part 36) and Section 504 of the Rehabilitation Act of 1973: Discrimination against Sarah Leitner as related to her disability & the disability of her child

377.    The foregoing allegations are incorporated herein by reference.

378.    This discrimination may be implemented throughout the PhD program through the use of flawed remediation procedures and/or spurious claims that a student was in an "unauthorized internship", as Sarah experienced.

379.    As a result of Liberty's inaction in 2015 and 2016, Sarah was forced to return to a coercive internship site.  This inaction by Liberty University meant Defendant Liberty created a disability then penalized Sarah for having one.

380.    Sarah had suffered additional trauma due to the multiple contradictory interpretations and/or fallacious statements Sarah received from the defendant.

381.    According to Sarah's email records, in 2016, the Disability office at Liberty University refused to allow Sarah to file a complaint in violation of Federal law, when Sarah sought to file a report based on the "perceived disability" individuals at her internship site had attributed to her.

382.    Fourth, Sarah sent multiple requests to any office at Defendant Liberty requesting any department that possibly could have jurisdiction to investigate her allegations.  When no one at Liberty chose to listen, this increased the trauma and the accompanying physical illness Sarah endured.

383.    Fifth, these are only a few examples of Liberty's actions and inactions that deepened the trauma that Sarah had endured through the present.  This trauma occurred during internship

in January and February 2016, between internship in spring and summer 2016, during internship in fall 2016 through February 2017.

384.    These many actions by defendant Liberty created and maintained a hostile environment based on disability related discrimination as Sarah attempted to complete her internship. This environment also doomed Sarah's attempts to seek redress through the grade appeals process, as well as informal appeals, to failure.

385.    In December 2016, Liberty issued a "letter of concern" to Sarah. This occurred shortly after Sarah attempted to withdraw from the internship due to family concerns as well as because of Sarah's disability. Defendant Liberty chose to question Sarah's mental state by stating that she had a lack of "self-regulation", as most any individual would under the same circumstances and level of stress, a sign of Liberty's discrimination.

386.    While Liberty discriminated against Sarah for having a disability, Liberty also discriminated against Sarah due to her child's disabilities. Statements such as "Repeatedly contacted SAO to discuss events including "Abuse" suffered at internship and difficulties with daughter" – a clear statement showing that Liberty, through its discrimination, had discounted all events related to the abuse Sarah endured, without even investigating the allegations.

387.    On or around June 1st, 2017, Defendant Liberty chose to disregard Sarah's pleas for additional time to appeal when her child was assaulted for a second time in May 2017. This reasonable request for additional time for Sarah to defend herself against Liberty's outrageous accusations was denied, once again showing that Liberty intended for Sarah to fail.

388.    These many actions by defendant Liberty created and maintained a hostile environment based on disability related discrimination. This environment doomed Sarah's attempts to seek redress through the grade appeals process, as well as informal appeals, to failure.

389.    Sarah Leitner does not know what other discrimination occurred since the documents received from FERPA were incomplete, duplicative, missing entire critical periods of time, such as most of 2015 and some of 2016.

### Damages

390.    As a direct, proximate and foreseeable consequence Liberty's violation of the ADA, Sarah's academic and career prospects, earning potential and reputation have been severely harmed. She has sustained significant damages, including but not limited to, damages to well-being, emotional and psychological damages, damage to reputation, past, current and future economic losses, loss of educational and professional opportunities, loss of future career opportunities, and other direct and consequential damages.

391.    As a result of the forgoing, Sarah is entitled to damages, the amount to be determined at trial, plus prejudgment interest and attorney's fees and costs.

### Count VII

### All Liberty Defendants

### Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*

### Regarding Gender Discrimination

392.    The foregoing allegations are incorporated herein by reference.

393.    Title IX of the Education Act Amendment of 1972, 20 U.S.C. § 1681 (a) (1988), also known as "Title IX", provides in relevant part "[n]o person in the United States shall, on the basis of sex be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal assistance."

394.    Title IX is enforceable through an implied right of action affording an individual discrimination due to his or her gender pecuniary damages and equitable relief. This implied right of action is also available in the case of retaliation.

COMPLAINT
Leitner v. Liberty University et al.

395.    LIBERTY receives federal funding in various forms, including, but not limited to federal

student loans.  LIBERTY has discriminated against Sarah, on the basis of her sex, through its

discriminatory, inequitable implementation of LIBERTY's appeal process, remediation

process, and in many other communications with Sarah.  This subjected Sarah to different

rules than those of her male classmates.

396.    According to Liberty's own[21] statistics, at the outset of the 2016-2017 year, 25% of students

in the PhD program were male (e.g., 16/64), while 6% of the applicants who were accepted and

enrolled during the same time period were male (e.g., 1/17).  This may be evidence that the

newly admitted and enrolled students are significantly different than the overall makeup of

Liberty PhD CES students – for instance if a larger percentage of women are forced to leave

the program due to unjust remediation due to gender.

