CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

12/4/2020

JULIA C. DUDLEY, CLERK
BY:   s/ A. Little
        DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

| | |
|---|---|
| SARAH LEITNER,<br><br>*Plaintiff*,<br><br>v.<br><br>LIBERTY UNIVERSITY, INC., *et al.*,<br><br>*Defendants.* | CASE NO. 6:19-cv-00029<br><br><br>MEMORANDUM OPINION<br><br><br>JUDGE NORMAN K. MOON |

This matter is before the Court on the motion to dismiss filed by Defendants Shield Ministries, David Truluck, and Melodie Truluck, Dkt. 19, as well as the motion to dismiss by Defendants Liberty University, Melissa Pride, Lisa Sosin, Mary Deacon and Elias Moitinho, Dkt. 22. The Court will grant Defendants' motions to dismiss and afford Plaintiff leave to amend her complaint.

### Background

Plaintiff was enrolled in Liberty University's Counselor Education & Supervision ("CES") doctoral program. Dkt. 17 ¶ 14. She was enrolled in the program from 2015 to Spring 2017. *Id.* ¶ 20. Defendant Liberty University is a private, Christian university. *Id.* ¶ 15. The remaining Liberty Defendants are faculty members at the University (with Liberty, collectively the "Liberty Defendants"). *Id.* ¶ 16. Defendant Shield Ministries is a South Carolina non-profit corporation. *Id.* ¶ 17. Defendants David and Melodie Truluck are employees or contractors of Shield Ministries (with Shield Ministries, collectively the "Shield Ministries Defendants"). *Id.* ¶ 18.

The Court assumes the parties' familiarity with the voluminous pleadings and will only set forth such allegations as are necessary for resolution of the motions to dismiss. Plaintiff,

representing herself *pro se*, has filed a 125-page complaint which includes nearly 500 numbered paragraphs.

By 2015, Plaintiff completed all coursework for her PhD with a 3.8 GPA, leaving an internship and dissertation left to complete. *Id.* ¶ 20. She alleges that no Liberty faculty or staff "voiced any concerns to [her] regarding [her] conduct in her capacity as a doctoral internship student until December 2015 …." *Id.* ¶ 21.

Throughout her complaint, Plaintiff asserts that there was an "unsafe, coercive and abusive hostile educational environment" at her first internship site, the Naval Consolidated Brig in South Carolina. *Id.* ¶ 5. She "felt unsafe" there, not because of concerns for her "physical safety," but rather her "emotional and psychological safety." *Id.* ¶ 32. She further alleges that she was subjected initially to "low level" harassment, which "increased to an extreme level." *Id.* ¶ 64. However, her allegations are often conclusory and devoid of factual elaboration, or when explained, do not bear out such a characterization.

Thus, while Plaintiff repeatedly refers to a "chaotic and unsafe internship site," *id.* at p. 19, and "extreme" harassment, her complaints mostly relate to difficulties in communicating with Liberty's internship coordinator, *id.* ¶¶ 65–66; alleged shortcomings in her supervisors' work at the internship site, *id.* ¶¶ 67–77; the requirement that Plaintiff to undergo a "remediation plan," following her concededly "poor[]" performance during a counseling session, *id.* ¶¶ 81–85; and the fact that her supervisors directed her to re-write her clinical notes numerous times, *id.* ¶¶ 86–93, 120—a practice Plaintiff calls "coercive," *id.* ¶ 93. Plaintiff repeatedly attempted to convince Dr. Pride, the Clinical Director at Liberty, to come to the internship site, which would be a "six hour drive each way," to "see the coercive environment for himself and find a solution." *Id.* ¶ 93; *see*

*also* ¶ 111(c) (requesting his visit again), ¶ 114 (requesting he visit the site "in one or more telephone calls").

December 2015 commenced a "period of ill health" for Plaintiff and her family: Plaintiff underwent two surgeries, her husband had "two or more surgeries and one hospitalization," and her child went to a psychiatric hospital three times. *Id.* ¶ 94. Plaintiff had to plan to care for her child, causing yet further stress. *Id.* ¶¶ 79, 80. Plaintiff acknowledges that she was not located at or was absent from her first internship site "for most of December 2015" due to the health problems she and her family faced at that time. *Id.* ¶¶ 95, 96. However, Plaintiff alleges that her supervisor "later used these absences against [her] in an evaluation in January or February 2016," which she characterizes as "a violation of law as these were based on her child's disability," constituting "associational discrimination." *Id.* ¶ 96.

While Plaintiff asked to withdraw from the internship in December 2015, she was "forced to continue returning" to the internship site. *Id.* ¶¶ 97, 98. The precise timeline for what transpired is not fully apparent from the complaint. Plaintiff decided to "take an incomplete instead." *Id.* ¶ 98. However, in January and February 2016, apparently before Liberty had approved Plaintiff to start another internship, Plaintiff alleges that she had to continue at that internship. *Id.* ¶¶ 100, 104 (alleging that in January 2016, Dr. Pride should have had "enough information to allow [Plaintiff] to leave the internship site"). During this period, Plaintiff put in even more time and effort into her internship, beyond what the expectations were, *id.* ¶¶ 99, 111, but Plaintiff was concerned that her internship supervisor would give her a poor evaluation. *Id.* ¶¶ 99–109. Dr. Pride responded that he would "follow up on the remediation process." *Id.* ¶ 101. Plaintiff's internship supervisor recorded in her evaluation that Plaintiff was late to work and left before she was expected to leave, which Plaintiff disputes. *Id.* ¶¶ 111–13.

3

In February 2016, Plaintiff alleges that she informed Dr. Pride of "unsafe" conditions and a "coercive and abusive atmosphere" at the internship site, yet he "told her she had to go back." *Id.* ¶ 116. Plaintiff thereafter sent a series of emails to Dr. Pride, in which she sought approval to change internships. *Id.* ¶¶ 116–21. Plaintiff allegedly sent Dr. Pride an email on February 3, 2016, which "again mentioned her child's health problems to Dr. Pride, stating that currently they were in the ER and asking if Dr. Pride needed anything else from her." *Id.* ¶ 122. Dr. Pride responded that he "pray[ed] [her] daughter is well quickly," and "[n]othing else [was] needed for now." *Id.*; *see also id.* ¶ 124 (similar response in another email from Dr. Pride). On February 13, 2016, Plaintiff sent another email to Dr. Pride reiterating her concerns about the internship site and notifying him that her daughter had an emergency the previous day. *Id.* ¶ 132. Dr. Pride responded that he was "sorry to hear this," but said that "the committee's remediation plan must be followed" and "[w]e can't ignore anything at this point, your comments included." *Id.* ¶ 133. Liberty issued Plaintiff a grade of "C" for the semester. *Id.* ¶ 144.[1] Plaintiff's academic appeals of her grade were unsuccessful. *Id.* ¶¶ 169–71.