397.    In Sarah Leitner v. Liberty University, Dilella, Deacon, Daniel, Moitinho, and Camden,

Civil Action No. 6:19CV00007, a case currently before the 4th District, the Plaintiff also

alleges gender discrimination by individuals in the Counselor Education and Supervision

Department at Liberty University.  This also lends credence to the notion that Sarah was

discriminated against by the Counselor Education and Supervision Department at Liberty

University.

398.    Just as concerning are some of President Falwell's tweets, in which President Falwell

shows a bias against "MeToo", a largely female movement.  As one example, on or around

March 1st Falwell tweeted the following: "Trump Jr. make 'Me too' joke during CPAC panel

| TheHill. Fun panel discussion today.  I admire @DonaldTrumpJr for his boldness in

---

[21]    https://www.liberty.edu/behavioral-sciences/counselor-ed/wp-content/uploads/sites/19/2018/12/5.1_CES_2017-18_Annual_Report.pdf page 20

speaking the truth!" @LibertyU[22], while multiple articles in September 2019 allege other inappropriate actions against women[23].

399.    Together, these data points show that <u>Liberty may be systematically discriminating against female students</u> as it appears a lower percentage of female students complete the program than the percentage of female students who begin the program.  It is believed that discovery will lead to additional documentation to show gender discrimination occurred throughout the experiences Sarah details in this complaint.

400.    This created a hostile educational environment, based on gender discrimination and retaliation, in violation of federal law.

### Regarding Retaliation

401.    Liberty defines a Responsible employee as "Any employee who has the authority to take action to redress sexual violence, the student reasonably believes has authority, has been given the duty of reporting incidents of harassment or other misconduct[24]".

402.    Note this states "reporting incidents of harassment or other misconduct" – and does not state the conduct must be of a sexual nature.  This shows that under Liberty's policies, the unsafe and hostile educational environment, including the abuse that Sarah endured at her first internship site should have been <u>reported and investigated</u> in January or February 2016 – not ignored or called alleged "abuse" or stated in written documents as "abuse".

403.    The behavior that Sarah endured at her first internship site only remained as alleged and/or "abuse" due to Liberty's inaction in <u>refusing to investigate</u> what had occurred.

---

[22]    https://twitter.com/jerryfalwelljr/status/1101679980642209792 as well as an example of news reporting: https://thehill.com/blogs/blog-briefing-room/news/432234-trump-jr-makes-metoo-joke-during-cpac-panel
[23] https://www.politico.com/magazine/story/2019/09/09/jerry-falwell-liberty-university-loans-227914
[24]    https://www.liberty.edu/titleix/index.cfm?PID=33414 as well as https://www.liberty.edu/media/1226/Liberty_University_Discrimination_Harassment_and_Sexual_Misconduct_Policy.pdf

404.   Note that any "Responsible employee" was required to report, thus <u>requiring Liberty to take the initiative</u>.  In other words, Liberty was not to wait until Sarah, in her extreme distress and physical illness, finally realized that the behavior was reportable.

405.   The University was responsible to help Sarah file reports and not treat her reports with extreme skepticism, as if they wanted Sarah to just "go away".  The university's attitude seems to have been typified by a Fall 2018 email, which claimed that Sarah had had adequate chance to submit a report to Title IX, complete with a smiley face.  This example shows the callous disregard that Liberty University placed on Sarah's Title IX claim, as well as related matters.

406.   Note that Defendant Sosin, in Summer 2018, upon seeing Sarah's emails where she described her environment at the first site as unsafe, filed a report, thus showing Defendant Sosin had a  similar understanding of Liberty's policies and the law.  However, Liberty also had the Provost respond to the email, telling Sarah all academic appeals were over, when Sarah's email had not even centered on academic appeals, another attempt at intimidation.

407.   However, in 2016, the Title IX office at Liberty University had refused to allow Sarah to file a complaint by falsely stating it did not have jurisdiction.  In 2018 it prematurely closed Sarah's complaint because Sarah had apparently not responded quickly enough due to her hospital's hospitalization and surgery.  Sarah was reassured via email that it could be reopened at any time.  When it was re-opened, according to records received from FERPA it appears the re-opening was never recorded in Liberty's database. <u>Altogether, these are more examples of retaliation and an environment of intimidation</u>.

408.   Throughout 2018, in violation of the <u>Liberty University Discrimination, Harassment, and Sexual Misconduct Policy</u>[25] Sarah was not allowed to speak to any Title IX investigator.

---

[25]
https://www.liberty.edu/media/1226/Liberty_University_Discrimination_Harassment_and_Sexual_Misconduct_Policy.pdf

COMPLAINT
Leitner v. Liberty University et al.

This combined with Liberty's previous treatment of her Title IX complain in 2016, posed an insurmountable barrier due to the trauma of the violation.

409.     In February 2019, Liberty did not even acknowledge receipt of Sarah's Title IX complaint.

410.     Liberty has retaliated against Sarah for submission of a Title IX complaint through its inability to allow Sarah to submit a Title IX report, its extreme skepticism, and in many other ways.