Plaintiff "attempt[ed] to file" a Title IX complaint in 2016, in which she appears to have raised similar concerns about the internship site. *Id.* ¶¶ 172–78. Liberty responded that it did not believe it had authority to do anything about the internship site, and that the "extent of [its] response would be to never recommend that site for internships again and allow [Plaintiff] to

---

[1] The Court notes that Liberty appears to assert that it was only "after receiving her fall 2015 grade" that Plaintiff "began e-mailing her professors, reporting that her internship site was 'abusive' and 'coercive.'" Dkt. 23 at 3. The Court reads the allegations in the complaint differently that she was raising those concerns earlier, before Liberty issued her grade in February 2016. The Court accepts Plaintiff's well pleaded allegations as true, but, regardless whether she had raised those concerns earlier in late 2015 or later in January or February 2016, it would not affect the outcome of these motions to dismiss.

appeal within the program which [it] believe[d] [she had] done." *Id.* ¶ 176. Plaintiff believes Liberty was "unwilling or unable to" address her grievances with the internship site. *Id.* ¶ 179.

Liberty allowed Plaintiff the ability to get a new supervisor and seek a new internship site to continue her program in Fall 2016. *Id.* ¶¶ 126, 136–37. Her participation in her Fall 2016 internship ran into difficulties as well. First, Plaintiff's child continued to require medical and psychological care during this period, which left Plaintiff "unable to accumulate hours towards her internship" and "*unable* to complete [her] internship." *Id.* ¶ 182 (emphasis in original). Second, Liberty ultimately concluded that Plaintiff was interning at an "unauthorized" internship site. *Id.* ¶ 200.

In Plaintiff's telling, her internship was "under the control of Win4Life, not Shield Ministries." *Id.* ¶ 45. Win4Life was the organization that Liberty believed Plaintiff was interning with. *Id.* ¶ 200. Plaintiff believed Shield Ministries to be the same site as Win4Life and under its supervision. *Id.* ¶ 263. Plaintiff alleges that Shield Ministries (by David Truluck) and Win4Life orally agreed in November and December 2016 to a partnership. *Id.* ¶¶ 4, 194; *id.* at p. 70. Plaintiff had previously been informed that "a situation such as this was allowed, as long as there was a connection between the two non-profits." *Id.* ¶ 195. And she alleges Dr. Pride received a "courtesy email notifying him of the situation" and counseling began several days later. *Id.* ¶ 196. Plaintiff acknowledges that Liberty asked several times for an affiliation agreement between Win4Life and Shield Ministries and a signed copy of Liberty's affiliation agreement, but Plaintiff considered that such agreements were not "necessary" because Plaintiff had met requirements laid out in emails from Dr. Pride. *Id.* ¶¶ 264–65.

Plaintiff did not report to personnel at Shield Ministries at the internship. *Id.* at p. 69. Plaintiff cites text messages and emails between herself and the Shield Ministries Defendants

regarding counseling of patients, and she alleges the Trulucks "wanted [her] to counsel at Shield Ministries but constantly made it difficult and sometimes impossible for her to counsel." *Id.* ¶¶ 209–15; *see also id.* at pp. 69–70. Plaintiff acknowledges that she made an "effort to ensure the oral partnership between Shield Ministries and Win4Life was written down," and that she sent "multiple texts and emails" to the Shield Ministries Defendants inquiring about the status of the partnership and if Shield Ministries wanted any additions or changes prior to signing." *Id.* ¶ 361. She was told in January 2017 that "this action required board approval and that board approval was required prior to Shield Ministries utilizing [Plaintiff] or any other intern in any role." *Id.* ¶¶ 361–62. On January 23, 2017, the Trulucks notified Plaintiff that she had to stop counseling with them, stating: "My board of trustees has concerns about the relationship between SHIELD MINISTRIES and you[.] They have told me to suspend all counseling effective immediately …." *Id.* ¶ 216.

In February 2017, Dr. Deacon at Liberty considered Plaintiff to have been interning at an "unauthorized" internship site, and that Plaintiff attempted an "end run" around Liberty's rules. *Id.* at p. 50, ¶¶ 198, 200, 223–30. Dr. Deacon took issue with Plaintiff's internship "for Win4Life at Shield Ministries." *Id.* ¶ 200. Liberty expelled Plaintiff from its CES program in early to mid-2017. *Id.* ¶ 14 (alleging dismissal in Spring 2017), ¶ 37 (alleging expulsion in February 2017). Plaintiff alleges that Liberty actually expelled her when she and her external supervisor "reported to Dr. Deacon of Liberty University that the partnership between Win4Life and Shield Ministries would be dissolved." *Id.* ¶ 42. Plaintiff alleges that Shield Ministries Defendants "made false reports to Dr. Deacon of Liberty University about [Plaintiff] and the partnership." *Id.* ¶¶ 45, 46. However, Dr. Deacon chose to believe those reports instead of Plaintiff. *Id.* ¶ 46. In addition to her alleged "misrepresent[ation of] the relationship between Win4Life and Shield Ministries," *id.*

6

¶ 267, Plaintiff writes that Liberty found significant that she had "advertised through Psychology Today to see clients independently, without approval or supervision from program coordinators," *id.* ¶ 268, and that Plaintiff had "repeatedly contacted" the Liberty's Student Advocate office, "to discuss events including 'abuse' suffered at internship and difficulties with daughter," *id.* ¶ 269. Plaintiff argues that she did nothing wrong in any of these respects. *Id.* ¶¶ 267–69. Plaintiff attempted to appeal her dismissal from the program, but her dismissal was upheld. *Id.* ¶¶ 270–71.

Plaintiff filed this lawsuit against the Liberty Defendants and Shield Ministries Defendants, raising thirteen different state and federal law causes of action against them. Liberty Defendants and Shield Ministries Defendants each filed a motion to dismiss Plaintiff's second amended complaint, Dkt. 19 (Shield Ministries Defendants), Dkt. 22 (Liberty Defendants).

## Standard of Review

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint to determine whether a plaintiff has properly stated a claim. The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), with all allegations in the complaint taken as true and all reasonable inferences drawn in the plaintiff's favor, *King v. Rubenstein*, 825 F.3d 206, 212 (4th. Cir. 2016). A motion to dismiss "does not, however, resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Id.* at 214.

Although the complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. A court need not "accept the legal conclusions drawn from the facts" or "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Simmons v. United Mortg. &*

*Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011) (internal quotations omitted). This is not to say Rule 12(b)(6) requires "heightened fact pleading of specifics"; instead, the plaintiff must plead "only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Still, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The Court liberally construes pro se complaints, even if inartfully pleaded. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

<u>Count I (Breach of Contract)</u>

Plaintiff's first cause of action is for breach of contract. Dkt. 17 ¶¶ 311–24. She brings this claim only against the Liberty Defendants. *Id.* at 85. She asserts that a "contractual relationship existed between Liberty and [Plaintiff] *through* Liberty's accreditation efforts with CACREP," the Council for Accreditation of Counseling and Related Programs, as well as multiple internship sites, *id.* ¶ 313 (emphasis added). Plaintiff attempts to enforce these purported contractual obligations as though she were a third-party beneficiary, though Plaintiff does not necessarily use that term. Dkt. 17 ¶¶ 313, 314, 321. She explains that she "is not stating that Liberty University breached a contract with her, but instead that Liberty University breached a contract with CACREP, as well as [her] two internship sites." *Id.* ¶ 314.