411.     In disciplinary proceedings, the University must provide a fair and equitable process – not one that is arbitrary and capricious – for the accused and "must formulate, interpret and apply its rules so as to protect academic freedom and free speech rights." Additionally "in both public and private schools, additional or separate rights may be created for ... students by ....institutional regulations and policies, such as ... student handbooks..." "Moreover, in regulating the conduct of its students and faculty to prevent or redress discrimination prohibited by Title IX (e.g., responding to harassment that is sufficiently serious as to create a hostile environment), a school must formulate, interpret and apply its rules so as to protect academic freedom and free speech rights."[26]

412.     Defendant Liberty itself create this hostile educational environment as detailed above.

413.     A university violates Title IX regulations when it subjects students "to separate or different rules or behavior, sanctions or other treatment..." (C.F.R. 1211.400(b)(4)..

414.     The above events evidence that Sarah, a female student, was treated differently, to her detriment, on multiple occasion due to her gender and due to retaliation for her attempts to submit a Title IX complaint.

415.     Defendant Liberty further violated Title IX by failing to accord Sarah the opportunity to complete submission of a Title IX case through its Title IX office.

---

[26]     https://www2.ed.gov/about/offices/list/ocr/docs/shguide.html.

COMPLAINT
Leitner v. Liberty University et al.

416.    Defendant Liberty violated Title IX by not keeping a Title IX complaint confidential and indeed, by sending an email to alert one of the defendants that a case was brewing.

417.    Defendant Liberty violated Title IX by not even giving Sarah a summary of the allegations against her so that she could prepare a sufficient defense.

418.    Liberty did not follow the preponderance of evidence standard on multiple occasions as it refused to allow Sarah to complete the submission of a Title IX complaint.  The power differential between Sarah and her accusers, as well as intimidation, served as a further barrier.

419.    Defendant Liberty did not send **all** documentation as required for a FERPA request.  This is evident because of missing attachments, as well as almost **NO documents received** about Sarah's reports to Defendant Liberty about how she was unsafe at the brig.

420.    These severe denials of due process- pervasive and objective – denied Sarah equal access to education as Title IX guarantees.

### Damages

421.    As a direct, proximate and foreseeable consequence of this discrimination, Sarah's academic and career prospects, earning potential and reputation have been severely harmed. She has sustained significant damages, including but not limited to, damages to well-being, emotional and psychological damages, damage to reputation, past, current and future economic losses, loss of educational and professional opportunities, loss of future career opportunities, and other direct and consequential damages.

422.    As a result of the forgoing, Sarah is entitled to damages, the amount to be determined at trial, plus prejudgment interest and attorney's fees and costs.

## Count VIII

## Defendants Liberty, Sosin, Deacon, Pride, and Moitinho

## Negligence

423.    The foregoing allegations are incorporated herein by reference.  Plaintiff believes and intends to show that one or more defendants breached the duty of care.

424.    The breach of the Defendant's duty is doubly significant for Defendants Sosin, Deacon, Pride and Moitinho who are licensed counselors in the state of Virginia, who are bound to follow the ethical code of conduct of the American Counseling Association[27] and of the Virginia Board of Counseling[28], including all applicable laws and regulations of the state of Virginia.

425.    Defendants Liberty, Sosin, Deacon, Pride, and Moitinho owe a duty of care to Sarah. Such duties include, without limitation:

      d.  a duty of reasonable care in hiring and retaining qualified employees to conduct fair, just and impartial investigations, in Title IX, disability, academic and disciplinary matters;

      e.  a duty of care in hiring and retaining counseling-programs faculty who are professional competent pursuant to the ACA's code of ethics;

      f.  A duty of care to ensure faculty and other employees who hold power and authority to determine a student's guilt or innocence are properly training and professionally competent to do so.

      g.  A special duty of care existed due to the expert knowledge of trauma that many in the CES department possessed.

---

[27]    https://www.counseling.org/knowledge-center/ethics#2014code
[28]    https://www.dhp.virginia.gov/counseling/

COMPLAINT
Leitner v. Liberty University et al.

h.  A duty of care to recognize that ordinary faculty, are not, in almost every case, trained investigators. Thus, Defendant Liberty has an obligation to ensure trained investigators are utilized when appropriate. The investigators must be trained in Title IX, disability law, higher education law, and the like. Note an employer may be negligent when or if it assigns employees to positions or duties for which they have had no prior experience for training. See, e.g., Grote v. Meyers Land and Cattle Co., a 1992 case in which a ranch owner was found negligent where an adolescent employee was injured when an animal kicked the boy in the head; Welsh Manufacturing, Division of Textron Inc., v. Pinkerton's Inc. (474 A.2D 436, R.I., 1984), in which an employer was found negligent for failure to supervise and/or train employees for the assigned tasks.

i.  Liberty University has a duty of care to protect students in the light of evidence that one or more faculty member's judgment may have been impaired as a result of bias, conflict of interest, biased results due to lack of adequate investigation and/or lack of clear policies and procedures, or any other reason.