In addressing a similar case, the Fourth Circuit held that under Virginia law, standards for accreditation did not create an enforceable contract between an educational institution and accreditation body, at least where the accreditation body could "alter the alleged 'contract' at will, and thus [was] not bound by its terms." *Prof. Massage Training Ctr., Inc. v. Accreditation All. of Career Schs. & Colls.*, 781 F.3d 161, 181 (4th Cir. 2015). Indeed, this Court recently applied that principle to hold that CACREP accreditation standards did not form a basis for a contract-based claim against Liberty under Virginia law. *Owen v. Liberty Univ.*, No. 6:19-cv-7, 2020 WL

8

1856798, at *8 (W.D. Va. Apr. 13, 2020) ("Liberty's violation of CACREP's Standards cannot form a basis for a contract-based claim under Virginia law because mutuality is absent."). The 2016 CACREP Standards clearly state that they are subject to CACREP's supplementation: "Please note that programs planning to seek CACREP accreditation under the 2016 Standards should not consider this a stand-alone document. Over the next several months, CACREP will release additional documents that include updated policies, application procedures, and a description of review processes."[2] Dkt. 17 ¶ 315 (quoting 2016 Standards and citing availability online); *Owen*, 2020 WL 1856798, at *8 (same). Thus, the accreditation standards Plaintiff cites do not constitute a contractual agreement between Liberty and CACREP. Without a contract between them, Plaintiff cannot be a third-party beneficiary to the contract.

To the extent Plaintiff seeks to base a breach-of-contract claim upon language from the CES Handbook, *e.g.*, Dkt. 17 ¶ 321, this claim fails because this handbook language demonstrates that there is a lack of mutuality of obligation as required to form a contract under Virginia law. *See* Dkt. 23-1 at 7 ("the Handbook is revised as Program and/or University policies and procedures evolve");[3] *Owen*, 2020 WL 1856798, at *8 ("the CES Handbook does not create a contractual relationship between Plaintiff and Liberty, because mutuality is clearly absent"); *see also Jackson v. Liberty Univ.*, No. 6:17-cv-41, 2017 WL 3326972, at *5 (W.D. Va. Aug. 3, 2017) (holding that Virginia law requires "absolute mutuality of engagement between the parties" such that each party is bound to hold the other to the agreement).

---

[2]   http://www.cacrep.org/wp-content/uploads/2017/08/2016-Standards-with-citations.pdf (last accessed Nov. 30, 2020).

[3] In view of the references to the CES Handbook included in the complaint as a basis for Plaintiff's breach of contract claim, *e.g.*, Dkt. 17 ¶ 321(b), the Court can consider the Handbook as it was incorporated by reference. *Sec'y of State for Def. v. Trimble Nav. Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007) (court can consider documents attached to a motion to dismiss so long as "integral to the complaint and authentic").

Finally, Plaintiff's argument that "Liberty University breached a contract with … [her] two internship sites," Dkt. 17 ¶ 314, also does not support a claim for breach of contract. Virginia law "requires a contract to clearly intend persons or entities to be third-party beneficiaries of the contract to qualify as such." *Futuri Real Est., Inc. v. Atl. Tr. Servs., LLC*, 835 S.E.2d 75, 79 (Va. 2019). Plaintiff purports to cite language from a contract between Liberty and her internship site stating that Liberty would "[m]ake periodic visits to the Agency to review student progress and consult with the Field Instructor(s) about learning patterns, problems and other matters pertinent to the operation of the program." Dkt. 17 ¶ 53. But this language in conjunction with any other related allegations in the complaint, *e.g.*, *id.* ¶¶ 93, 153, 314, does not clearly show that Liberty and the internship site intended to confer an enforceable benefit upon interns as a group, much less Plaintiff in particular. *Cf. Smith v. James C. Hormel Sch. of Va. Inst. of Autism*, No. 3:08-cv-30, 2010 WL 1257656, at *17 (W.D. Va. Mar. 26, 2010) (noting, in decision holding student not a third-party beneficiary, the fact that "the contracting parties did not intend to benefit any specific individual student").

In any event, even if Plaintiff were an intended third-party beneficiary—and she is not— Plaintiff has not demonstrated that Liberty Defendants *breached* the cited agreement and obligation to make "periodic visits" to the Agency, when Dr. Pride did not make the six-hour drive each way in December 2015 or January 2016, despite Plaintiff's repeated requests. Dkt. 17 ¶¶ 93, 111(c), 114.

### Count II (Tortious Interference with Business Practices)

Next, Plaintiff claims that Liberty University Defendants and Shield Ministries Defendants should be liable for tortious interference with business practices. Dkt. 17 ¶¶ 325–44. She alleges both sets of defendants improperly interfered with certain contracts: that the Liberty Defendants

breached and improperly interfered with Liberty's contract with Win4Life, *id.* ¶¶ 327–28, 331, and that Shield Ministries Defendants breached and improperly interfered with a "valid, oral contract" between Shield Ministries and Win4Life in November or December 2016, *id.* ¶¶ 336–39, 341–42. Elsewhere, she alleges that Shield Ministries Defendants "improperly interfered with the contract between Liberty University and Shield Ministries by denying the existence of its partnership with Win4Life." *Id.* ¶ 342. Because, under Virginia law, "[a] person cannot intentionally interfere with his own contract," *Francis Hosp. v. Read Props.*, 820 S.E.2d 607, 610 (Va. 2018), and because Plaintiff's claims for tortious interference with contractual and business relationships are all based on alleged interference by Defendants with *their own contracts*, the Court will dismiss Count II, *with prejudice*, for failure to state a claim.

<u>Count III (Detrimental Reliance)</u>

Next, Plaintiff purports to bring a claim for "detrimental reliance," asserting that she "reasonably relied on the promises of Liberty University and Shield Ministries," and that her reliance on these promises caused her harm. Dkt. 17 ¶¶ 345–49. As "no independent cause of action for detrimental reliance exists under Virginia law," the Court will dismiss Count III, *with prejudice*. *Minor v. Tyson Foods, Inc.*, 60 F. Supp. 3d 684, 689 (W.D. Va. 2014) (Conrad, J.) (internal quotation marks omitted); *Browning v. Fed. Nat'l Morg. Ass'n*, No. 1:12-cv-9, 2012 WL 1144613, at *3 (W.D. Va. Apr. 5, 2012) (Jones, J.) ("When a cause of action is based upon a party's reliance, to its detriment, upon a misleading promise, it is a cause of action for promissory estoppel and cannot be sustained under Virginia law.").

<u>Count IV (Fraud)</u>

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "[T]he 'circumstances' required to be pled with particularity under Rule 9(b) are 'the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) (quoting 5 Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. § 1297 (2d ed. 1990)). However, the complaint may rely on general allegations of a defendant's knowledge and intent. Fed. R. Civ. P. 9(b); *see also Reynolds v. Wells Fargo Home Mortg.*, No. 7:19-cv-00799, 2020 WL 3977934, at *7 (W.D. Va. July 14, 2020).