426.  As such Defendants Liberty, Sosin, Pride, Deacon and/or Moitinho breached their duty of care to Sarah.

427.  In Sarah's case, Defendant Liberty had a duty to act to remediate and/or dismiss professors who evidence shows acted unprofessionally towards Sarah and/or other students. See Southeast Apartments Management Inc. v. Jackman, 257 Va. 256, 513 S.E.2d 395 (1999).

428.  In an appeal directly to Dr. Pride and Dr. Sosin dated March 15, 2016, and referenced above, Sarah listed some industry best practices that the site did not observe and neither did Liberty. The following list of ACES[29] and APA practices that were not observed by

---

[29]     Association of Counselor Education and Supervision

Defendant Liberty, Sosin, Pride, Deacon and Moitinho, between 2015 and the present, some even as recently as 2018:

j.   The ACES Best Practices emphasize the importance of the working alliance and a supervisor/supervisee relationship that is "collaborative and egalitarian" (1.c), the importance utilizing a supervision contract (8.a), the importance of balancing "challenging and supportive" and "clear" feedback that is constructive… specific, concrete and descriptive" (3.a & b), that the supervisor must recognize that "some level of conflict is inevitable…", and that the supervisor must handle this conflict in "productive ways" (5.b), that the supervisor "*attends to strains, gaps and/or ruptures in working alliance*" (5.b), that the supervisor "*elicits*" and is open to feedback (5.b), that the supervisor discusses supervisee strengths as well as limitations (7.c, 9.a), that the supervisor is attentive to the power differential (5.c), that remediation must include "clear objectives, requirements, a timeline, and consequences" (9.d), and that the Supervisor has the "courage to be imperfect" and does not require supervisees to be perfect (11.d).

k.   Similar guidelines from the APA[30] emphasize the supervisory relationship and its link to the assessment, evaluation and feedback of supervisees[31]. These guidelines amplify the ACA Best Practices by requiring "*openness and transparency*" (E.1), that multiple counseling sessions should be included in an evaluation (E.2 & 3), that feedback should be "*direct, clear, and timely, behaviorally anchored, responsive to supervisees' reactions, and mindful of the impact on the supervisory relationship*" so that "*evaluation is not a surprise*" *(E.3)*, highlight the possibility of supervisee "*demoralization*" (E.3), the

---

[30]   American Psychological Association
[31]   http://apa.org/about/policy/guidelines-supervision.pdf

emphasizing importance of the power differential (C, C.3), and by empathizing

the importance of a collaborative relationship (Executive Summary).

    l.    American Counseling Association 2014 ethics code is mandatory and has many

        applicable portions as cited throughout this document.

429.    When Sarah Leitner, on multiple occasions, sent a listing of standards the site did not

    meet, this provided Liberty University notice, requiring an investigation.

## Damages

430.    As a direct, proximate and foreseeable consequence of negligence, Sarah's academic and

    career prospects, earning potential and reputation have been severely harmed.  She has

    sustained significant damages, including but not limited to, damages to well-being, emotional

    and psychological damages, damage to reputation, past, current and future economic losses,

    loss of educational and professional opportunities, loss of future career opportunities, and

    other direct and consequential damages.

431.    As a result of the forgoing, Sarah is entitled to damages, the amount to be determined at

    trial, plus prejudgment interest and attorney's fees and costs.

## Count IX

## Defendants Liberty, Sosin, Pride, Deacon, Moitinho, Shield Ministries, Truluck and Truluck

## Defamation

432.    The foregoing allegations are incorporated herein by reference.

433.    "Defamation is "the offense of injuring a person's character, fame or reputation by false

    and malicious statements…" 12A M.J. Libel and Slander § 2 (2014). To state a claim for

    defamation under Virginia law, a plaintiff "must show (1) publication, (2) of an actionable

    statement with (3) reckless intent.  Echtenkamp v. Loudon County Public Schools, 263 F.

Supp. 2d 1043, 1061 (E.D. Va 2003).  "to be 'actionable', the statement must not only be false, but defamatory, that it, it must "tend so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associated or dealing with him." Echtenkamp, supra, quoting Chapin v. Knight-Ridder, Inc., 993 F.2d 1087, 1092, 4th Circuit court, 1993.  Eichtenkamp, supra also says defamatory statements "are those that make the plaintiff appear odious, infamous, or ridiculous."

434.    Sarah Leitner's dismissal from the Liberty CES program were the direct result of Defendants Liberty, Sosin, Pride, Deacon, Moitinho, Shield Ministries, Truluck and Truluck individual and corporate defamation of Sarah's character, professional competence, clinical skills and integrity in a malicious  and intentional matter.  The full extent of these untrue statements were not known until 2019 when the statements were sent to Sarah through the FERPA process.