Plaintiff substantially relies on the following allegations to support her fraud claim against the Liberty Defendants: (1) Plaintiff provided Liberty information that contradicted its resolution of her grade appeal, but it was not considered, Dkt. 17 ¶ 353; (2) Plaintiff "relied on multiple pieces of documentation, and on Liberty University long standing policy, to believe that she would be given a withdraw[al] if it became necessary due to extreme circumstances," but when she believed such circumstances warranted her request to withdraw from a course, it was denied, *id.* ¶ 354; (3) Plaintiff "naturally relied on the statements of Liberty University faculty, as well as Liberty University manuals, syllabi, etc., to believe that she would receive a fair hearing" in her internship, grade appeals, and Title IX process, *id.* ¶ 355; (4) Liberty engaged in "misrepresentations" and and acted "contrary to its established procedures," including when it denied Plaintiff permission to leave the "coercive internship site," and then was denied a hearing by Liberty "to determine what had occurred," *id.* ¶ 356. Plaintiff contends that all of this "amounted to fraud as [she] had good reason to assume that Liberty University would act in accordance with its own policies and

procedures," including the "promises it had made to CACREP and other accreditation boards." *Id.*
¶ 359.

These allegations fall well short of the requirement that fraud be pleaded with particularity.
*E.g.*, *id.* ¶ 354 (allegedly "rel[ying] on the multiple pieces of documentation, and on Liberty
University long standing policy"); *id.* ¶ 355 (allegedly "rel[ying] on the statements of Liberty
University faculty, as well as Liberty University manuals, syllabi, etc."). The who, what, where,
when, and why underlying any perceived fraud is absent, notwithstanding Plaintiff's voluminous
allegations. *See Harrison*, 176 F.3d at 784.

Plaintiff's claims against the Shield Ministries Defendants fail as well. Plaintiff alleges that
she sought to "ensure the oral partnership between Shield Ministries and Win4Life was written
down," but that Plaintiff "was notified that this action required board approval and that board
approval was required prior to Shield Ministries utilizing [Plaintiff] or any other intern in any
role." Dkt. 17 ¶¶ 361–62. While Plaintiff alleges that she "naturally believed" that the Trulucks
"would act with integrity and tell the truth to Liberty University," instead "they chose to deceive
Liberty University." *Id.* ¶ 363. Plaintiff alleges that "as a result of these misrepresentations" she
was unable to complete her PhD. *Id.* ¶ 364. Rule 9(b) requires more particularity than Plaintiff has
provided. Alleging that a party "chose to deceive" and engaged in "misrepresentations" does not
suffice to state a plausible claim for fraud. *See Harrison*, 176 F.3d at 784.

### Count V (Breach of Covenant of Good Faith & Fair Dealing)

Because the Court has concluded that there is no underlying contract, Plaintiff's purported
free-standing claim for breach of the implied covenant of good faith and fair dealing also fails and
must be dismissed. Dkt. 17 ¶¶ 368–70; *Jackson*, 2017 WL 3326972, at *7 ("Without an underlying
contract, there can be no breach of contract or covenant of good faith and fair dealing claims");

*Albayero v. Wells Fargo Bank, N.A.*, No. 3:11-cv-201, 2011 WL 4748341, at *6 (E.D. Va. Oct. 5, 2011) ("Under Virginia law, every contract contains an implied covenant of good faith and fair dealing; however, a breach of those duties only gives rise to a breach of contract claim, not a separate cause of action.").

<u>Count VI (Discrimination Related to Disability & Disability of Her Child)</u>

Plaintiff next claims the Liberty Defendants discriminated against her on account of her disability and her child's disability, in violation of Title III of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act. Dkt. 17 ¶¶ 377–91.

The Rehabilitation Act precludes federal grantees from "excluding, denying benefits to, or discriminating against any 'otherwise qualified individual … solely by reason of her or his disability.'" *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 461 (4th Cir. 2012) (quoting 29 U.S.C. § 794(a)). Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a). To the extent possible, the Fourth Circuit has construed the ADA and Rehabilitation Act to impose similar requirements. *Halpern*, 669 F.3d at 461.

To establish a violation of either Act based on her own condition, Plaintiff must establish that she (1) has a disability, (2) is otherwise qualified to participate in the defendant's program, and (3) was excluded from the program on the basis of her disability. *Id.* at 461. Plaintiff alleges "disability discrimination … due to the disability Liberty created through its negligent handling of [her] case in 2015 and 2016." Dkt. 17 ¶ 2; *id.* ¶ 240 (alleging that "Liberty University Defendants had created the disability by their inaction while [Plaintiff] was at the brig," her first internship site). Plaintiff's claim fails because she does not allege the nature of her disability, and the Court

need not accept as true legal conclusions or conclusory allegations devoid of factual enhancement. *Iqbal*, 556 U.S. at 678; *Simmons*, 634 F.3d at 754. Nor does Plaintiff's complaint include factual allegations that would show she was excluded from the program on the basis of her disability—a claim made even more implausible as Plaintiff has alleged that Liberty Defendants themselves "created" her disability through their challenged conduct.

Plaintiff also claims "associational discrimination" by Liberty Defendants on account of her child's disability. Section 504 of the Rehabilitation Act has been interpreted "to prohibit discrimination against an individual based on his or her association with a disabled person." *D.N. v. Louisa Cnty. Pub. Schs.*, 156 F. Supp. 3d 767, 772 (W.D. Va. 2016). An associational discrimination claim "requires a separate and distinct denial of a benefit or service to a non-disabled person and may not be premised on a derivative benefit or harm based on treatment towards a disabled person." *Id.* (cleaned up, internal quotation marks omitted). To state such a claim under the ADA, a plaintiff would need to demonstrate (1) she was qualified for the job at the time of the adverse employment action; (2) she was subjected to an adverse employment action; (3) she was known by her employer to have a relative or associate with a disability; and (4) the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision. *Den Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1085 (10th Cir. 1997).

The complaint does not state a plausible associational discrimination claim. Plaintiff argues that she was subjected to several adverse employment actions, and further, that she was known by Liberty University at the time to have a relative with a disability or perceived to have one. Numerous allegations show that Liberty Defendants were aware of her child's disability. For example, Plaintiff cites emails in February 2016 in which she mentioned her child's health in her

communications with Liberty Defendants, and they expressed concern and hope that Plaintiff's child's health would improve. Dkt. 17 ¶¶ 122, 132. However, the allegations in the complaint fail to satisfy the requirement that the adverse employment action occurred under circumstances raising a reasonable inference that the disability of her child was "a determining factor" in the employer's decision. *Den Hartog*, 129 F.3d at 1085. They also fail to establish that Plaintiff was otherwise qualified for the position.

Plaintiff alleged that she was absent for "most of December 2015," due in part to her child's illness and care needs, but her internship supervisor "later used these absences against [Plaintiff] in an evaluation in January or February 2016, a violation of law as these were based on her child's disability, an example of associational discrimination." Dkt. 17 ¶¶ 94–96.[4] Thus, to Plaintiff, it was discrimination for Liberty (or her supervisor) to consider her absences in order to care for her child. While ADA interpretative guidance would not permit "an employer to make decisions based on the 'belief that the employee would have to miss work' in order to take care of a disabled person," the Fourth Circuit has held that "[t]he ADA does not require an employer to restructure an employee's work schedule to enable the employee to care for a relative with a disability." *Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 214 (4th Cir. 1994) (quoting ADA guidance, cleaned up).