435.    Below are a few examples of the malicious, intentional and misrepresentation of Sarah Leitner's character, integrity, clinical skills and professional competence at Shield Ministries:

   m.  For instance, one or more Shield Ministries personnel claimed to Defendant Liberty that Sarah had represented herself as an "agent" of Shield Ministries. Since Sarah has paperwork, signed by each and every individual that she counseled, stating that she was an intern for Win4Life, it was very clear that Sarah was **NOT** an agent of Shield Ministries at any time.  Thus this is a spurious and defamatory accusation for which Sarah was not given an opportunity to respond, as Sarah did not know of this allegation until February 2019.  She still does not know the circumstances Defendants were referring to.

   n.  A second allegations by one or more individuals at Shield Ministries to Defendant Liberty included additional vague, spurious and defamatory allegations, such as that Sarah was speaking to a volunteer when Truluck and/or Truluck were not available.  The "volunteer" was a then-member of the Board of Shield Ministries

that Sarah had been instructed to speak to if Truluck and/or Truluck were unavailable. Since details are not available, Sarah may have been attempting to secure a different room to see clients as Truluck and/or Truluck often were utilizing the room when Sarah had prior authorization to counsel clients there. Regardless, since no one from Shield Ministries or Liberty University ever brought this up to Sarah, Sarah has had no chance to present her side of the story.

 o. Shield Ministries, Truluck and Truluck may also have defamed Sarah Leitner to others as Sarah Leitner knows of an oral communication between Truluck and a third party, her minister.

 p. Due to the widespread confusion and chaos at Shield Ministries, Sarah does not know who sent some of the emails that were sent to her from the Shield Ministries account. Some were not signed and multiple people appear to have had access ot to the account.

436. Below are some examples of the malicious, intentional misrepresentation of Sarah Leitner's character, integrity, clinical skills and professional competence by Defendants Liberty, Sosin, Pride, Deacon and Moitinho:

 q. Sarah Leitner's non-Academic incident report, the contents of which are not known as the report was omitted from the documents Sarah Leitner received from Liberty University through her FERPA request, contains one or more defamatory allegations against Sarah Leitner. The existence of the non-Academic incident report was hidden from Sarah Leitner prior to 2019.

 r. Defendants Liberty, Sosin, Pride, Deacon and Moitinho intentionally defamed Sarah Leitner through multiple injurious and/or untrue statements to other defendants as well as to others, including President Falwell and Provost Hicks in Summer and Fall 2018. The full extent of these statements were not known until 2019.

COMPLAINT
Leitner v. Liberty University et al.

s.  In Summer and Fall 2018, when Sarah Leitner attempted to discuss Liberty's inability to allow her to submit a Title IX case, false and defamatory statements were made by one or more of the Liberty Defendants.

t.  As a result, one or more individuals broke confidentiality with Provost Hicks in the Summer of 2018 by discussing Sarah's request to ask Liberty to undertake a new Title IX investigation.

u.  When Sarah was unable to submit details within ten days of contact with Title IX in 2018, the case was automatically closed. When Sarah asked to re-open the case, due to her husband's hospitalization and surgery, this was allowed, but the re-opening was not even been documented in the Title IX databases as released through the FERPA process. This appears to be one of many times in which Sarah was denied opportunity to submit a Title IX case, while the institution told senior officials, possibly including Jerry Falwell, that Sarah had opportunity to submit complaints.

v.  Because of Defendant Liberty's refusal to conduct an oral interview of Sarah as required by Liberty's policy and Liberty's requirement that Sarah answer in a foreshortened period of time, Sarah was unable to submit anything that met Defendant Liberty's high standards even though Defendant Liberty often took the same length of time to even answer emails about Title IX.

w.  Despite this, an email between two Liberty employees, dated states "That's what she says ☺" as if it was "funny" that Sarah was unable to submit a complaint under these conditions. This conversation between two individuals, one of which Sarah had not even corresponded with, again shows how Sarah was defamed to individuals unknown who may have had an effect on Sarah's case.

x.  Sarah's case was further undermined by Defendant Liberty's whistleblowing office in Fall 2018, who promised Sarah confidentiality while forwarding her

emails to others in the University noting only FYI.... <u>This likely impeded Sarah's attempts to bring safety and related issues to Jerry Falwell's attention in Fall 2018.</u>

y.  Defendant Liberty claimed to the IRS in its form 990 (2017[32]) to have a whistleblowing policies. However, based on emails Sarah Leitner received from the whistleblowing office, the "whistleblowing" office does not entertain Whistleblowing complaints, but instead sends individuals to other offices within Defendant Liberty. Since Sarah Leitner went to the whistleblowing office precisely because these offices did NOT do due diligence, <u>this defeated the point of having a whistleblowing office.</u>

z.  Jerry Falwell Fall 2018 to Sarah Leitner, via email, that all issues had been adequately investigated was a conclusion based on defamatory information.

### Damages

437.    As a direct, proximate and foreseeable consequence of Defendant Liberty, Sosin, Pride, Deacon, Moitinho, Shield Ministries, Truluck and Truluck's conduct, Sarah's academic and career prospects, earning potential, and reputation have been severely harmed. She has suffered significant damages, including but not limited to, damages to reputation, her physical, emotional and psychological well-being, past and future economic losses, losses of educational, professional and career prospects and opportunities, and other direct and consequential damages.