Thus, in *Tyndall*, the Fourth Circuit wrote that an associational discrimination case could be made if an employer made an "unfounded assumption" that an employee would have to miss work to take care of a disabled relative; however, where termination resulted from the employee's "record of past absences and [her] clear indication that she needed additional time off," the

---

[4] While this individual was not a Liberty employee, her evaluation would have gone to Liberty and considered in its assessment of Plaintiff's grade and performance during the semester.

employee could not make a valid associational discrimination claim. Plaintiff's allegations of associational discrimination as presently articulated in the complaint fall into the latter set of claims and thus are insufficient under *Tyndall*. Significantly, Plaintiff had alleged that her child's health and home care situation rendered Plaintiff "*unable* to complete her internship." *Id.* ¶ 182 (emphasis in original). And she had also alleged that for her first internship, "she was out of the brig for most of December 2015," which absences "were based on her child's disability," among other health issues. Dkt. 17 ¶¶ 95–96. Plaintiff has largely pleaded herself out of an associational discrimination claim in light of these allegations.

In addition, a plaintiff must be qualified to do her job in order for any adverse employment action to be unlawful under the ADA. That means having "both the skills to do the job and the ability to show up when needed." *Schmitz v. Alamance-Burlington Bd. of Educ.*, No. 1:18-cv-910, 2020 WL 924545, at *8 (M.D.N.C. Feb. 26, 2020). "In addition to possessing the skills necessary to perform the job in question, an employee must be willing and able to demonstrate these skills by coming to work on a regular basis." *Tyndall*, 31 F.3d at 213. Plaintiff has also largely pleaded herself out of an associational discrimination claim given these allegations that Plaintiff was "*unable* to complete her internship" on account of her child's health issues. *Id.* ¶ 182 (emphasis in original). Plaintiff therefore also failed to show she was qualified for the position.

The Court will afford Plaintiff leave to amend her complaint to attempt to remedy these deficiencies and to state a plausible associational discrimination claim, including any allegations as would tend to establish: (1) Plaintiff was qualified for her position; (2) the defendants took an adverse employment action against her on account of her child's disability, or that the circumstances raise the reasonable inference that her child's disability was a determining factor in the adverse employment action; and (3) such adverse employment action was based on an

"unfounded assumption" about future absences by Plaintiff, rather than the record of absences before such adverse employment action.

Count VII (Title IX)

Plaintiff also claims the Liberty Defendants discriminated against her on account of her gender, in violation of Title IX. Dkt. 17 ¶¶ 392–422. First, Plaintiff purports to raise a claim of gender discrimination, *id.* ¶¶ 392–400; and second, she purports to raise a claim for retaliation, *id.* ¶¶ 401–422. Plaintiff has failed to state a claim in either respect.

Title IX provides that "[n]o person in the United States shall, *on the basis of sex*, be excluded from participating in, be denied benefits of, or be subject to discrimination under any education program or activity receiving Federal financial assistance ...." 20 U.S.C. § 1681 (emphasis added). Importantly, notwithstanding its length, Plaintiff's complaint fails to include any non-conclusory allegations of gender discrimination. *E.g.*, Dkt. 17 ¶ 2 (alleging gender and other forms of discrimination in summary manner). Most of Plaintiff's allegations which she includes as evidence of gender discrimination do little more than combine allegations of an allegedly flawed proceeding, with a conclusory allegation of gender discrimination. *See id.* ¶ 257. But "allegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination are not sufficient to survive a motion to dismiss." *Streno v. Shenandoah Univ.*, 278 F. Supp. 3d 924, 929 (W.D. Va. 2017) (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)).

Plaintiff cites several points that she believes shows gender discrimination, though they are unconnected to the circumstances of her case. First, she cites demographic statistics of the students enrolled in the CES program, which shows that 25 percent of the overall student body is currently male, while just 6 percent of newly-admitted students are male. She believes that "may be

18

evidence" that a "larger percentage of women are forced to leave the program due to unjust remediation due to gender." Dkt. 17 ¶ 396.; *see id.* ¶ 399. This argument is counterintuitive and asks the court to rely on unreasonable inferences without any factual allegations to back them up. If anything, Plaintiff's statistic would seem to show the CES program, which already is composed of a majority of female students, is taking on an even higher percentage of female applicants. Second, Plaintiff cites another case that was before this Court in which another plaintiff raised allegations of gender discrimination. *Id.* ¶ 397. Subsequently, however, the Court held that plaintiff failed to state a gender discrimination claim and dismissed that case, which is currently on appeal. *See Owen v. Liberty Univ.*, 2020 WL 1856798.

In any event, a plaintiff must "allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Yusuf*, 35 F.3d at 715. Again, here, Plaintiff has made has no allegations concerning gender discrimination against her that are not conclusory or devoid of factual content. While she alleges that she is subject to "different rules than those of her male classmates," Dkt. 17 ¶ 395, she does not describe in what manner that is the case, much less allege any comparator.[5] To the extent Plaintiff raises a retaliation claim against Liberty for her filing a Title IX complaint, Dkt. 17 ¶¶ 401–22, Plaintiff has not alleged a causal connection between the filing of her Title IX complaint and her dismissal from the CES program nearly a year later. *See, e.g.*, *Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998) ("Thirteen months passed

---

[5] To the extent Plaintiff raises a claim of a hostile work environment, including based upon a joke made by the former President of Liberty about the "Me Too" movement, that claim fails as well. Dkt. 17 ¶¶ 398–400. Plaintiff has not alleged facts about how she was discriminated against on the basis of gender, and she has not met several elements of a prima facie claim of a hostile work environment: that but for her sex, Plaintiff would not have been the victim of discrimination, or that such conduct was "sufficiently severe or pervasive" so as to alter the conditions of her employment. *Pueschel v. Peters*, 577 F.3d 558, 565 (4th Cir. 2009).

between his initial charge and termination. A thirteen month interval between the charge and termination is too long to establish causation absent other evidence of retaliation.").

The Court will therefore dismiss *with prejudice* Plaintiff's claim of gender discrimination.

## Count VIII (Negligence)

Plaintiff next raises a claim of negligence against the Liberty Defendants. Dkt. 17 ¶¶ 423–31. Plaintiff asserts that the Liberty Defendants owed her various duties of care, including a duty of care (1) "in hiring and retaining qualified employees" to conduct "fair" and "impartial" investigations, including for Title IX, disability, academic and disciplinary matters; (2) in "hiring and retaining counseling-programs faculty who are professional and competent pursuant to the [American Counseling Association's] code of ethics; (3) to ensure faculty and those "who hold power and authority to determine a student's guilt or innocence" are "properly trained" and "professional competent"; (4) "to ensure trained investigators are utilized when appropriate," who are "trained in Title IX, disability law, higher education law, and the like"; (5) to protect students from any "biased" or "conflicted" judgment of faculty; (6) on account of the expert knowledge of trauma that many in the CES department possessed, indeed owing students a "special duty of care" in this regard. *Id.* ¶ 425.