438.    As a result of the foregoing, Sarah is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorney's fees and costs.

---

[32] CharityNavigator.org

## Count X

## All Defendants

## Defamation *per se*

439.    The foregoing allegations are incorporated herein by reference.

440.    Some defamatory statements have historically been deemed so vile that damages would
be presumed.  These include "(1) Words imputing the commission of a crime of moral
turpitude, (2) words imputing infection with a contagious or loathsome disease, (3) words
imputing an unfitness to perform the duties of an office or employment of profit, or lack of
integrity in the discharge of such duties, (4) words prejudicing a person in his profession or
trade." *Fleming v. Moore*, 221 Va. 884, 889, 275 S.E. 2d 632, 635 (1981); see also Shuppe
v. Rose's Stores, Inc., 213 Va. 374, 376, 192 S.E.2d 766, 767 (1972);

441.    The present case involves statements and allegations that involve the later two elements:
Words imputing Sarah's unfitness to performance the duties of a doctoral student in a
counselor education and supervision program and as a professional counselor, researcher and
advocate due to an alleged lack of integrity and professional competence in the discharge of
such duties.

442.    These "special damages" have been found by the Supreme Court of Virginia, in *Fleming
v. Moore, supra*, to include "emotional upset and embarrassment.".  Sarah has suffered
emotional upset and embarrassment due to the defamation of her professional character and
competence.

443.    Virginia courts apply a negligence standard to defamation claims brought by private
figures seeking compensatory damages when the allegedly defamatory statement makes
substantial danger to reputation apparent.  If substantial damage to reputation is not apparent
the actual malice standard applies.  See *The Gazette, Inc. v. Harris*, 325 S.E.2d 713, 725
(1985).  Actual malice involves statements that are made with "knowledge that it was false or

with reckless disregard of whether it was false or not." New York Times Co. v. Sullivan, 376 U.S. (2790280), 84 S.Ct (725 – 726).

444.    Plaintiff believes and intends to show defendants, including defendant Liberty, defamed Sarah, as recently as Fall 2018.

445.    Despite Sarah's please and documentation to refute the defamatory claims, Liberty nevertheless refused to act to restore Sarah to the CES program or to discipline any of the defendants who are licensed professional counselors.

446.    Moreover, on multiple occasions, including in Fall 2018, one or more defendants made one or more defamatory statements to individuals to include Falwell.  For instance, in Fall 2018 Sarah specifically addressed the lack of investigation of her claims, including Liberty's refusal to allow Sarah to leave a harmful and unsafe internship environment to Dr. Falwell.

447.    Reports made to Dr. Falwell involved information that was known to be incorrect by one or more defendants.  Sarah, her external and site supervisor had all endeavored to give defendants additional information that was ignored or refused, and in fact, in February 2017 had refused to listen when it became evident that Sarah's site supervisor *had not been consulted* prior to the erroneous reports Deacon had made to Defendant Sosin.  Dr. Sosin, by her own admission also made the same allegations to unspecified "Deans".  Dr. Deacon had not allowed Sarah to present more evidence in her defense, such as the emails to Shield Ministries from Win4Life.    When Sarah endeavored to correct the record, emails from one Defendant, Dr. Sosin, told Sarah the decision was made and not to appeal.  Near simultaneous emails told Sarah to include the information Defendants had neglected to include in the appeal.  It is evident from these statements that the defendants did not even consider this information.  The defendants did not even include this information in Liberty's outrageous and inaccurate  "Summary of Academic Events Leading to Ms. Sarah Leitner's Dismissal" as well as Liberty's flawed "Timeline of Title IX Activity".

448.   As such, Defendants Liberty, Pride, Deacon, Sosin and/or Moitinho knew that Sarah had practiced ethical behavior, that an investigation had not been completed, and that Sarah's expulsion had not followed the guidelines in the internship manual, yet chose to knowingly give Dr. Falwell and others incorrect and libelous information about Sarah.  Other information not given to Sarah when she asked for documentation from Defendant Liberty under FERPA, such as the missing Incident Report, also may have influenced the case so as further defame Sarah.

449.   It is unknown if anyone from Shield Ministries committed defamation *per se* about Sarah Leitner to Liberty University from March 2017 to the present.  If Liberty University defendants did NOT contact Shield Ministries during this time, this would be a severe lack of consideration to a grade appeal.

450.   At least one individual attempted to contact Liberty University via telephone during the appeals period in order to dispute the allegations, Dr. Charlotte Murrow-Taylor, Professor Emeritus at a CACREP accredited counseling program at Clemson University.  No one at Defendant Liberty returned her calls.  Dr. Charlotte Murrow-Taylor did send a registered letter to Dr. Warren to provide additional information due to the severity of the defamation and defamation *per se* that had occurred.  No response was received from Defendant Liberty.