"There can be no actionable negligence unless there is a legal duty, a violation of the duty, and consequent damage." *Fox v. Curtis*, 372 S.E.2d 373, 375 (Va. 1988). Whether such a legal duty exists is a pure question of law. *Burns v. Gagnon*, 727 S.E.2d 63, 641 (Va. 2012). Plaintiff's claim fails because Virginia law does not support a duty of care between a college or its administration and its students, such as Plaintiff has alleged.

In *Jackson v. Liberty University*, this Court rejected a student's negligence claim based on similar purported duties of care to, for example, "develop[ ] and implement[ ]" "fair and equitable

policies in accordance with the requirements of Title IX," "fully and properly investigat[e] claims of retaliation," and "ensur[e] staff were properly trained to process reports of retaliation." 2017 WL 3326972, at *8. However, the Court concluded that Virginia case law "does not support a college or its administrators having the duties of care asserted in these circumstances." *Id.* at *9. The Eastern District of Virginia recently rejected a similar claim of negligence based on allegations that Marymount University owed its students a "duty to exercise special care throughout [plaintiff's] disciplinary proceedings," and a "duty to be fair" in such proceedings. *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 589 (E.D. Va. 2018). In that case too, the court concluded that such a negligence claim "is not currently recognized in Virginia," and the federal court would not recognize a new common law tort not previously recognized by the Supreme Court of Virginia or Virginia Court of Appeals. *Id.* at 589–90; *see also Doe v. Va. Wesleyan Coll.*, No. CL14-6942-01, 2015 WL 10521466, at *10 (Va. Cir. Ct. 2015) (stating that "the college/student relationship does not constitute a special relationship that would impose a duty on [the college] to warn or protect [a student]"); *Schieszler v. Ferrum Coll.*, 236 F. Supp. 2d 602, 608–09 (W.D. Va. 2002) ("[I]t is unlikely that Virginia would conclude that a special relationship exists as a matter of law between colleges and universities and their students.").

Plaintiff lastly argues that Liberty Defendants owed her a duty of care to hire faculty who are competent pursuant to the ACA's code of ethics, and also that they owed her a "special duty of care" due to the "expert knowledge of trauma that many in the CES department possessed." Dkt. 17 ¶ 425. This Court has already found "unavailing" a similar argument that Liberty faculty at CES must be "professionally bound to abide by the ACA's code of ethics," when, "[r]egardless of the professional licensing status of its faculty, Virginia law does not recognize any special relationship between a university, its faculty, and its students." *Owen*, 2020 WL 1856798, at *10;

*see also Chitty v. Liberty Univ.*, No. 6:13-cv-43, 2013 WL 3877664, at *1 n.2 (W.D. Va. July 25, 2013) (rejecting negligence claim based on argument that law school breached duty of care by refusing to comply with American Bar Association rules in its treatment of plaintiff).

As Plaintiff has not alleged that Liberty Defendants owed her any legal duty, the Court will dismiss her negligence claim *with prejudice.*

<u>Counts IX & X (Defamation and Defamation Per Se)</u>

Plaintiff also brings claims against all defendants for defamation, Dkt. 17 ¶¶ 432–38, and defamation per se, *id.* ¶¶ 439–52.

In Virginia, a claim for defamation must allege "(1) publication of (2) an actionable statement with (3) the requisite intent." *Schaecher v. Bouffault*, 772 S.E.2d 589, 594 (Va. 2015). An "actionable statement" is one that is "both false and defamatory." *Id.* It is not enough for language to be "insulting, offensive, or otherwise inappropriate, but constitutes no more than 'rhetorical hyperbole,'" to be defamatory; rather, defamatory language "tends to injure one's reputation in the common estimation of mankind, to throw contumely, shame, or disgrace upon him, or which tends to hold him up to scorn, ridicule, or contempt, or which is calculated to render him infamous, odious, or ridiculous." *Id.* Defamation per se must be based on language which "can reasonably be understood to suggest that a person is unfit in his or her trade." *Va. Citizens Def. League v. Couric*, 910 F.3d 780, 784 (4th Cir. 2018). Courts "must decide as a threshold matter of law whether a statement is reasonably capable of defamatory meaning before allowing the matter to be presented to a finder of fact." *Id.* at 784 (quoting *Schaecher*, 772 S.E.2d at 595).

First, the Court concludes that Plaintiff's defamation claims against Shield Ministries Defendants fail. The language about which Plaintiff complains does not rise to the level of "defamatory language' under Virginia law. For instance, she alleges that Shield Ministries

Defendants told Liberty that Plaintiff "represented herself as an 'agent' of Shield Ministries," when it was "very clear that [she] was not an agent of Shield Ministries at any time." Dkt. 17 ¶ 435 (m) (emphasis omitted). Another example Plaintiff cites: Shield Ministries Defendants told Liberty that Plaintiff "was speaking to a volunteer when [the Trulucks] were not available," she claims to have been speaking to a member of Shield Ministries' board of directors. *Id.* ¶ 435(n). Not only do these allegations not rise to the level of "defamatory," it is difficult to discern how they are at all insulting, offensive, or inappropriate. Plaintiff's conclusory, speculative allegation that the Shield Ministries Defendants "may have defamed" her "to others," *id.* ¶ 435(p), is not entitled to a presumption of truth and does not make the other challenged language any more defamatory.

Although Plaintiff purported to bring a defamation per se case against all defendants, *id.* at p. 113, Plaintiff appears to focus her claims on statements by and between Liberty Defendants, *id.* ¶¶ 444–48. And, indeed, Plaintiff concedes that "[i]t is unknown if anyone from Shield Ministries committed defamation *per se* about [Plaintiff] to Liberty University from March 2017 to the present." *Id.* ¶ 449. Accordingly, Plaintiff has also failed to allege a plausible claim of defamation per se against Shield Ministries Defendants.

Second, the Court concludes that Plaintiff also has failed to state a claim for defamation or defamation per se against the Liberty Defendants. The statements that Plaintiff specifically cites as defamatory fall far short of the requisite standard. Some of Plaintiff's examples are conclusory and devoid of further factual elaboration. *E.g.*, *id.* ¶ 436(q) (alleging that a report, "the contents of which are not known … contain[ ] one or more defamatory allegations against [Plaintiff]"); *id.* ¶ 436(r) (alleging that Liberty Defendants "intentionally defamed [Plaintiff] through multiple injurious and/or untrue statements to other defendants as well as to others"); *id.* ¶ 436(s) (writing that "[i]n Summer and Fall 2018, when [Plaintiff] attempted to discuss Liberty's inability to allow

her to submit a Title IX case, false and defamatory statements were made by one or more of the Liberty Defendants").

Where Plaintiff's allegations have more factual content, they too fall short of defamation. For instance, Plaintiff challenges a statement made apparently in an internal Liberty University document that Plaintiff had "stated that she was planning to seek consultation before deciding whether to attend a meeting with faculty later that month." *Id.* ¶ 236. Another challenged statement from Liberty apparently suggested that Plaintiff had previously threatened "legal action," and that she "decline[d] when asked to clarify her intentions." *Id.* ¶ 272. These statements, and others that Plaintiff challenges, can scarcely be understood as inappropriate or disparaging, as Plaintiff seems to characterize them. In any event, they fall well short of the standard that a defamatory statement be one which "tends to injure one's reputation in the common estimation of mankind," or would be such as to render one "infamous, odious, or ridiculous." *Shaecher*, 772 S.E.2d at 594.