### Damages

451.   As a direct, proximate and foreseeable consequence of this defamation, Sarah's academic and career prospects, earning potential and reputation have been severely harmed.  She has sustained significant damages, including but not limited to, damages to well-being, emotional and psychological damages, damage to reputation, past, current and future economic losses, loss of educational and professional opportunities, loss of future career opportunities, and other direct and consequential damages.

452.    As a result of the forgoing, Sarah is entitled to damages, the amount to be determined at trial, plus prejudgment interest and attorney's fees and costs.

## Count XI

## ALL DEFENDANTS

## Civil and Statutory Conspiracy

453.    The foregoing allegations are incorporated herein by reference.  Plaintiff believes and intends to show that more than one of the defendants was involved in a civil conspiracy against Plaintiff Sarah Leitner.

454.    Sarah asserts a claim of civil and statutory conspiracy against all Defendants.

455.    Defendants engaged in concerted action, with legal malice, that resulted in damages. Sarah's reputation, business, and profession have been injured by Defendant's actions.

## Damages

456.    As a direct, proximate and foreseeable consequence of this conspiracy, Sarah's academic and career prospects, earning potential and reputation have been severely harmed.  She has sustained significant damages, including but not limited to, damages to well-being, emotional and psychological damages, damage to reputation, past, current and future economic losses, loss of educational and professional opportunities, loss of future career opportunities, and other direct and consequential damages.

457.    As a result of the forgoing, Sarah is entitled to damages, the amount to be determined at trial, plus prejudgment interest and attorney's fees and costs.

## Count XII

## All Defendants

### Intentional Infliction of Emotional Distress

458.    The foregoing allegations are incorporated herein by reference.  Plaintiff believes and

intends to show that one or more defendants inflicted emotional damage against Sarah.

459.    The Virginia Supreme Court has recognized intentional inflection of emotional distress as

a cause of action in *Womack v. Eldridge*, 210 S.E.2d 145 (1974).  In *Womack*, the  court held

that four elements must be proved to establish an intentional infliction of emotional distress:

1) the conduct was intentional or reckless; 2) the conduct was outrageous or intolerable; 3)

there was a causal connection between the Defendants's conduct and the resulting emotional

distress; and 4) the resulting emotional distress was severe.  *Id.* At 148.

460.    This Complaint details each of these requisite elements.  Indeed, Defendant Liberty,

Pride, Moitinho, Deacon, Shield Ministries, Truluck and Truluck's conduct toward Sarah

"has been so outrageous in character, and so extreme in degree, as to go beyond all possible

bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized

community." *Russo* 241 Va. 23, 27 (1991)  (quoting *Restatement (Second) of Torts* §46 cmt j

(1965)).  See also Baird v. Rose, 192 F.3d 462 (4th Circ., 1999).

461.    The actions of Defendant Liberty, by and through its CES faculty Pride, Deacon, Sosin,

and Moitinho, were willful and intentional on many occasions, including its actions

throughout 2015 to 2018.

462.    The actions of Defendant Shield Ministries, by and through its agents Truluck and

Truluck, were willful and intentional.

463.    Defendants Liberty, Pride, Deacon, Sosin and Moitinho, knew or should have known

that its actions in finding Sarah responsible for its faculty member's patently frivolous and

untrue charges, in creating and conducting a fundamentally flawed processes, and in

sanctioning Sarah by effectively labelling her as professionally impaired, unethical and incompetent would cause Sarah severe emotional distress. *Russo, supra.*

464.   Defendants Shield Ministries, Truluck and Truluck, knew or should have known that its patently untrue descriptions of Sarah's behavior to Liberty Defendants, would cause Sarah severe emotional distress. *Russo, supra.*

465.   The conduct of all Defendants was extreme and outrageous, beyond the bounds of decency, and utterly intolerable in a civilized community.

### Damages

466.   Defendants Liberty, Pride, Deacon, Sosin, Moitinho, Shield Ministries, Truluck and Truluck's conduct was the direct and proximate cause of Sarah's severe emotional distress. She has experienced Post Traumatic Stress disorder, anxiety, depression; inability to sleep through the night, and has experienced severe medical effects.

467.   As a direct, proximate and foreseeable consequence of Defendants Liberty, Pride, Deacon, Sosin, Moitinho, Shield Ministries, Truluck and Truluck's aforementioned conduct, Sarah's academic and career prospects, earning potential, and reputation have been severely harmed.  She has sustained significant damages, including but not limited to, severe emotional distress, damages to physical well-being, emotional and psychological distress, damages to reputation, past, current and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

468.   As a result of the forgoing, Sarah is entitled to recover damages, in an the amount to be determined at trial, plus prejudgment interest and attorney's fees and costs.

## Count XIII

## All Defendants

## Negligent Infliction of Emotional Distress

469.    The foregoing allegations are incorporated herein by reference.  Plaintiff believes and intends to show that one or more defendants inflicted emotional damage against Sarah.

470.    When Defendant undertakes to investigation allegations of any form of misconduct against one of its students, or to one of its students, or hires faculty and vests powers in them, it owes that student a duty to protect him or her from foreseeable harm.