Plaintiff's defamation and defamation per se claims against the Liberty Defendants also fail because any allegedly defamatory statements made by them would be protected by qualified privilege. In Virginia, "qualified privilege attaches to communications between persons on a subject in which the persons have an interest or duty." *Cashion v. Smith*, 749 S.E.2d 526, 632 (Va. 2013) (internal quotations and alterations omitted). Whether a communication is protected by qualified privilege is a question of law for the court to decide. *Smalls v. Wright*, 399 S.E.2d 805, 807 (Va. 1991). As Plaintiff was a doctoral candidate in Liberty University's CES program and was then enrolled in internships to complete her Liberty degree, the Liberty Defendants (including the University and faculty members in or related to the CES program), had a interest and duty in tracking and assessing Plaintiff's grades, performance at authorized or unauthorized internships, and any disputes with sponsors of internship programs. Plaintiff takes issue with Liberty

24

Defendants' statements regarding these subjects, but they are all "clearly relevant to the subject of Plaintiff's fitness as a candidate for that program," *Owen*, 2020 WL1856798, at *13, and accordingly, Liberty Defendants are protected by qualified privilege. Plaintiff also fails to allege any facts that would demonstrate malice sufficient to defeat an assertion of qualified privilege. Furthermore, because the Liberty Defendants' allegedly defamatory statements appear to be internal communications, Dkt. 17 ¶¶ 236, 272, 436, Plaintiff's defamation claims also fail because she has not alleged "publication" of any defamatory statements. *Schaecher*, 772 S.E.2d at 594.

Accordingly, the Court will dismiss *with prejudice* Plaintiff's defamation and defamation per se claims.

<u>Count XI (Civil and Statutory Conspiracy)</u>

Plaintiff further raises a "civil and statutory conspiracy" claim. Dkt. 17 ¶¶ 453–57. Plaintiff alleges that "more than one of the defendants was involved in a civil conspiracy" against her, and that "Defendants engaged in concerted action, with legal malice," that caused injury to Plaintiff's reputation, business and profession. *Id.* ¶¶ 453, 455.

Plaintiff appears to ground her statutory conspiracy claim at least in part on Virginia Code §§ 18.2-499 and 500. Dkt. 17 ¶ 486. Virginia Code § 18.2-499 states, in relevant part, that "[a]ny two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of (i) willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever … shall be jointly and severally guilty of a Class 1 misdemeanor." Virginia Code § 18.2-500 creates a private cause of action for parties injured under this statute. "To ultimately prevail under the Virginia conspiracy statute, a plaintiff must prove by clear and convincing evidence the following elements: (1) concerted action; (2) legal malice; and

(3) causally related injury." *Schlegel v. Bank of Am., N.A.*, 505 F. Supp. 2d 321, 325 (W.D. Va. 2007).

Plaintiff's conspiracy claims fail for numerous reasons. At the outset, she fails to articulate even the rough contours of, much less develop with factual allegations, the conspiracy she challenges. Plaintiff's three sparse allegations on this claim assert that "more than one" of the Defendants was "involved in a civil conspiracy against Plaintiff," and that such Defendants "engaged in concerted action, with legal malice," damaging her "reputation, business, and profession." Dkt. 17 ¶¶ 453–55. The rest of the complaint offers little further indication of the nature of Plaintiff's conspiracy claim. Plaintiff alleges that "Liberty's conspiracy included saying one thing in emails to [Plaintiff] and other things in Liberty University's databases …." *Id.* ¶ 25. The alleged conspiracy also appears to involve Liberty University telling its employees that Plaintiff already had "plenty of opportunities to ask for an investigation," in purporting to be a "conspiracy to prevent the investigation" Plaintiff requested into the internship site. *Id.* ¶ 27; *id.* ¶ 297 (alleging conspiracy to "retaliate[ ] against Plaintiff at every turn" and to "personally and professionally" harm her). Plaintiff fails to include allegations of fact, taken as true, that would establish a plausible conspiracy claim or individually satisfy any or all three of the elements of statutory conspiracy. Notably absent are allegations of any meeting of the minds or agreement to act in concert, or any allegations that any alleged coconspirator engaged in any illegal, wrongful or tortious conduct. And while courts are required to liberally construe pro se litigants' filings, that does not mean courts should take on the role of advocate for a pro se litigant and develop arguments for them they have not themselves raised. *Gordon v. Leeke*, 574 F.2d 1147, 1152 (4th Cir. 1978).

Plaintiff's conspiracy claim also fails because she alleges a conspiracy among employees of Liberty University. Dkt. 17 ¶¶ 25, 27. Under Virginia's doctrine of "intracorporate immunity,"

a single entity cannot conspire with itself. *Walsh v. Logothetis*, No. 3:13-cv-401, 2014 WL 229588, at *12 (E.D. Va. Jan. 21, 2014) (holding that the doctrine of intracorporate immunity protects all defendants qualifying as agents of Virginia Commonwealth University). To the extent Plaintiff raises this claim against the Shield Ministry Defendants, the doctrine of intracorporate immunity would bar claims against them as well. Accordingly, the Court will dismiss Plaintiff's civil and statutory conspiracy claim *with prejudice*.

<u>Count XII (Intentional Infliction of Emotional Distress)</u>

Claims of intentional infliction of emotional distress carry a "disfavored status" under Virginia law. *A.H. v. Church of Christ, Inc.*, 831 S.E.2d 460, 476 n.18 (Va. 2019). To state a claim for intentional infliction of emotional distress ("IIED"), the plaintiff must plead the following: (1) the defendant's conduct was intentional or reckless; (2) the conduct was outrageous or intolerable; (3) there was a causal connection between the defendant's conduct and the plaintiff's emotional distress; and (4) the resulting emotional distress was severe. *Supervalu, Inc. v. Johnson*, 666 S.E.2d 335, 369–70 (Va. 2008). It is "not enough" for conduct to be "[i]nsensitive and demeaning" to satisfy the second element of an IIED claim; rather, it must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Eldib v. Bass Pro Outdoor World, L.L.C.*, 654 F. App'x 620, 621 (4th Cir. 2016) (per curiam) (quoting *Harris v. Kreutzer*, 625 S.E.2d 24, 33 (Va. 2006)).

Plaintiff's IIED claim fails because she has not satisfied the second element of the claim—that Defendants engaged in outrageous or intolerable conduct. Plaintiff asserts that the Liberty Defendants "should have known that [their] actions in finding [Plaintiff] responsible for its faculty member's [sic] patently frivolous and untrue charges, in creating and conducting a fundamentally

27

flawed processes, and in sanctioning [her] by effectively labelling her as professionally impaired, unethical and incompetent," which caused her "severe emotional distress." Dkt. 17 ¶ 463. Plaintiff further alleges that Liberty Defendants' actions were "willful and intentional on many occasions, including … throughout 2015 to 2018." *Id.* ¶ 461. As to the Shield Ministries Defendants, Plaintiff claims that they should have known that their "patently untrue descriptions of [her] behavior to Liberty Defendants" would cause her "severe emotional distress." *Id.* ¶ 464. She also argues that their "actions … were willful and intentional." *Id.* ¶ 462.