471.    By Sarah's multiple attempts, via email to Dr. Pride, to be removed from the brig, multiple attempts in 2016 through 2019 to provide Defendant Liberty with information in order to participate in investigations, including grade appeals and a Remediation Process that was not explained to Sarah, Sarah reasonably relied upon Liberty's duty to protect her from harm.

472.    This is particularly true when Sarah was frequently notifying Dr. Pride of harm that occurred while still at the brig, of the emotional distress inflected upon Sarah due to Dr. Pride's refusal to remove her from a coercive internship site, and of additional distress due to Defendant Liberty's attitude throughout the process from 2016 to 2019.

## Damages

473.    As a direct, proximate and foreseeable consequence of Defendants Liberty, Pride, Deacon, Sosin, Moitinho, Shield Ministries, Truluck and Truluck's aforementioned conduct, Sarah's academic and career prospects, earning potential, and reputation have been severely harmed.  She has sustained significant damages, including but not limited to, severe emotional distress, damages to physical well-being, emotional and psychological distress, damages to reputation, past, current and future economic losses, loss of educational and

professional opportunities, loss of future career prospects, and other direct and consequential damages.

474.    As a result of the forgoing, Sarah is entitled to damages, in an amount to be determined at trial, plus prejudgment interest and attorney's fees and costs.

## PRAYER FOR RELIEF

475.   Accordingly, Plaintiff prays for judgment in her favor and against Defendants as described below:

476.   Declaring that Defendants Liberty, Pride, Sosin, and Moitinho, breached a contract with CACREP causing grievous harm to Sarah Leitner.

477.   Declaring that all Defendants committed torturous interference, causing grievous harm to Sarah Leitner.

478.   Declaring that all Defendants committed Detrimental Reliance, causing grievous harm.

479.   Declaring that all Defendants committed fraud, causing grievous harm.

480.   Declaring that all Defendants violated the law through breach of the covenant of good faith and fair dealing.

481.   Declaring that Defendants Liberty, Pride, Sosin, Deacon and Moitinho violated the Americans with Disabilities act by discriminating against Plaintiff on the basis of disability, and/or retaliating against Plaintiff for engaging in protected activity, and/or due to the disability of her child;

482.   Declaring that Defendants Liberty, Pride, Sosin, Deacon and Moitinho violated the violated Title IX through gender discrimination as well as retaliation for protected activity.

483.   Declaring that Defendants Liberty, Pride, Sosin, Deacon and Moitinho were negligent in their treatment of Sarah Leitner;

484.   Declaring that All Defendants defamed Sarah Leitner;

485.   Declaring that Defendants all defendants committed defamation *per se* against Sarah Leitner;

486.   Declaring that all Defendants were involved in a civil/statutory conspiracy against Sarah Leitner; Awarding Plaintiff relief as necessary for Liberty's Civil and Statutory Conspiracy (including treble damages pursuant to Virginia Code §§18.2-499 and 18.2-500)

487.   Declaring that Defendants all Defendants committed Intentional Infliction of Emotional Distress against  Sarah Leitner;

488.   Declaring that Defendants all defendants committed Intentional Infliction of Emotional Distress against  Sarah Leitner;

489.   Awarding Plaintiff lost past and future wages and benefits as a result of Defendant's violations, plus interest thereon;

490.   Awarding Plaintiff compensatory damages in an amount to be proven at trial, plus interest thereon;

491.   Awarding Plaintiff punitive damages in an amount to be proven at trial, plus interest thereon;

492.   Awarding Plaintiff lost past and future wages and benefits as a result of Defendant's actions, plus interest thereon;

493.   Awarding Plaintiff the costs of bringing and maintaining this civil action and the investigation that preceded it, including reasonable attorneys' fees and costs;

494.   Awarding Plaintiff pre- and post-judgment interest;

495.   Enjoining Defendant from discriminating or retaliating against Plaintiff in the future

496.   Awarding Plaintiff such other and further relief as the interests of justice may require.

## PLAINTIFF DEMANDS A TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a jury trial for all claims and issues so triable.

### Certification and closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and believe that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending,

COMPLAINT
Leitner v. Liberty University et al.

modifying, or reversing existing law; (3) the factual contentions have evidentiary support, or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11. Additionally, I, Sarah Leitner, declare under penalty of perjury that the foregoing is true and correct pursuant to Virginia Code §8.01-4.3.

Respectfully submitted,

_____

Sarah Leitner

132 Clay St

Goose Creek, SC 29445

843-860-5638

modifying, or reversing existing law; (3) the factual contentions have evidentiary support, or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11. Additionally, I, Sarah Leitner, declare under penalty of perjury that the foregoing is true and correct pursuant to Virginia Code §8.01-4.3.

Respectfully submitted,

*Sarah Leitner*

Sarah Leitner        *September 16, 2019*

132 Clay St

Goose Creek, SC 29445

843-860-5638

COMPLAINT
Leitner v. Liberty University et al.