Plaintiff repeatedly calls Liberty's conduct and that of the internship site "abusive," "coercive," "unsafe" "illegal," even "criminal," but any underlying challenged conduct is a far cry from those characterizations. *E.g.*, *id.* ¶¶ 25, 37, 84, 95, 110, 114, 116, 181, 188, 289. Taken in the light most favorable to her, Plaintiff alleges she had to work at an internship in which, among other things, her supervisors required her to repeatedly rewrite her clinical notes, *id.* ¶¶ 86–93, 120; she had to sign onto a "remediation plan" following a concededly poor performance in a counseling session, *id.* ¶¶ 81–85; and Liberty staff were slow to respond to her repeated entreaties and not interested in investigating or conducting a site visit to the internship site which would be a six-hour drive away from Liberty, *id.* ¶¶ 111(c), 114. Ultimately, Liberty gave her a "C" for the semester and denied her grade appeals, and denied her requests to investigate further, but nonetheless permitted Plaintiff in the Fall 2016 semester to participate in another counseling internship as part of her program. *Id.* ¶¶ 144, 169–71, 179. But that next semester's internship fared no better: Liberty took the position that Plaintiff had been interning at an unauthorized site, Shield Ministries, rather than Win4Life, and expelled her as a result, *id.* ¶¶ 198–200; or, as Plaintiff elsewhere alleges, Liberty expelled her after she notified Liberty "that the partnership between Win4Life and Shield Ministries was being dissolved" on account of "an erratic individual she was

interacting with at Shield Ministries, who Dr. Deacon then proceeded to trust instead of [Plaintiff]." *Id.* ¶ 42.

As for the Shield Ministries Defendants, Plaintiff alleges that they "made false reports to Dr. Deacon of Liberty University about [Plaintiff] and the partnership," and that Dr. Deacon "chose to believe" them rather than her. *Id.* ¶¶ 45–46. Other allegations are of a similar nature. *E.g.*, *id.* ¶ 8 (alleging they supplied "incorrect 'information'" to Liberty); *id.* ¶¶ 216–29 (describing communications between Shield Ministries Defendants, Plaintiff and/or Liberty, including a request to Plaintiff that she suspend all counseling at Shield Ministries).

Accepting all Plaintiff's well-pleaded allegations of fact as true, this conduct alleged by either set of defendants does not rise to the level of "outrageous or intolerable," as required to state a claim for IIED—it is simply not "so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Almy v. Grisham*, 639 S.E.2d 182, 187 (Va. 2007). In one relevant case, *Harris v. Kreutzer*, the Supreme Court of Virginia considered an IIED claim brought by a plaintiff against a doctor who treated her for a traumatic brain injury brought about by a car accident. 624 S.E.2d 24. The court held that the plaintiff had not suffered such "outrageous" treatment from the defendant doctor to state an IIED claim, though he allegedly "verbally abused [her], raised his voice to her, caused her to break down in tears in his office, stated she was 'putting on a show,' and caused her of being a faker and malingerer," all despite the fact that the doctor knew she had a "medical history of a nervous problem, had been the victim of armed robberies, suffered from post-traumatic stress disorder, and was suicidal." *Id.* at 27 n.5. If this conduct does not suffice to state an IIED claim, then neither do the allegations that Plaintiff states in this case. In any event, many of Plaintiff's most stringent allegations of "abuse" bear little relation to the underlying facts

alleged, and most of Plaintiff's claims are more similar to those raised in *Owen v. Liberty*—having to "endure what she calls a 'fundamentally flawed' remediation process" and grade appeals which Plaintiff believes were unfair and did not comport with Liberty's own handbook and procedures. *See* 2020 WL 1856798, at *19–20 ("[F]ederal courts sitting in diversity, adjudicating IIED claims under Virginia law, have found facts far worse than these not to be outrageous as a matter of law") (citing authorities). Accordingly, the Court will dismiss Plaintiff's IIED claim *with prejudice*.

### Count XIII (Negligent Infliction of Emotional Distress)

Like claims of IIED, a claim for negligent infliction of emotional distress ("NIED") is also disfavored under Virginia law. *Burnopp v. Carter Bank & Tr.*, No. 4:20-cv-52, 2020 WL 6875037, at *3 (W.D. Va. Nov. 23, 2020); *Earley v. Marion*, 540 F. Supp. 2d 680, 690 (W.D. Va. 2008) ("Virginia courts hold litigants to a rigorous standard for negligent infliction of emotional distress claims.").

To survive a motion to dismiss, a plaintiff raising an NIED claim must allege sufficient facts to demonstrate that the plaintiff suffered from a physical injury that was the "natural result of fright or shock proximately caused by the defendant's negligence." *McClary v. Greyhound Lines, Inc.*, No. 7:17-cv-98, 2017 WL 3725992, at *2 (W.D. Va. Aug. 29, 2017). A plaintiff also must establish that the defendant breached "an underlying tort duty of care." *A.H. v. Church of Christ, Inc.*, 831 S.E.2d at 477. Plaintiff's NIED claim against the Liberty Defendants fails as a matter of law for this reason, because the Court has already concluded that Plaintiff has not established that Liberty Defendants owed her any such duty.

As to the Shield Ministries Defendants, while Plaintiff purports to raise her NIED claim against all defendants, the only allegations she raises in that claim concern conduct by Liberty Defendants, not Shield Ministries Defendants. Dkt. 17 ¶¶ 469–74. The Court will not step in as an

advocate for Plaintiff and craft an argument for a claim to relief when Plaintiff has not done so. *See Gordon v. Leeke*, 574 F.2d 1147, 1152 (4th Cir. 1978). In any event, to establish a claim for NIED, a plaintiff must sufficiently allege she suffered physical injury that was a natural result of a fright or shock proximately caused by the defendant's negligence, and thus, there is a "clear and unbroken chain of causal connection between the negligent act, the emotional disturbance, and the physical injury." *Hughes v. Moore*, 197 S.E.2d 214, 219 (Va. 1973). Plaintiff has not pleaded, nor could she plead, against either set of Defendants, that she suffered any experience that would result in "fright or shock" and cause physical injury of the sort recognized in *Hughes*.[6]

Accordingly, the Court will dismiss Plaintiff's NIED claim *with prejudice*.

## Conclusion

For these reasons, the Court has in an accompanying Order, Dkt. 49, dismissed *with prejudice* all of Plaintiff's claims, except Plaintiff's claim of Disability Discrimination (Count VI), which is dismissed *without prejudice*. The Court affords Plaintiff leave to amend to include and clearly identify any factual allegations to support her claim that she was discriminated against on account of her child's disabilities, as more fully described herein. The Court affords Plaintiff leave to file a Third Amended Complaint no later than December 21, 2020.

The Clerk of Court is directed to send this Memorandum Opinion to all parties in the case.

Entered this ___4th___ day of December, 2020.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE

---

[6] In *Hughes*, "Plaintiff was standing in a doorway in her house between the kitchen and living room, looking through a picture window, when she heard a noise and saw the headlights of defendant's car shining into her living room. The car crashed into the front porch of the house, and after the initial collision the car moved back and forth across the porch several times." 197 S.E.2d at 215.